

FILED
2024 Mar-27 PM 01:31
U.S. DISTRICT COURT
N.D. OF ALABAMA

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ALABAMA**
**JASPER DIVISION**

| | |
|---|---|
| **CLAYTON ANTWAIN SHANKLIN,** ) | |
| ) | |
| **Petitioner,** ) | |
| ) | |
| **vs.** ) | **6:20-cv-2020-LSC** |
| ) | |
| ) | |
| **JEFFERSON DUNN,** ) | |
| **Commissioner, Alabama** ) | |
| **Department of Corrections,** *et al*. ) | |
| ) | |
| **Respondents.** ) | |

**MEMORANDUM OF OPINION**

This matter is before the Court on the amended petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner Clayton Antwain Shanklin ("Shanklin"), a death row inmate at Holman Correctional Facility in Atmore, Alabama. (Docs. 24 & 25-1 (sealed)). Shanklin challenges the validity of his 2011 capital murder convictions and death sentence in Walker County, Alabama. Shanklin was convicted of one count of capital murder for killing Michael Crumpton ("Michael") during the course of a first-degree robbery, in violation of section 13A–5–40(a)(2) of the Code of Alabama; a second count of capital murder for killing Michael during the course of a first-degree burglary, in violation of section 13A–5–

40(a)(4), Ala. Code; and one count of attempted murder for attempting to cause the death of Ashley Crumpton, Michael's wife, in violation of sections 13A-4-2 and 13A-6-2, Ala. Code. Shanklin's amended petition raises allegations of ineffective assistance of trial counsel, error by the trial court, and prosecutorial misconduct. He also claims that he should not be executed for a variety of reasons.

Upon thorough consideration of the entire record and the briefs submitted by the parties, the Court finds that Shanklin's amended petition for habeas relief is due to be denied.

## I.    FACTS OF THE CRIME

The Alabama Court of Criminal Appeals ("ACCA") summarized the facts of this case in its opinion on direct appeal, as follows:

> The evidence introduced at trial established the following: On October 11, 2009, Shanklin sent Tracy Ward, his girlfriend, a text message telling her that he wanted to "meet up" and smoke marijuana. Ward then drove to Parrish[, Alabama], to pick up Shanklin at his grandmother's house; she arrived at approximately 9:00 p.m. Ward and Shanklin then drove to Shanklin's mother's house and, thereafter, drove to the Warrior River Apartments in Cordova, because Ward was going to purchase marijuana from her long-time friend, Michael. Ward telephoned Michael and told him that she would be coming by his apartment to purchase marijuana. According to Ward, Shanklin had never been to Michael's apartment and he stayed in the vehicle when she went into Michael's apartment to purchase the marijuana.
>
> When Ward entered Michael's apartment, she saw Michael, Ashley [Crumpton], Michael's mother, Lori Crumpton, and Michael's uncle, Lonnie Beard. Ward and Michael went into the master bedroom

where Ward paid Michael $25 for one gram of marijuana. According to Ward, when Michael gave her the marijuana she observed more marijuana "in individual sacks" and also observed "a stack of cash." According to Ashley, when Ward and Michael returned from the master bedroom, Ward said, "'Y'all have a lot of money.'" (R. 590.) Ward then left Michael's apartment and returned to her vehicle.

Ward and Shanklin left the apartment complex and, according to Ward, Shanklin asked her whom she had seen in the apartment, how much marijuana she had seen in the apartment, and what kind of marijuana she had seen in the apartment. Ward told Shanklin that she had seen "only a few sacks" of marijuana but that it was "hydro," which, she said, means "a very high grade of marijuana." Ward told Shanklin that she had seen "a stack of money in there also." Ward and Shanklin returned to Parrish, where they went to an abandoned house and smoked the marijuana. Thereafter, Ward told Shanklin that she was going to go home; Shanklin, however, told Ward that he wanted to go to Jasper to pick up his cousin Kevin Shanklin ("Kevin"). Ward stated that she suspected that Shanklin and Kevin were going to rob Michael because Shanklin had mentioned "earlier that he wanted to go in there," presumably talking about Michael's apartment.

Ward then drove Shanklin to Kevin's house. Shanklin went inside Kevin's house where he remained for approximately 20 minutes; thereafter, both Shanklin and Kevin came out of Kevin's house and got into Ward's vehicle. Shanklin then told Ward that they wanted to go to "Jeremiah's" apartment—Jeremiah, like Michael, lived at the Warrior River Apartments. Ward then drove Shanklin and Kevin to the Warrior River Apartments and let them out in front of Jeremiah's apartment sometime "before midnight." According to Ward, Shanklin sent her approximately 100 text messages between 11:49 p.m. and 2:40 a.m. Although Ward stated that she knew what was going to happen, she did nothing to stop it. FN 1

> FN 1. Ward testified that she pleaded guilty to murder, *see* § 13A–6–2(a)(3), Ala. Code 1975, and, as a result of a plea agreement, was sentenced to 20 years' imprisonment, which sentence was split and she was ordered to serve 5

years' imprisonment. According to Ward, as part of her plea agreement, she "agreed to tell the truth on every related matter of this case." (R. 685.)

According to Ashley, after Ward left the apartment, the family continued to watch television. Around midnight Ashley decided to go to sleep in the master bedroom; Michael and Lonnie, however, stayed awake. At that time, Michael and Ashley's two-year-old and eight-month-old children were asleep in the bedroom they shared, which was adjacent to the master bedroom. Around 1:30 a.m., Ashley awoke and went outside to smoke a cigarette, and Michael joined her—Lonnie had already left the apartment. Michael and Ashley then went back inside the apartment, checked to make sure the doors were secured, and went to sleep in the master bedroom.

Thereafter, Ashley was awakened by voices, and she attempted to wake Michael but she noticed someone in the room. Ashley then lay back down because, she said, she "was going for [her] gun," which was normally kept under her pillow; her gun, however, was not there. Ashley then sat up in the bed, and the individual next to the bed pulled out a gun, which she described as a silver, revolver-type gun, and said, "'Bitch, don't move.'" Ashley also saw a second individual at the foot of the bed. According to Ashley, the individual with the gun was wearing a ski mask and the individual at the foot of the bed was wearing a bandana, which, she said, covered only the bridge of his nose and his mouth. Ashley screamed at them to get out of the apartment.

At that time, the individual wearing the ski mask fired the gun, hitting her in the upper thigh. The individual wearing the ski mask then gave the gun to the individual wearing the bandana, who then "put[ ] the gun in [her] face and pull[ed] the trigger three times"; the gun, however, misfired, and he passed the gun back to the individual wearing the ski mask. While the gun was in her face, Ashley noticed that the individual wearing the bandana had "[l]ight skin . . . [and] a scar on the right side of his face." (R. 609.) After the individual wearing the bandana handed the gun back to the individual wearing the ski mask, Ashley began fighting the individual wearing the bandana, and Michael awoke and began yelling at the two individuals.

4

According to Ashley, the two individuals also had in their possession "big and bulky looking" rocks, which, she said, appeared to be from the nearby railroad tracks. As Ashley was fighting the individual wearing the bandana, he struck her twice in the chest with the rock. Ashley, however, was able to "get the rock from his hand and start striking him with it." (R. 611.) Then the individual wearing the ski mask struck Michael on the head with a rock and the individual wearing the bandana escaped from Ashley and ran "back down the hallway." (R. 611.) Ashley then turned to help Michael fight the individual wearing the ski mask. According to Ashley, while Michael was facing the wall, the individual wearing the ski mask "had the gun pointed at Michael's back. . . . [and] [h]e pull[ed] the trigger and sho[t] him four times in the back." (R. 612.) Michael grabbed his back in pain, and the individual wearing the ski mask attempted to run out of the master bedroom. Ashley, however, grabbed him, trapped his head in the bedroom door, and "was hitting him with the door and his head against the wall." (R. 613.) Ashley then turned on the bedroom lights and, because the ski mask had come off during the struggle, Ashley saw the side of his face. While Ashley had the individual with the ski mask pinned in the doorway, Michael got up from the bedroom floor with a gun in his hand and told Ashley "to get out." At that point Ashley let go of the individual with the ski mask. According to Ashley, the individual with the ski mask ran down the hallway into the living room where the individual with the bandana was waiting, and the two left the apartment.

Ashley then went to Michael and they both walked down the hallway. Ashley then looked into her children's room and noticed that her children were both awake and in the eight-month-old's crib; Ashley explained that she did not know how the two-year-old ended up in the crib. Then, according to Ashley, the following occurred:

> "[W]e both walked to the sofa, the loveseat, and he has his gun in his hand and I asked him just to put it down and he drops the gun on the couch. And I asked him if he was okay, and he looked at me and asked me if I were okay and he said no. And I told him I was fine, I had just been shot in the leg. I went to try to open the front door and my hands

were shaking so bad I couldn't open it so he opened it for me. And I told him I was going to call an ambulance so I ran back down the hallway to get our phone that usually sits on the computer stand.

"....

"[Michael] looked pale. He couldn't breathe and he was just hurting."

(R. 617–18.) Ashley could not find her telephone and told Michael that she was going to Karen Nicholson's apartment to telephone an ambulance. On the way to Nicholson's apartment, Ashley saw her upstairs neighbor, Steven Madison, and told him what had happened to Michael. Madison went to Michael's apartment to tend to Michael, and Ashley went to Nicholson's apartment to telephone an ambulance. When Ashley arrived at Nicholson's apartment, which, Nicholson stated, was around 3:00 a.m., Nicholson would not let Ashley leave because Nicholson "was afraid that [the intruders] were still on the grounds." Nicholson then telephoned 911. FN 2

> FN 2. According to the evidence presented at trial, multiple telephone calls reporting the incident were made to 911.

According to Madison, when he entered Michael's apartment he saw Michael "slumped over the arm of the couch and [he saw Michael's] oldest daughter standing in the hallway." (R. 1393.) Madison moved Michael from the couch to the floor in front of the apartment door. Madison stated that Michael looked like "he was trying to hang on." (R. 1395.) Madison told Michael "to try to hang on and somebody was going to call 911." (R. 1396.) While Madison was tending to Michael, Madison's wife came downstairs and took Michael's children from the apartment. Shortly thereafter, Michael died, which Madison described as "[j]ust a gasp, you know, it was his last breath leaving." (R. 1399.) Madison then attempted to perform C.P.R. on Michael, but was unsuccessful. According to Madison,

Michael appeared to be focused and maintained eye contact with Madison until he died.

According to Ashley,

> "[a]s [she] was sitting there on the couch, [she] could hear [Madison] talking to Michael and said, 'Come on, man. I'll take you over there.' And they were trying . . . to get out of the apartment. And they never made it out of the apartment."

(R. 621.) Shortly after 3:00 a.m., paramedics and law enforcement arrived at the apartment.

Josh Bankston, a paramedic with Regional Paramedic Services in Jasper, responded to the 911 call. Bankston assessed Michael and determined that Michael showed no signs of life. Bankston stated that Michael was "apneic and pulseless," and Michael was declared dead on the scene. After the paramedics treated Ashley, she was taken by way of ambulance to the hospital. Keith Concord, the head investigator for the Cordova Police Department, went with Ashley to the hospital. Ashley was treated and released from the hospital the same day. When she was released from the hospital, Ashley went directly to the courthouse to speak with Investigator John Softley and Investigator Frank Cole. Ashley described to Investigator Cole and Investigator Softley the two men who had shot her and Michael. Specifically, Ashley told them:

> "[T]hey were two black males, both wearing masks, dark clothing, anywhere from 5′11″ to maybe 6 feet tall.
>
> " . . . .
>
> "I told them they were small in size.
>
> " . . . .

Case 6:20-cv-02020-LSC   Document 43   Filed 03/27/24   Page 8 of 176


". . . I told them that the guy at the foot of the bed had a scar on the right side of his face, kind of, I told them they both kind of had big ears."

(R. 625.)

Shortly after 3:00 a.m., Shanklin sent Ward a text message asking her to come pick him up. Although Ward initially declined to do so, she eventually agreed. Ward stated that Shanklin told her to pick him up on River Road, which, she said, was "[b]y the asphalt plant by the railroad tracks." (R. 721.) According to Ward, when she arrived at River Road, it was raining and Shanklin and Kevin appeared to be "[s]cared, terrified, [and] nervous" (R. 722), and Shanklin was not wearing shoes. When Shanklin got into Ward's car, Ward asked him what was wrong and Shanklin told her, "[w]e shot him." (R. 725.) Shanklin told Ward to drive to Kevin's house. When they arrived at Kevin's house, Kevin got out of the car and then Shanklin and Ward drove to Shanklin's grandmother's house in Parrish. According to Ward, Shanklin told her that, if anyone asked, she was to tell them that she had not seen him.

After being dropped off at his Grandmother's house, Shanklin spoke with his cousin, Isaiah Howze, and told him that "he messed up and killed someone" in an apartment. FN3 At some point, Shanklin also had a conversation with another cousin, Tyrone Dickerson, and, according to Dickerson, Shanklin told him that "some shit went wrong" and that "it was a scuffle and she wasn't backing down. He wasn't backing down." FN 4 (R. 839, 841.)

> FN 3. According to Howze, before October 12, Shanklin had told him that he "had a lick," which, Howze explained, was "a robbery" and that the place had "some weed or some money."

> FN 4. Like Howze, before October 12, Shanklin told Dickerson that he "was gonna . . . hit a lick," which, he said, was going to happen "[s]omewhere in Cordova." (R. 834, 836.)

Later that morning Ward received a "MySpace instant messag[e]" from Shanklin. According to Ward, Shanklin asked her if she had "talked to any police." (R. 729.) By the time Ward had received the instant message from Shanklin, she had learned that Michael had died, and she asked Shanklin if they had killed him. According to Ward, Shanklin did not respond.

Around 5:30 a.m., Shanklin sent Amber Piper, another girlfriend, text messages asking her to come pick him up, and Piper did so. According to Piper, Shanklin left his grandmother's house "with a garbage bag of clothes, threw them in the back of the truck," and they left. Piper stated that Shanklin appeared to be nervous and that she "knew something was wrong." Piper asked Shanklin what was wrong, and Shanklin told her that he had shot somebody. When Piper asked if he had actually shot somebody, Shanklin told her "he was just playing." (R. 764.) Piper stated, however, that she knew something was wrong. Piper and Shanklin then drove to Piper's grandfather's house in Gadsden. While at her grandfather's house, Piper continued to ask Shanklin what was wrong, and, according to Piper, Shanklin told her that he had killed somebody, explaining:

> "He said that earlier that day, the day that the shooting actually happened, the girl Tracy went into the house, unlocked the back door, that she went there to buy weed because the guy that got shot, I guess, sold weed to her. And she went in there and hung out for a little while and unlocked the back door, and later on that night him, [Shanklin], another guy and Tracy went in the house through the back door and proceeded to look around for the drugs and the money. And [Shanklin] walked up to the guy while he was asleep in the bed and put a gun to his back and said, 'MF'er, are you ready to die.' And the guy jumped up and started fighting for his money. [Shanklin] shot him, and [Shanklin] and all of them ran out of the house and jumped in Tracy's parents' car and left. And when they left [Shanklin] threw out the clothes and the gun out the window, and I assume that Tracy went home after she took them home."

(R. 769–70.) Piper stated that, after Shanklin told her that he had shot someone, she was scared, and Shanklin told her that he would kill her and her child if she told anyone. According to Piper, Shanklin then took her cellular telephone because he did not want her to telephone anyone. Piper and Shanklin then went to Piper's mother's house in Albertville.

On October 14, Ashley met with Investigator Softley, Investigator Cole, and Cordova Police Department Chief of Police Kenneth Bobo at the Cordova Police Station. At that time, Ashley was given 29 photographs to look through to see if she could identify the individuals that had been in her apartment. According to Chief Bobo, Ashley

> "was flipping through the stack of photographs and she immediately recognized one photograph and said, 'Oh my God, this is one of them,' and become very hysterical, excited. She kept on flipping through the photographs, flipped through maybe five or ten more, found another picture and said, 'This is the other one, this is the other one,' and she started crying. You know, we had to give her a few moments to recoup herself."

(R. 1165–66.) Ashley identified Shanklin and Kevin. Thereafter, Investigator Cole, Investigator Softley, and Chief Bobo picked up Ward to question her and also arrested Kevin. Around 7:00 p.m., Investigator Cole and Investigator Softley were interviewing a witness, and Investigator Softley received a telephone call from Shanklin. According to Investigator Softley, he

> "stepped outside of the office in another room and I answered the phone and the caller identified himself as Twan. And he asked me, he said, 'John, I heard y'all had been looking for me.' I said, 'Yeah, Antwain,' I said, 'We have.' I said, 'We have a witness up here that we've been talking to them and we need to talk to you and where are you located.' He said, 'I'm in Parrish.' He said, 'Let me talk to Frank.'"

(R. 1510.) Thereafter, Investigator Softley returned to the interview room and told Investigator Cole that Shanklin was on the telephone and wanted to speak with him. According to Investigator Cole, the following conversation occurred:

> "I said, 'Hello.' He said, 'Hey, this is Antwain.' I said, 'What's up man?' Antwain said, 'Man, this shit bad ain't it?' I said, 'Sure is.' I said, 'You need to come up here.' He then stated, 'Man, shit just went crazy.' He said, 'Is there anything you can do for me?' I said, 'Not one thing in the world, Antwain.' I said, 'You need to come on in here.' And Antwain said, 'How bad is it?' And I said it was real bad. I then asked him if he was going to come in and when. He said, 'I'll be there in about two hours,' and that he would call [Investigator Softley] when he got close to Jasper."

(R. 1498–99.) Shanklin, however, did not turn himself in.

Gary Stanfield, the chief investigator at the Boaz Police Department, was contacted by law-enforcement officers from Walker County and was told that Shanklin might be in his area. Investigator Stanfield was provided with a description of Shanklin and information that he might be with a girl from that area and that the girl had family in that area.

On October 15, 2009, Investigator Stanfield visited Piper's family but was informed that, although Shanklin and Piper had been at the house earlier, they had left. Thereafter, Investigator Stanfield stated that he "had gotten with [the] Albertville Police Department" and had begun searching for Shanklin at "some of the lower end motel areas." (R. 1223.) According to Investigator Stanfield, when he pulled into the parking lot of the Royal Inn Motel, he saw Piper getting something out of a vehicle that matched the description and license-plate number provided to him by Walker County law-enforcement officers. Investigator Stanfield then approached Piper and asked her if Shanklin was in the room. Piper told Investigator Stanfield that Shanklin was in

the motel room and gave Investigator Stanfield a key to the room. Thereafter, Investigator Stanfield entered the motel room and took Shanklin into custody.

On October 16, 2009, Investigator Cole and Investigator Softley spoke with Jerrell Thomas. Thomas stated that before October 12, 2009, Shanklin had asked Thomas if Thomas had a handgun and asked if he could use it. Thomas testified that he "told him [he would] see if [he] [could] get it to him" but claimed that he never gave Shanklin the handgun. Thomas, instead, explained that he "gave it to someone," but could not remember whom he had given it to. Thomas explained, however, that the person he gave it to knew Shanklin. Thomas stated that the gun was a silver .32–caliber revolver.

On October 17, 2009, Chief Bobo drove to the Albertville Police Department to pick up Shanklin. According to Chief Bobo, Shanklin, without being questioned, stated that "the girl didn't have nothing to do with this" and that he "just wanted to tell his side of the story." (R. 1143.) Shanklin also asked Chief Bobo how they were able to find him and "said that he bet it was the cell phone." (R. 1143.) Shanklin explained to Chief Bobo that he knew Investigator Softley and that Shanklin "actually called [Softley] on his cell phone." (R. 1143.) Shanklin was then transported to the Walker County jail.

While in the Walker County jail, Shanklin spoke with Joshua Moreland, a trustee. According to Moreland, Shanklin told him what had happened on October 12, 2009, and Shanklin explained that "they" went to Cordova "to rob them. He supposedly had some high grade weed and some cash and he was trying to come up and they were going to make a hit." (R. 849.) Moreland stated that Shanklin then explained:

> "He said that they had went in to rob them and caught them off guard, and the lady, I guess the guy's spouse, attacked the other one, Kevin, attacked him. During the time while she was attacking him, she was shot in the leg. And he said he shot her in the leg. She fell down, and I want to say that he said that the guy was trying to pick up a brick to hit him with it. And then he said he unloaded on him,

fired at him, and I believe he said he hit him in the chest several times."

(R. 851.) Moreland also stated that Shanklin told him that he had "wished he would have killed Kevin" because "it would have been a witness gone." (R. 851, 852.)

While in the Walker County jail, Shanklin also spoke with Kenneth Traywick, another inmate. According to Traywick, Shanklin said that he and Kevin went to Cordova "to rob somebody for some marijuana and some money." (R. 873.) Shanklin told Traywick that he was armed with a handgun and that they shot "a white guy in an apartment complex in Cordova" and "a female, his wife, girlfriend, I don't know, shot her in the leg." (R. 874.) According to Traywick, Shanklin stated that "once they started shooting they kind of got scared and ran." (R. 874.)

Dr. Emily Ward, a medical examiner for the Alabama Department of Forensic Sciences, conducted an autopsy on Michael. According to Dr. Ward, Michael was shot four times in the back. Dr. Ward stated that Michael had "about a liter of blood in the right side of his chest. And there was also blood inside the sac around the heart," which, she said, would indicate that Michael lived for "several minutes" after he was shot. (R. 1453.) Dr. Ward stated that two of the bullets entered Michael's back and that "[b]oth of those wounds . . . just ripped through the muscles of his back and ended up lodged . . . behind his fifth rib and the other one behind his eleventh rib." (R. 1454.) Dr. Ward stated that both of those wounds would cause "severe pain." (R. 1455.) Dr. Ward testified that a third bullet wound entered Michael's "right flank" and "ended up on the left side of the pelvis." Dr. Ward testified that the fourth bullet

> "went through the right side of his back and it went into the mid part of his chest area called the mediastinum. It went through the vena cava which is a vein that returns blood to the heart, and then it went into the heart itself. It went through the right ventricle of the heart and the septum in the middle of the heart. It continued through the

heart and it impacted the inside of the breastbone where we could see a little bit of blood on the inside of the breastbone and then it kind of ricocheted backward into his diaphragm."

(R. 1457–58.) Dr. Ward stated that the fourth bullet caused Michael's death. Dr. Ward agreed that Michael's death would be "a slow, relatively agonizing death" explaining:

> "Once the bullet went through the heart and the vena cava, those areas started to bleed. Because the bullet is coming from the back of the heart to the front, the blood left the sac of the heart first of all and went into the right side of his chest. So, we found about a liter of blood in the right side of his chest and the chest wall is fixed relatively. So if you put a liter of blood, and you can just visualize a two liter bottle of soda and half of that amount of volume is in the right side of his chest so his lung is not going to be able to expand well because the blood is going to keep it from expanding. And that means he can't take a deep breath of air and he is going to get the sensation of smothering or of not being able to breathe. In addition to that, the blood does collect eventually inside that sac around the heart and that is going to mean that his heart can't expand and contract when it beats, so he is going to have a sensation that he is not getting enough blood to his brain and to the rest of his body and at the same time he is suffering from not being able to get a good breath of air, so it would be the equivalent of smothering."

(R. 1461–62.) During the autopsy Dr. Ward recovered four bullets from Michael's body.

Dancy Sullivan, a firearms and toolmarks analyst at the Alabama Department of Forensic Sciences, testified that she received and examined four bullets from Dr. Ward and a fifth bullet that had been recovered from Michael's apartment. Sullivan concluded that they were .32–caliber bullets.

*Shanklin v. State*, 187 So. 3d 734, 745–53 (Ala. Crim. App. 2014) (footnote omitted).

## II.   PROCEDURAL HISTORY

On March 8, 2010, Shanklin was indicted on three counts: capital murder during a robbery in the first degree, capital murder during a burglary in the first degree, and attempted murder, in violation of sections 13A-5-40(a)(2), 13A-5-40(a)(4), and 13A-4-2, Ala. Code, respectively. Vol. 1 at C. 24–26.

Shanklin initially entered a plea of not guilty by reason of mental disease or defect. *Id*. at C. 29. The trial court ordered a competency evaluation. *Id*. at C. 31. Doug McKeown, Ph.D., conducted a forensic evaluation, which resulted in a report in which he opined that, although Shanklin functioned in the "low-average" range of intelligence and had a history of substance abuse and suicide attempts, there was no indication that Shanklin could not appreciate appropriate and inappropriate behavior during the time of the crime or that Shanklin had a severe mental disease or defect or substance abuse issue during that time that would provide a basis for a mental state defense. *Id*. at C. 40–41. Once the trial court determined Shanklin to be competent, Shanklin amended his plea to not guilty. *Id*. at C. 35–41; R. 76; Vol. 2 at R. 189.

Although two other attorneys had represented Shanklin prior to his trial, Nath Camp and Dustin Whisenhunt were appointed to represent him at trial. Vol. 1 at C. 43.

Shanklin's trial began on October 17, 2011. Vol. 1 at R. 79. The State presented its case over five days, and its witnesses included Ashley Crumpton (Michael's widow); Lori Crumpton (Michael's mother); Shanklin's girlfriend Tracy Ward; another girlfriend of Shanklin's Amber Piper; his neighbor Steven Madison; his cousins Isaiah Howze and Tyrone Dickerson; Joshua Moreland, a trustee at the Walker County Jail; and Kenneth Traywick, another inmate. *Id.* at R. 4–5. Dancy Sullivan from the Alabama Department of Forensic Science testified that the four bullets recovered during Michael's autopsy and a fifth found on the floor of his bedroom were .32 caliber, and that four bullets were determined to have been fired from the same gun, while the fifth, which was an autopsy bullet, was inconclusive. Vol. 6 at R. 996; Vol. 8 at R. 1332–35, 1339–43. Although the bullets were designed to be fired from a semiautomatic pistol, he testified that they could have been fired from a revolver. Vol. 8 at R. 1374. He added that misfires are consistent with a revolver loaded with cartridges intended for semiautomatic use. *Id.* at R. 1375–76. The defense presented no guilt-phase witnesses. Vol. 9 at R. 1557.

The defense submitted an affidavit signed by Shanklin in which he waived jury instructions on lesser included offenses and stated that he was instead pursuing an "all or nothing" approach. The court announced that it would not instruct on lesser included offenses because it believed that the evidence did not support them, so the three charges were submitted to the jury without lesser included offenses. *Id*. at R. 1633–36; *see* Vol. 1 at C. 44–45.

On October 26, the jury found Shanklin guilty on all counts. Vol. 9 at R. 1675–76; Vol. 1 at C. 48. After the verdict was announced, the court briefly recessed before starting the penalty phase that evening. During the penalty phase, the State presented victim impact testimony from Ashley and Lori Crumpton. Vol. 9 at R. 1688–91; Vol. 10 at R. 1692. The defense offered testimony from Shanklin's aunt and uncle, his father, and his wife. Vol. 10 at R. 1693–1711. The jury unanimously recommended life in prison without parole. *Id*. at R. 1739; Vol. 1 at C. 49.

Following the advisory sentencing verdict, the trial court ordered a presentence investigation report and set a sentencing hearing for April 4, 2012. Vol. 1 at C. 50–52. Mr. Camp moved to withdraw due to a conflict, as he had accepted an appointment as a public defender for Walker County. *Id*. at C. 53–56. The motion was granted, and attorneys Martin Adams and Joshua McKeown were appointed to represent Shanklin along with Mr. Whisenhunt. *Id*. at C. 57.

At the sentencing hearing, the State offered victim impact testimony from Michael's mother and grandmother. Vol. 10 at R. 1747–53. The defense offered testimony from Shanklin's parents. *Id.* at R. 1754–59. The trial court sentenced Shanklin to death on both counts of capital murder. *Id.* at R. 1762–63; Vol. 1 at C. 61–91. At the time, Alabama law permitted a judge to override the jury's recommendation. In its written sentencing order, the trial court found the existence of five statutory aggravating circumstances: 1) the capital offense was committed by a person under sentence of imprisonment; 2) the defendant was previously convicted of another capital offense or felony involving the use or threat of violence; 3) the defendant knowingly created a great risk of death to many persons; 4) the capital offense was committed during the commission or attempted commission of a rape, robbery, burglary, or kidnapping; and 5) the capital offense was especially heinous, atrocious, or cruel. Vol. 1 at C. 69–75. The trial court did not find the existence of any statutory mitigating circumstance, but it did consider the testimony of Shanklin's family members. *Id.* at C. 76–80.

The trial court then gave its reasons for overriding the jury's life imprisonment without parole recommendation. First, it considered the unanimity of the recommendation, and while it gave the recommendation "great weight," it concluded "that several jurors['] emotions may have hindered their ability to follow

the law and impose the death penalty," as "[t]he aggravating circumstances clearly weigh in favor of the death penalty." Vol. 1 at C. 82. Second, the court noted that while some jurors may have had doubts as to the identity of the triggerman, "the overwhelming evidence in this case pointed to Shanklin as the major perpetrator." *Id.* Third, the court noted that the Crumpton family had not recommended life without parole. *Id.* at C. 83. Fourth, the court considered the witnesses Shanklin had not killed—Ashley, her children, and Piper and her child—but gave this factor "the absolute minimum consideration" in Shanklin's favor. *Id.* at C. 83–84. Finally, the court recounted facts known to it but not to the jury about Shanklin's extensive criminal history. *Id.* at C. 84–85.

Shanklin's counsel filed a motion for new trial, which was denied by the trial court after conducting a hearing. Vol. 1 at C. 99.

Shanklin's family retained new counsel, James W. Parkman, III, for his direct appeal. Vol. 1, C. at 98, 100–01. The ACCA affirmed Shanklin's convictions and death sentence in 2014. Vol. 13, Tab #R-37; *Shanklin*, 183 So. 3d 734. The Alabama Supreme Court denied certiorari in 2015. Vol. 13, Tab #R-37; *Ex parte Shanklin*, No. 1140922 (Ala. Aug. 28, 2015). The United States Supreme Court denied certiorari in 2016. Vol. 15, Tab #R-41; *Shanklin v. Alabama*, 136 S. Ct. 1467 (2016).

For state postconviction proceedings pursuant to Rule 32 of the Alabama Rules of Criminal Procedure, Shanklin was represented by *pro bono* counsel J.D. Lloyd, Eric Allen, and Gregory Gardner. *E.g.*, Vol. 24, Tab #R-52. Shanklin filed a Rule 32 petition on August 25, 2016, allegedly *pro se* but admittedly with the help of the Equal Justice Initiative. Vol. 16, Tab #R-42. He filed an amended petition through counsel on June 12, 2017. Vol. 17, Tab #R-44. The State moved to dismiss in July 2017. Vols. 17–18, Tab #R-45. On December 20, 2017, the Honorable H. Douglas Farris, Jr.—who had presided over Shanklin's trial—summarily dismissed the amended petition. Vol. 19, Tab #R-46.

Shanklin timely appealed, through counsel. The ACCA affirmed in an unpublished memorandum opinion in October 2018. Vol. 23, Tab #R-50; *Shanklin v. State*, No. CR-17-0416 (Ala. Crim. App. Oct. 5, 2018).  The Alabama Supreme Court denied certiorari on May 22, 2020. Vol. 24, Tab. #R-53; *Ex parte Clayton Antwain Shanklin*, No. 1180254 (Ala. May 22, 2020).

 Shanklin filed a petition for a writ of habeas corpus in this court on December 15, 2020, represented by counsel from the Federal Defenders for the Middle District of Alabama. (Doc. 1). Shanklin filed an amended petition on March 30, 2022. (Docs. 24 & 25-1 (sealed).) He attached eleven exhibits to his amended petition, seeking to expand the record pursuant to Rule 7 of the Rules Governing § 2254 Cases in the

U.S. District Courts. (Docs. 24-1 through 24-11 & Doc. 25-1 (sealed)). On June 8, 2022, Shanklin filed a "Motion to Stay, and Hold in Abeyance, the Instant Proceedings Pending Exhaustion of Claim III in State Court." (Doc. 26.) The motion to stay was briefed (docs. 27 & 28), and Respondent also filed an answer to the amended habeas petition and an accompanying brief on July 26, 2022. (Docs. 32 & 33.) Originally having been assigned to another district judge, on October 19, 2022, this action was reassigned to the undersigned. (Doc. 38.) Shanklin subsequently replied in support of his amended habeas petition. (Doc. 41.) This Court denied the motion to stay proceedings on March 3, 2023. (Doc. 42.) The amended petition is therefore fully briefed and ripe for review.

This Court has jurisdiction because Shanklin's conviction and sentence were imposed in Walker County, Alabama. 28 U.S.C. § 2241(a). Shanklin's petition was also timely filed. *See* 28 U.S.C. § 2244(d)(1)(A).

## III.   STANDARDS OF FEDERAL HABEAS REVIEW

This action is governed by 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *See Guzman v. Sec'y, Dep't of Corr.*, 663 F.3d 1336, 1345 (11th Cir. 2011). Pursuant to § 2254(a), a federal district court is prohibited from entertaining a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court"

unless the petition alleges "he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). In other words, this Court's review of habeas claims is limited to federal constitutional questions. Claims pertaining solely to "an alleged defect in a [state] collateral proceeding" or to a "state's interpretation of its own laws or rules" do not provide a basis for federal habeas corpus relief under § 2254. *Alston v. Dep't of Corr., Fla.*, 610 F.3d 1318, 1325–26 (11th Cir. 2010) (quotation marks and citations omitted).

## A.     Exhaustion of State Remedies and Procedural Default

Under § 2254(b) and (c), a federal court must limit its grant of habeas applications to cases where an applicant has exhausted all state remedies. *Cullen v. Pinholster*, 563 U.S. 170, 182 (2011). This means that "'[s]tate prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process,' including review by the state's last court of last resort, even if review in that court is discretionary." *Pruitt v. Jones*, 348 F.3d 1355, 1358–59 (11th Cir. 2003) (quoting *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999)). Alabama's discretionary direct review procedures bring Alabama prisoner habeas petitions within the scope of the rule. *Id*. The purpose of this requirement is to ensure that state courts are afforded the first opportunity to correct federal questions affecting the validity of state court

convictions. *See Snowden v. Singletary*, 135 F.3d 732, 735 (11th Cir. 1998); *see also Smith v. Newsome*, 876 F.2d 1461, 1463 (11th Cir. 1989) ("Federal courts are not forums in which to relitigate state trials.") (citation omitted)). Moreover, "to exhaust state remedies fully the petitioner must make the state court aware that the claims asserted present federal constitutional issues. 'It is not enough that all the facts necessary to support the federal claim were before the state courts or that a somewhat similar state-law claim was made.'" *Snowden*, 135 F.3d at 735 (quoting *Anderson v. Harless*, 459 U.S. 4, 5–6 (1982)). "[A]n issue is exhausted if 'the reasonable reader would understand the claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)) (brackets in original omitted).

If a petitioner fails to raise his federal claim to the state court at the time and in the manner dictated by the state's procedural rules, the state court can decide the claim is not entitled to a review on the merits, i.e., "the petitioner will have procedurally defaulted on that claim." *Mason v. Allen*, 605 F.3d 1114, 1119 (11th Cir. 2010). Moreover, a "state court's rejection of a petitioner's constitutional claim on state procedural grounds will generally preclude any subsequent federal habeas

review of that claim." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010) (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)). "Where there has been one reasoned state judgment rejecting a federal claim, later unexplained orders upholding that judgment or rejecting the same claim rest upon the same ground." *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

Yet as the Eleventh Circuit has noted, a claim will only be procedurally defaulted in the following circumstance:

> [A] state court's rejection of a federal constitutional claim on procedural grounds may only preclude federal review if the state procedural ruling rests upon "adequate and independent" state grounds. *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995) (citation omitted).

> We have "established a three-part test to enable us to determine when a state court's procedural ruling constitutes an independent and adequate state rule of decision." *Judd*, 250 F.3d at 1313. "First, the last state court rendering a judgment in the case must clearly and expressly state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Id.* Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law. *See id.* Third, the state procedural rule must be adequate, i.e., firmly established and regularly followed and not applied "in an arbitrary or unprecedented fashion." *Id.*

*Ward*, 592 F.3d at 1156–57 (footnote omitted).

There are also instances where the doctrines of procedural default and exhaustion intertwine. For instance, if a petitioner's federal claim is unexhausted—

i.e., the petitioner never presented the claim to the state court—a district court will traditionally dismiss it without prejudice or stay the federal cause of action to allow the petitioner to first avail himself of his state remedies. *See Rose v. Lundy*, 455 U.S. 509, 519–20 (1982). But "if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own procedural rules, a court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect." *Bailey v. Nagle*, 172 F.3d 1299, 1305 (11th Cir. 1999) (citation omitted).

## B. Overcoming Procedural Default

"[A]n adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749–50 (1991) (citations and internal quotation marks omitted).

The "cause and prejudice" exception is framed in the conjunctive, and a petitioner must prove both cause and prejudice. *Id.* at 750. To show cause, a petitioner must prove that "some objective factor external to the defense impeded

counsel's efforts" to raise the claim previously. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). Examples of such objective factors include:

> . . . interference by officials that makes compliance with the State's procedural rule impracticable, and a showing that the factual or legal basis for a claim was not reasonably available to counsel. In addition, constitutionally ineffective assistance of counsel . . . is cause. Attorney error short of ineffective assistance of counsel, however, does not constitute cause and will not excuse a procedural default.

*McCleskey v. Zant*, 499 U.S. 467, 494 (1991) (internal quotation marks, brackets, and citations omitted). As for prejudice, a habeas petitioner must show "not merely that the errors . . . created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original).

Finally, a petitioner may also escape a procedural default bar if he "can demonstrate a sufficient probability that [the court's] failure to review his federal claim will result in a fundamental miscarriage of justice." *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000). To make such a showing, a petitioner must establish that either: (1) "a constitutional violation has probably resulted in the conviction of one who is actually innocent," *Smith v. Murray*, 477 U.S. 527, 537 (1986) (quoting *Carrier*, 477 U.S. at 496), or (2) the petitioner shows "by *clear and convincing* evidence that but for a constitutional error, no reasonable juror would have found

the petitioner eligible for the death penalty." *Schlup v. Delo*, 513 U.S. 298, 323 (1995)

(emphasis in original) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 336 (1992)).

## C.    AEDPA Review of State Court Decisions Under § 2254(d) and (e)

When a constitutional claim upon which a petitioner seeks relief under § 2254

is not procedurally defaulted but has instead been adjudicated on the merits in state

courts, this Court is still restricted in its ability to grant relief on those claims by §

2254(d). The AEDPA "imposes a highly deferential standard for evaluating state-

court rulings" and "demands that state-court decisions be given the benefit of the

doubt." *Guzman*, 663 F.3d at 1345 (internal quotation marks and citation omitted).

To grant habeas relief on a claim, this Court must not only find that the constitutional

claims are meritorious, but also that the state court's resolution of those claims:

> (1) resulted in a decision that was contrary to, or involved an
> unreasonable application of, clearly established Federal law, as
> determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable
> determination of the facts in light of the evidence presented in the State
> court proceeding.

28 U.S.C. § 2254(d)(1)-(2); *see also Boyd v. Allen*, 592 F.3d 1274, 1292 (11th Cir.

2010) (quoting § 2254(d)). The burden of showing that an issue falls within §

2254(d)(1) or (d)(2) is upon the petitioner. *See Woodford v. Visciotti*, 537 U.S. 19, 25

(2002). Section 2254(d)(1)'s "contrary to" and "unreasonable application of"

clauses have independent meanings. *See Alderman v. Terry*, 468 F.3d 775, 791 (11th Cir. 2006) ("[T]he 'contrary to' and 'unreasonable application' clauses are interpreted as independent statutory modes of analysis.") (citation omitted). A state court's decision is contrary to "clearly established precedents [of the Supreme Court of the United States] if it applies a rule that contradicts the governing law set forth in [the Court's] cases, or if it confronts a set of facts that is materially indistinguishable from a decision of th[e] Court but reaches a different result." *Brown v. Payton*, 544 U.S. 133, 141 (2005) (citation omitted). On the other hand, to determine whether a state court's decision is an "unreasonable application" of clearly established Federal law, the Supreme Court has stated:

> The pivotal question is whether the state court's application of the [relevant constitutional] standard was unreasonable . . . For purposes of § 2254(d)(1), an *unreasonable* application of federal law is different from an *incorrect* application of federal law. A state court must be granted a deference and latitude that are not in operation when the case involves review under the [relevant constitutional] standard itself.
>
> A state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision. And as the [Supreme Court] has explained, evaluating whether a rule application was unreasonable requires considering the rule's specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.

*Harrington v. Richter*, 562 U.S. 86, 101 (2011) (citation and quotation marks omitted) (emphasis in original); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The

question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Guzman*, 663 F.3d at 1346 ("Ultimately, before a federal court may grant habeas relief under § 2254(d), 'a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'") (quoting *Harrington*, 562 U.S. at 103). As the Supreme Court has stated, "If this standard is difficult to meet, that is because it was meant to be. As amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal-court relitigation of claims already rejected in state proceedings." *Harrington*, 562 U.S. at 102.

If a federal court determines that a particular claim for relief was adjudicated on the merits in state court, the § 2254(d) analysis that follows must be shaped by the content, if any, of the last reasoned state court decision. *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018) ("when the last state court to decide a prisoner's federal claim explains its decision on the merits in a reasoned opinion[,] . . . a federal habeas court simply reviews the specific reasons given by the state court and defers to those reasons if they are reasonable").

Additionally, a state court's factual determination is entitled to a presumption of correctness under § 2254(e)(1). And commensurate with the deference accorded to a state court's factual findings, "the petitioner must rebut 'the presumption of correctness [of a state court's factual findings] by clear and convincing evidence.'" *Ward,* 592 F.3d at 1155–56 (alterations in original) (quoting § 2254(e)(1)).

### D. The Burden of Proof and Heightened Pleading Requirements for Habeas Petitions

Additionally, because habeas corpus review is limited to review of errors of constitutional dimension, a habeas corpus petition "must meet [the] heightened pleading requirements [of] 28 U.S.C. § 2254 Rule 2(c)." *McFarland v. Scott*, 512 U.S. 849, 856 (1994) (citation omitted). "[T]he petition must 'specify all the grounds for relief available to the petitioner' and 'state the facts supporting each ground.'" *Mayle v. Felix*, 545 U.S. 644, 655 (2005) (quoting Rule 2(c) of the Rules Governing § 2254 Cases in the U.S. District Courts). The burden of proof is on the habeas petitioner "to establish his right to habeas relief and he must prove all facts necessary to show a constitutional violation." *Blankenship v. Hall*, 542 F.3d 1253, 1270 (11th Cir. 2008) (citation omitted); *see also Smith v. Wainwright*, 777 F.2d 609, 616 (11th Cir. 1985) (holding that a general allegation of ineffective assistance of counsel is insufficient; a petition must allege specific errors in counsel's performance and facts showing prejudice).

E.     The General Standard for Ineffective Assistance of Counsel Claims

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court

established the following two-pronged standard for judging, under the Sixth

Amendment, the effectiveness of attorneys who represent criminal defendants at

trial or on direct appeal:

> A convicted defendant's claim that counsel's assistance was so
> defective as to require reversal of a conviction or death sentence has two
> components. First, the defendant must show that counsel's
> performance was deficient. This requires showing that counsel made
> errors so serious that counsel was not functioning as the "counsel"
> guaranteed the defendant by the Sixth Amendment. Second, the
> defendant must show that the deficient performance prejudiced the
> defense. This requires showing that counsel's errors were so serious as
> to deprive the defendant of a fair trial, a trial whose result is reliable.
> Unless a defendant makes both showings, it cannot be said that the
> conviction or death sentence resulted from a breakdown in the
> adversary process that renders the result unreliable.

*Id.* at 687.

Because *Strickland*'s preceding two-part test is clearly framed in the

conjunctive, a petitioner bears the burden of proving both "deficient performance"

and "prejudice" by "a preponderance of competent evidence." *Chandler v. United*

*States*, 218 F.3d 1305, 1313 (11th Cir. 2000) (en banc); *see also Holladay v. Haley*, 209

F.3d 1243, 1248 (11th Cir. 2000) ("Because both parts of the test must be satisfied

in order to show a violation of the Sixth Amendment, the court need not address the

performance prong if the defendant cannot meet the prejudice prong, [ ] or vice versa.").

In order to establish deficient performance, a habeas petitioner "must show that counsel's representation fell below an objective standard of reasonableness." *Strickland*, 466 U.S. at 688. That reasonableness is judged against "prevailing professional norms." *Id*. Moreover, under *Strickland*, lower federal courts must be "highly deferential" in their scrutiny of counsel's performance. *Id*. at 689. As the *Strickland* Court outlined:

> Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.

*Id*. (citations and quotation marks omitted).

Simply put, a habeas petitioner "must establish that no competent counsel would have taken the action that his counsel did take" to overcome the presumption that counsel's conduct fell within the wide range of reasonable professional assistance. *Chandler*, 218 F.3d at 1315. The reasonableness of counsel's performance is judged from the perspective of the attorney, at the time of the alleged error, and in light of all the circumstances. *See, e.g.*, *Newland v. Hall*, 527 F.3d 1162, 1184 (11th Cir. 2008) ("We review counsel's performance 'from counsel's perspective at the time,' to avoid 'the distorting effects of hindsight.'") (quoting *Strickland*, 466 U.S. at 689).

To satisfy the prejudice prong, a habeas petition "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Stated differently, "[a] finding of prejudice requires proof of unprofessional errors so egregious that the trial was rendered unfair and the verdict rendered suspect." *Johnson v. Alabama*, 256 F.3d 1156, 1177 (11th Cir. 2001) (citations and quotation marks omitted). Further, the fact that counsel's "errors had some conceivable effect on the outcome of the proceeding" is insufficient to show prejudice. *Strickland*, 466 U.S. at 693. Therefore, "when a petitioner challenges a death sentence, 'the

question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Stewart v. Sec'y, Dep't of Corr.*, 476 F.3d 1193, 1209 (11th Cir. 2007) (quoting *Strickland*, 466 U.S. at 695).

Because *Strickland* and § 2254(d) both mandate standards that are "'highly deferential'", "when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (citations omitted). The inquiry is not then "whether counsel's actions were reasonable," but is instead "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.* The court must determine "whether the state court's application of the *Strickland* standard was unreasonable. This is different from asking whether defense counsel's performance fell below *Strickland*'s standard." *Id.* at 101. This "[d]ouble deference is doubly difficult for a petitioner to overcome, and it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Evans v. Sec'y, Fla. Dep't of Corr.*, 699 F.3d 1249, 1268 (11th Cir. 2012).

Finally, "[s]tate court findings of historical facts made in the course of evaluating an ineffectiveness claim are subject to a presumption of correctness under 28 U.S.C. § 2254(d)." *Thompson v. Haley*, 255 F.3d 1292, 1297 (11th Cir. 2001).

### F.   Shanklin's Exhibits

With regard to the exhibits Shanklin attaches to his amended petition, the Court will not consider them. These exhibits were not part of the state court record. As the Supreme Court made clear in *Cullen v. Pinholster*, "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." 563 U.S. 170, 181 (2011). *See also French v. Warden*, 790 F.3d 1259, 1266 (11th Cir. 2015) (relying upon *Pinholster* in denying the petitioner's motion to admit five affidavits that were not made part of the state record).

## IV.   DISCUSSION OF SHANKLIN'S CLAIMS

Shanklin's amended petition raises twelve claims for relief, many with numerous subclaims. Each claim is addressed separately.

### A.   Shanklin's claim that he was denied effective assistance of trial counsel during the guilt phase of his trial

Shanklin first argues that he was denied his Sixth Amendment right to effective assistance of counsel during the guilt phase of his trial in four distinct ways: 1) his counsel waived a jury instruction on lesser included offenses to capital murder; 2) his counsel failed to object to the jury instruction on accomplice liability; 3) his counsel failed to object to various instances of prosecutorial misconduct; and 4) his counsel failed to locate and investigate witnesses, prepare an adequate defense,

conduct reasonable cross-examinations of key State witnesses, and present a defense theory of the case. Each of these four subclaims is addressed separately.

> **1.    Shanklin's subclaim that his trial counsel were ineffective in allowing Shanklin to waive a jury instruction on lesser included offenses to capital murder**

Near the end of the State's case-in-chief during Shanklin's trial, Shanklin's counsel filed an affidavit signed by Shanklin stating that he did not want the trial court to give the jury any instructions on lesser included offenses, such as felony murder, that would not carry with them a penalty of death. Vol. 1 at C. 44–45. The affidavit further stated that Shanklin was waiving these instructions against the advice of his trial counsel, who had advised him that a lesser included offense instruction would be in his best interest. *Id.* The affidavit stated that Shanklin wanted to pursue an "all or nothing approach." *Id.*

Before the trial court gave the jury instructions, it held a brief discussion on the record. Vol. 9 at R. 1633–35. The court noted that the day before, the court had had an "informal charge conference" with the parties regarding the jury instructions, and that the court was finding no basis to include an instruction on lesser included offenses "based upon [its] own findings and the affidavit filed by the defendant, Mr. Shanklin, requesting that no lesser included charges be included in the instructions to the jury." *Id.* at 1633. The court then read Shanklin's affidavit

into the record. *Id.* at 1634–35. At that point, the State indicated that, just for the record, it was requesting a lesser included offenses jury instruction. *Id.* at 1635.

Shanklin argues that his counsel's allowing him to waive a jury instruction on lesser included offenses violated his constitutional right to effective counsel. He divides this subclaim into several allegations: 1) his counsel were ineffective for drafting and filing the affidavit signed by Shanklin; 2) his counsel were ineffective for inviting the trial court to accept Shanklin's affidavit; and 3) his counsel created a conflict of interest by preparing the affidavit instead of demanding a waiver colloquy.[1] The Court will address each of the three parts of this subclaim about the waiver affidavit separately.

### i. *drafting and filing the waiver affidavit*

Shanklin contends that his counsel were ineffective for drafting and filing the affidavit. He argues that counsel "knew the State had presented an overwhelming case of Mr. Shanklin's guilt as to felony murder," that there was "no reasonable strategic basis for having obtained or filed the purported waiver" or for following Shanklin's wishes, and that counsel now admit this was a mistake on their part. (Doc. 24 at 37–39.) In support, Shanklin identifies testimony that he says would have

---

[1]    Shanklin actually divides this subclaim into five parts, but since two of the five parts are arguments as to why 28 U.S.C. § 2254(d) should not bar relief as to the other three allegations, the Court will consider those arguments within its discussion of the other three allegations.

proven that he was guilty of felony murder rather than capital murder. For example, Shanklin points out that Investigator Softley testified that the day after the incident, Ashley Crumpton, the surviving victim and Michael's wife, had identified co-defendant Kevin Shanklin as her husband's killer and Shanklin as merely being present at the scene. Vol. 2 at R. 151, 167–68. He also points to trial testimony from various individuals that Shanklin had told them after the incident that the burglary and robbery went "wrong" or "crazy," or otherwise not according to plan. Vol. 5 at R. 714–18, 722, 839, 873; Vol. 6 at R. 917–19; Vol. 9 at R. 1498–99. Thus, according to Shanklin, his trial counsel could have argued that he was involved in the burglary and robbery of the Crumpton home, but that he did not intend for anyone to die, making him guilty only of felony murder.

Shanklin also offers new declarations from trial counsel Mr. Camp and Mr. Whisenhunt, prepared for this federal habeas proceeding, in which they both state generally that they were inexperienced in capital litigation at the time of Shanklin's trial, that they allowed Shanklin to make decisions that they should not have, and that they had no strategic reason for allowing Shanklin to make his own decisions about what instructions should be presented to the jury. (*See generally* Docs. 24-1 & 24-2.)

Shanklin exhausted this claim during his Rule 32 proceedings as claim 2.I.H. ("Trial counsel unprofessionally drafted and filed a statement to exclude all lesser included offenses."). Vol. 17 at C. 256–62; Vol. 21, Tab #R-47, at 34–37; Vol. 24, Tab #R-52, at 42–48. The ACCA, in its decision affirming the circuit court's denial of Shanklin's amended Rule 32 petition, quoted the circuit court's opinion dismissing this claim and agreed with its reasoning, as follows:

> Shanklin argues that trial counsel were ineffective for drafting and filing a statement in which Shanklin waived instructions on lesser-included offenses. Shanklin argued this claim in his petition and argues on appeal that trial counsel had a conflict of interest because they drafted and filed a statement waiving instructions and that trial counsel were ineffective by doing so.

> This Court, as addressed above in Part III, found that trial counsel did not have a conflict of interest when they drafted and filed the statement. Likewise, trial counsel was not ineffective for doing so. The facts concerning this claim are discussed above. In its order, the circuit court addressed this claim as follows:

>> "First, Shanklin alleges that counsel's decision to file the affidavit was *per se* ineffective. This claim is insufficiently pleaded because Shanklin failed to plead facts showing that the affidavit did not represent his wishes or that he would have disavowed it during a waiver colloquy. Moreover, the affidavit and counsel's in-court statements show that counsel wanted to pursue lesser included offenses and were merely following their client's wishes. Counsel were not ineffective for memorializing Shanklin's decision and having the affidavit read into the record. Further, Shanklin pleaded nothing showing prejudice. As discussed above, this Court found no basis for instructing the jury on lesser included offenses, and the

Court of Criminal Appeals found no plain error in the instructions. The jury obviously agreed that Shanklin was guilty of the offenses charged, as they returned their verdict on the day they received the case and still had time to render a penalty-phase recommendation that afternoon. (*See* R. 1673, 1676, 1739; C. 48-49.) Therefore, this claim is dismissed pursuant to Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure.

"Second, Shanklin claims that counsel's decision to file his affidavit was particularly prejudicial to him because there was sufficient evidence to support lesser included offenses. This claim is both insufficiently pleaded and meritless. As noted, the affidavit was a memorialization of Shanklin's wishes for trial strategy. He pleaded nothing suggesting that if he had not signed the affidavit, counsel would have requested instruction[s] on lesser included offenses against his wishes. Moreover, this Court found no reason to give an instruction on lesser included offenses, and the Court of Criminal Appeals found no plain error in the charge. Shanklin has not pleaded facts showing that but for the affidavit, the court would have given his instruction, and he would not have been convicted of capital murder. Further, the evidence showed that Shanklin had a specific intent to kill. . . . Ashley Crumpton testified that both men used the gun during the assault: while Shanklin shot her in the leg and killed Michael, Kevin Shanklin tried three times to shoot her in the face. (R. 600-09.) Shanklin repeatedly admitted to being the triggerman, telling at least four people that he shot Michael. *Shanklin*, 187 So. 3d at 794. As Shanklin pleaded nothing that would overcome these facts or show he was entitled to a felony murder instruction, let alone why the jury would have convicted him of the lesser offense, this claim is dismissed pursuant to Rules 32.3, 32.6(b), and 32.7(d) of the Alabama Rules of Criminal Procedure."

(C. 772-73.)

The circuit court's findings are supported by the record and we adopt them as part of our memorandum. It appears that Shanklin chose not to have the jury instructed on lesser included offenses after consulting with trial counsel and that trial counsel recorded that decision. The record also indicates that the trial court did not think that the lesser included offenses were applicable and would not have instructed the jury on those offenses even if trial counsel had requested it do so. Therefore, Shanklin failed to show that trial counsel were ineffective in drafting and filing the affidavit or for not requesting instructions on lesser included offenses. In addition, Shanklin failed to show that even if trial counsel had requested the instructions, he was entitled to them, particularly when the trial court stated that it did not think Shanklin was entitled to have the jury instructed on lesser-included offenses. Accordingly, the circuit court properly dismissed this claim.

Vol. 23, Tab #R-50, at 65-67 (some citations omitted).

Since the Alabama state courts addressed this claim on the merits, this Court's review is deferential, and to obtain relief Shanklin must demonstrate that the ACCA's decision, which is the last reasoned state court opinion, *see Wilson*, 138 S. Ct. at 1192, is contrary to or an unreasonable application of clearly established Federal law as determined by the Supreme Court or based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

Shanklin argues that he can establish unreasonableness as to both of the ACCA's conclusions on this claim, specifically: 1) that Shanklin failed to show that his trial counsel performed deficiently in drafting and filing the affidavit and 2) that

Shanklin failed to show prejudice because the trial court stated that it did not think he was entitled to a lesser included offenses instruction even if he had asked for one.

Taking the ACCA's second conclusion as to prejudice first, Shanklin argues that it is contrary to *Beck v. Alabama*, 447 U.S. 625, 627 (1980), in which the Supreme Court held that "when the jury was not permitted to consider a verdict of guilt of a lesser included noncapital offense, and when the evidence would have supported such a verdict . . . the death penalty may not be imposed[.]" Shanklin reads *Beck* as a constitutional mandate that all defendants facing the death penalty are entitled to lesser included offenses instructions, but that is not the case. They are only so entitled when the evidence would support such a verdict for a noncapital offense. *See id.* Thus, although the ACCA did not cite *Beck*, it's conclusion is not at odds with it. The circuit court on Rule 32, whose findings were adopted by the ACCA, found that Shanklin was not entitled to an instruction on felony murder, citing the heavy evidence of his intent to kill and his repeated admissions to being the triggerman. *See* Vol. 19, Tab #R-46, at C. 773. Thus, *Beck* was not violated because "the evidence would [not] have supported such a verdict," *see Beck*, 447 U.S. at 627.

Shanklin also argues that the ACCA's conclusion about prejudice is an unreasonable determination of the facts, pursuant to § 2254(d)(2), because there was "ample evidence from the trial record to support the lesser included offense of felony

murder." (Doc. 25-1 at 49 (sealed)). Again, the state courts disagreed (and the Rule 32 judge was the same judge who presided over Shanklin's trial and heard all of the evidence). Indeed, multiple witnesses testified as to Shanklin's actions and incriminating statements. Federal review under § 2254(d) weighs heavily in favor of the state courts' decisions. "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). So long as "fairminded jurists could disagree on the correctness" of the state courts' decisions, this Court may not grant relief. *Harrington*, 562 U.S. at 88. This Court finds no reason to overturn the state courts' ruling.

With regard to the ACCA's first conclusion about deficient performance, Shanklin contends that it is contrary to *Beck* and the record. The Court again disagrees. The circuit court found that the record demonstrated that Shanklin wanted an "all or nothing" approach, thereby avoiding the risk that he could be found guilty of felony murder, and even though his counsel disagreed, there was nothing inappropriate about counsel memorializing Shanklin's decision for the record. Shanklin cites Alabama law for the proposition that counsel, not the defendant himself, should decide which jury instructions to request, *see Parker v. State*, 510 So. 2d 281, 286 (Ala. Crim. App. 1987), but that case is not federal

constitutional law as determined by the Supreme Court. Further, while Mr. Camp and Mr. Whisenhunt now claim in declarations prepared for the first time in this proceeding that they should not have allowed Shanklin to make the decision as to jury instructions, *see* docs. 24-1 at ¶ 13 & 24-2 at ¶ 11, neither attorney states that this decision to forgo instructions on lesser included offenses was not what their client wanted or that the affidavit was anything other than a reflection of Shanklin's wishes. As stated previously, this Court will not consider these declarations, as they were not part of the state court record. *See* section III.F., *supra*. But even if this Court were to consider those declarations, they would not undermine the deference that this Court must give to the state courts' decisions in this regard.

Accordingly, Shanklin's claim that his counsel was ineffective in drafting and filing the waiver affidavit is denied.

### ii.    *inviting the trial court to accept the waiver affidavit*

Apart from Shanklin's preceding claim, Shanklin also claims that his trial counsel were constitutionally ineffective in *inviting the trial court to accept* the waiver of jury instructions on lesser included offenses.

Respondent argues that Shanklin never raised this specific claim in the state courts, and so it is not properly before this Court. True, the Court can find no claim described in this specific way in Shanklin's Rule 32 amended petition. Shanklin urges

that the preceding claim "necessarily encompassed" this claim, and that "the substance" of this claim was sufficiently presented to the state courts. (Doc. 41 at 21 (quoting *Picard v. Connor*, 404 U.S. 270, 278 (1971) ("We simply hold that the substance of a federal habeas corpus claim must first be presented to the state courts."))). But the Eleventh Circuit has held that "an issue is exhausted if 'the reasonable reader would understand [the] claim's *particular legal basis and specific factual foundation*' to be the same as it was presented in state court." *Pope*, 680 F.3d at 1286 (quoting *Kelley*, 377 F.3d at 1344–45) (emphasis added). The Court is perplexed as to why Shanklin would raise this claim as a separate claim in his federal habeas proceedings because it seems to be repeating arguments from his preceding claim, but in any event, assuming that this claim is considered an offshoot of the preceding claim and that it has thus been sufficiently exhausted, Shanklin cannot overcome the § 2254(d) hurdle for the reasons stated in the previous section.

### iii.   *creating a conflict of interest by preparing the affidavit instead of demanding a waiver colloquy*

Shanklin also claims that his trial counsel were constitutionally ineffective when they created a conflict of interest between Shankin's best interests and counsel's best interests by preparing the waiver affidavit instead of requesting that the trial court conduct a waiver colloquy with Shanklin. He contends that the

affidavit is a clear attempt to insulate trial counsel from liability for failing to request a lesser included offenses instruction.

Shanklin exhausted this claim during his Rule 32 proceedings in the Alabama state courts, as claim 1.II.A. ("Trial counsel's preparation of an affidavit for Mr. Shanklin to preemptively defend future ineffectiveness claims showed that counsel's interests had divulged from Mr. Shanklin's."). Vol. 17 at C. 221–24; Vol. 21, Tab #R-47, at 13–14; Vol. 24, Tab #R-52, at 12–14. The ACCA, in its decision affirming the circuit court's denial of Shanklin's Rule 32 petition, heavily quoted the circuit court's opinion dismissing this claim, and agreed with it, as follows:

> Shanklin contends that his trial counsel had a conflict of interest. Specifically, Shanklin argues that by drafting and filing an affidavit by Shanklin indicating that he waived jury instructions on lesser-included offenses, trial counsel demonstrated an "allegiance to themselves and their decision to elevate their own interests over the interests of the client." (Shanklin's brief, at 14.) Shanklin claims that by preparing the affidavit, trial counsel prevented Shanklin from waiving his right to jury instructions in open court on lesser-included offenses following a waiver colloquy. The circuit court addressed the various parts of this claim, including the part that asserts that the conflict caused trial counsel to be ineffective. The circuit court stated the following when summarily dismissing this claim:

>> "Shanklin contends that his trial counsel were conflicted because they asked Shanklin to sign an affidavit concerning lesser included offenses. For the reasons that follow, this claim is dismissed pursuant to Rules 32.3, 32.6(b), and 32.7(d) of the Alabama Rules of Criminal Procedure.

"The relevant facts are as follows. On October 25, 2011, while his trial was ongoing, Shanklin executed an affidavit stating that he was directing his attorneys not to propose instructions on lesser included offenses. Although counsel had advised Shanklin that pursuing lesser included offenses would be in his best interest, Shanklin stated that he was declining to follow their advice and wished to take an 'all or nothing' approach. (C. 44-45.)

"Prior to charging the jury, this Court stated that it found no basis to instruct on lesser included offenses, based upon both its own findings and on Shanklin's affidavit. (R. 1633.) This court also read the affidavit into the record. (R. 1634- 35.) The Court of Criminal Appeals found no plain error in the guilt-phase instructions. *Shanklin*, 187 So. 3d at 795-96.

". . . .

". . . Shanklin contends that his counsel were ineffective because they failed to raise the issue of this Court's decision not to instruct on lesser included offenses before closing arguments. But as the Court's decision was in line with Shanklin's wishes, as stated in his affidavit, Shanklin failed to plead how counsel erred or how he was prejudiced. *See, e.g. Ex parte Mills*, 62 So. 3d 574, 581-90 (Ala. 2010) (no error where trial court followed defendant's wish to not instruct on lesser included offenses); *Adkins v. State*, 930 So. 2d 524, 536-40 (Ala. Crim. App. 2001) (defendant estopped from arguing penalty-phase ineffective assistance where he instructed counsel not to present mitigation case).

"As this claim fails to meet the pleading and specificity requirements of Rules 32.2 and 32.6(b) of the Alabama Rules of Criminal Procedure, it is dismissed.

". . . .

"... Shanklin contends that 'there is no reasonable strategic reason for submission of this affidavit other than an attempt to protect [counsel] from future litigation.' (Am. Pet. 21.) Here, although counsel recognized the benefit of pursuing instructions on lesser included offenses, Shanklin chose to ignore their professional advice. As an unexplained failure to seek these instructions could have exposed counsel to a claim of ineffective assistance, counsel were wise to submit the affidavit and explain the situation to this Court.

"Shanklin pleaded no facts showing how his counsel behaved unethically for putting this explanation on the record. He also failed to cite any authority standing for the proposition that presenting an affidavit from a defendant is improper or that a colloquy hearing is required by law. As this claim fails to meet the pleading and specificity requirements of Rules 32.2 and 32.6(b) of the Alabama Rules of Criminal Procedure, it is dismissed.

". . . .

"... Shanklin alleges that counsel's drafting of the affidavit 'was improper under the law.' (Am. Pet. 21.) He now claims that he was not told of the affidavit before trial, that counsel approached him to ask if he would approve an 'all or nothing' approach, that counsel failed to explain the risks of waiving lesser included offenses, and that counsel did not ask the Court to conduct a waiver colloquy.

"Here, Shanklin failed to plead facts showing that the affidavit did not represent his wishes or that he would have disavowed it during a waiver colloquy. Moreover, the affidavit and counsel's in court statements show that counsel wished to pursue lesser included offenses and were merely following their client's wishes. The notion that counsel would goad Shanklin into taking this

approach, then do everything in their power to convince this Court that the idea was Shanklin's alone is, frankly, absurd. Thus, this claim fails to meet the pleading and specificity requirements of Rules 32.2 and 32.6(b) of the Alabama Rules of Criminal Procedure, and it is dismissed.

"....

". . . Shanklin argues that counsel had a conflict of interest because they drafted the affidavit, induced Shanklin to sign it, and thereby caused him to waive his rights. This contention is nonsensical and utterly meritless. Nothing in the record suggests that trial counsel wanted to waive lesser included offenses, as Shanklin now contends. On the contrary, the affidavit expressly states that counsel informed Shanklin that instruction on lesser included offenses would be in his best interest, and he declined to follow that advice. (C. 45.) As counsel were bound to follow their client's wishes, they simply put an explanation for the decision in writing.

"Shanklin failed to plead any facts showing that this was a conflict of interest. Rather, submitting this affidavit was a prudent decision guarding counsel against a claim of ineffective assistance for merely honoring Shanklin's request. Therefore, this claim is dismissed pursuant to Rule 32.7(d) of the Alabama Rules of Criminal Procedure.

"....

"Finally . . . Shanklin alleges that because his counsel were conflicted, they limited their explanation to him about the ramifications of forgoing instruction on lesser included offenses, thereby inducing him to waive his rights. He further avers that it was error for counsel to discuss the waiver off the record.

> "Again, Shanklin pleaded no facts establishing a
> conflict of interest or any error on counsel's part.
> Moreover, he failed to plead facts that, if true, would show
> how further explanation would have caused him to change
> his decision. As this claim fails to meet the pleading and
> specificity requirements of Rules 32.2 and 32.6(b) of the
> Alabama Rules of Criminal Procedure, it is dismissed."

(C. 754-57.) This Court agrees with the circuit court's findings.
Therefore, Shanklin is not entitled to relief on this claim.

Vol. 23, Tab #R-50, at 23-26.

Thus, the ACCA, the last reasoned state court opinion, *see Wilson*, 138 S. Ct.
at 1192, affirmed the circuit court's dismissal of this claim based upon Shanklin's
failure to plead the claim with specificity, which he was required to do by Rules 32.3,
32.6(b), and 32.7(d) of the Alabama Rules of Criminal Procedure. A Rule 32
dismissal for failure to plead a claim with sufficient specificity is a merits ruling in
this circuit, to which the 28 U.S.C. § 2254(d) presumption attaches. *Borden v. Allen*,
646 F.3d 785, 812-13 (11th Cir. 2011). Shanklin must thus demonstrate that the
ACCA's decision reviewing his Rule 32 appeal and rejecting his ineffective
assistance of counsel claim is contrary to or an unreasonable application of clearly
established Federal law as determined by the Supreme Court or based upon an
unreasonable determination of the facts. *See Borden v. Allen*, 646 F.3d 785, 812 (11th
Cir. 2011) ("A ruling by an Alabama court under Rule 32.6(b) is . . . a ruling on the
merits.").

As well as *Strickland*, Shanklin refers this Court to other Supreme Court cases addressing conflicts of interest specifically. Indeed, the right to effective assistance of counsel includes "a correlative right to representation that is free from conflicts of interest." *Wood v. Georgia*, 450 U.S. 261, 271 (1981). As noted by Shanklin, under *Cuyler v. Sullivan*, 446 U.S. 335 (1980), conflict claims are an exception to the *Strickland* standard, requiring only that a defendant show that the conflict actually "affected the adequacy of his representation." *Id*. at 349. An actual conflict exists where the interests of the attorney and the client "diverge with respect to a material factual or legal issue or to a course of action." *Id*. at 356 n.3.

However, this Court sees no reason to disturb the Alabama state courts' decision that no conflict existed here. Shanklin has not demonstrated that obtaining a waiver affidavit from a defendant is improper or that a waiver colloquy is required by law in this circumstance. The circuit judge in Shanklin's Rule 32 proceedings, who also presided over his trial, found that it was "absurd" that Shanklin would claim after the fact that his counsel persuaded him to sign the affidavit against his wishes but then take extreme measures to persuade the trial court that the decision was his alone. Vol. 23, Tab #R-50, at 23-26. This Court must presume the state court's factual finding to be correct, and Shanklin has not rebutted that presumption

by clear and convincing evidence. *See Ward*, 592 F.3d at 1155–56 (quoting §
2254(e)(1)).

As the foregoing demonstrates, Shanklin is due no relief on his ineffective
assistance of counsel claim premised on his waiver of a jury instruction on lesser
included offenses, including all parts of the claim.

> ## 2. Shanklin's subclaim that his trial counsel were ineffective for failing to object to the jury charge on accomplice liability

The trial court stated the following at the conclusion of its jury charge on
accomplice liability: "When two or more persons join in an unlawful enterprise, each
is responsible for everything which may consequently and proximately flow from the
unlawful purpose, whether committed by the accused or not and whether specifically
intended or not." Vol. 9, Tab #R-18, at R. 1661. Shanklin did not raise any
contemporaneous objection to this charge, nor did he claim error on direct appeal.

However, the ACCA addressed the correctness of the jury instructions *sua
sponte* in its review for plain error on direct appeal. *Shanklin*, 187 So. 3d at 795; Vol.
13, Tab #R-37, at 795. The ACCA explained that the accomplice liability instruction
was incorrect because to convict a defendant of capital murder and sentence him to
death, he must be found to have had a particularized intent to kill. Nonetheless, the
ACCA determined that there was no plain error, as follows:

Although Shanklin did not object to the circuit court's jury instructions during the guilt phase of his trial and does not argue on appeal that the circuit court's jury instructions during the guilt phase of trial were erroneous, we have reviewed the guilt-phase instructions for plain error. Doing so, we recognize that at one point the circuit court's instruction on accomplice liability was incorrect. Specifically, with regard to intent under accomplice liability the circuit court instructed the jury that "[w]hen two or more persons join in an unlawful enterprise, each is responsible for everything which may consequently and proximately flow from the unlawful purpose, *whether committed by the accused or not and whether specifically intended or not.*" (R. 1661 (emphasis added).)

It is well settled and

"'Alabama appellate courts have repeatedly held that, to be convicted of capital offense and sentenced to death, a defendant must have had a particularized intent to kill and the jury must have been charged on the requirement of specific intent to kill. *E.g., Gamble v. State*, 791 So. 2d 409, 444 (Ala. Crim. App. 2000); *Flowers v. State*, 799 So. 2d 966, 984 (Ala. Crim. App. 1999); *Duncan v. State*, 827 So. 2d 838, 848 (Ala. Crim. App. 1999).'

"*Ziegler v. State*, 886 So. 2d 127, 140 (Ala. Crim. App. 2003).

"""'[N]o defendant is guilty of a capital offense unless he had an intent to kill, and that intent to kill cannot be supplied by the felony murder doctrine. *Beck v. State*, 396 So. 2d 645, 662 (Ala. March 6, 1981)'; Carnes, *Alabama's 1981 Capital Punishment Statute*, 42 Ala. Law. 456, 468 (1981). *See also E[n]mund v. Florida*, 458 U.S. 782, 102 S. Ct. 3368, 73 L.Ed.2d 1140 (1982), *but see Godbolt v. State*, 429 So. 2d 1131, 1134 (Ala. Cr. App. 1982), holding that *E[n]mund* is inapplicable to a defendant who does not receive the death penalty. However, a non-triggerman can be convicted of a

capital offense if he was a knowing accomplice to the intentional killing itself. *Ritter v. State*, 375 So. 2d 270 (Ala. 1979). '[T]he accomplice liability doctrine may be used to convict a non-trigger man accomplice if but only if the defendant was an accomplice in the intentional killing as opposed to being an accomplice merely in the "underlying felony.'" *Ex parte Raines*, 429 So. 2d 1111, 1112 (Ala. 1982), cert. denied, 460 U.S. 1103, 103 S. Ct. 1804, 76 L.Ed.2d 368 (1983).

"'"'Alabama's 1981 capital punishment statute under which [the defendant] was convicted 'provides that a defendant who does not personally commit the intentional killing which is part of the capital offense is nonetheless guilty of it and can be convicted of the capital offense, if that defendant intentionally promotes or assists in the commission of the intentional killing which is actually done by another.' Carnes, 42 Ala. Law at 471.

"'"'Our duty on appeal was stated in *Raines*, 429 So. 2d at 1113. 'To affirm a finding of a "particularized intent to kill", the jury must be properly charged on the intent to kill issue, and there must be sufficient evidence from which a rational jury could conclude that the defendant possessed the intent to kill.'"

"'*Lewis v. State*, 456 So. 2d 413, 416–17 (Ala. Cr. App. 1984).'

"*Rowell v. State*, 570 So. 2d 848, 850–51 (Ala. Crim. App. 1990)."

*Brown v. State*, 72 So. 3d 712, 715–16 (Ala. Crim. App. 2010).

Although this Court in *Brown* found plain error in the circuit court's instructions, this case is distinguishable from *Brown*. Specifically, Brown was charged with 17 counts of capital murder. The State, when arguing its case to the jury, leaned heavily on proving its case through accomplice liability. Additionally, when charging the jury, the circuit court, although instructing on specific intent, instructed on numerous occasions that the State had to prove that Brown "intended to kill the deceased, or another person, or another individual who he aided and abetted intended to kill." *Id.* at 717. After reviewing the entire instructions, this Court held that "it [was] clear that the trial court did not adequately inform the jury that Brown could not be convicted of capital murder unless it determined that he had the specific, particularized intent to kill." *Id.* at 718 (emphasis in original).

Here, unlike in *Brown*, Shanklin was charged with only two counts of capital murder. Additionally, unlike in *Brown*, the State, throughout its closing arguments, argued that Shanklin was, in fact, the individual who shot both Michael and Ashley. In fact, the State in its closing argument attempted to discredit evidence of Ashley's identification of Kevin as the shooter. Additionally, unlike in *Brown*, the circuit court, when it instructed the jury as to the charges of capital murder, explained that the State had to prove that Shanklin himself "caused the death of [Michael] by shooting him; that in committing the act which caused the death of [Michael], [Shanklin] intended to kill [Michael]," and also that "[t]he intent to kill must be real and specific." (R. 1645–46, 1651.) Thus, unlike in *Brown*, after a review of the entire instructions, it is clear that the circuit court adequately instructed the jury that it could not convict Shanklin unless it determined that Shanklin, himself, had the specific, particularized intent to kill.

*Shanklin*, 187 So. 3d at 796–96.

In his Rule 32 proceedings, Shanklin raised and exhausted the claim that his trial counsel were ineffective for failing to object to the accomplice liability jury instruction. Vol. 17, Tab #R-44, at C. 262–64; Vol. 21, Tab #R-47, at 37–39; Vol. 24,

Tab #R-52, at 48–51. The ACCA, in its decision affirming the circuit court's denial of Shanklin's Rule 32 petition, heavily quoted the circuit court's opinion dismissing this claim, and agreed with it, as follows:

> Shanklin argues that trial counsel were ineffective because counsel failed to object to the trial court's instruction on accomplice liability. Specifically, Shanklin contends that the instruction eliminated the intent requirement for a murder conviction. In his brief, Shanklin states that the trial court gave the following instruction:

>> "A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense, he aids or abets such other person in committing the offense. . . . When two or more persons join in an unlawful enterprise, each is responsible for everything which may consequently and proximately flow from the unlawful purpose, whether committed by the accused or not and whether specifically intended or not."

> (Shanklin's brief, at 37-38.)

> Shanklin contends that the instruction was "highly inappropriate" because, he says, he "could be held responsible for the death of Michael Crumpton, whether or not he pulled the trigger or specifically intended it to happen, as long as he joined with his co-defendant in an unlawful enterprise." (Shanklin's brief, at 38.) Shanklin argues that the instruction was magnified by the State during its closing argument when the prosecutor said:

>> "[T]he Judge is going to tell you, you don't have to consummate, the attempt is good enough. The other thing he's going to say is if you believe Kevin was the shooter and not Antwain that aiding and abetting that if you enter into something with a co-defendant and both of ya'll have the intent to do this, that you're just as guilty even if you didn't pull the trigger. You're going to hear the word aiding and abetting.

> Listen to what that means. The law covers that just in case, the law covers that."

*Id*. Shanklin states that this Court recognized the instruction was error in addressing this claim on direct appeal.

In dismissing this claim, the circuit court acknowledged that on direct appeal this Court determined that the instruction was incorrect but that this Court found no plain error. . . . The circuit court dismissed this claim, finding that

> "[i]n light of [the ACCA's opinion on direct appeal], Shanklin pleaded no facts showing that the jury was not adequately instructed about the necessity of determining that he had the specific intent to kill Michael Crumpton or that he was prejudiced by counsel's failure to object to this instruction. Beyond Ashley Crumpton's eyewitness testimony and identification, four witnesses testified that Shanklin admitted he had been the shooter. The State did not need accomplice liability to convict Shanklin of capital murder because the evidence showed that Shanklin had been the triggerman. Even if the State's case had hinged on accomplice liability, the Court of Criminal Appeals found that the jury was sufficiently instructed in that area, and Shanklin pleaded nothing to show how the jury's decision would have been different if counsel had objected. Therefore, this claim is dismissed pursuant to Rules 32.3, 32.6(b), and 32.7(d) of the Alabama Rules of Criminal Procedure."

(C. 774.)

> "[A] determination on direct appeal that there has been no plain error does not automatically foreclose a determination of the existence of the prejudice required under *Strickland* to sustain a claim of ineffective assistance of counsel." *Ex parte Taylor*, 10 So. 3d 1075, 1078 (Ala. 2005). "In determining whether to grant a Rule 32 petitioner relief, a court must examine both the plain-error and prejudice standards of review." *Id*. For the same reasons this Court found no

plain error, this Court finds that Shanklin failed to show that, but for his trial counsel's failure to object to the instruction, there is a reasonable probability that the outcome of his trial would have been different. The State did not rely on accomplice liability to prove that Shanklin committed capital murder. At trial, the State contended that Shanklin was the shooter. The trial court instructed the jury on capital murder, and, after reviewing the entire instructions, this Court concluded that the trial court adequately instructed the jury regarding intent. Therefore, Shanklin failed to show how he was prejudiced as a result of counsel's failure to object to the trial court's instructions. Accordingly, the circuit court correctly dismissed this claim.

Vol. 23, Tab #R-50, at 70-71.

Because the ACCA denied this claim on the merits, Shanklin must demonstrate that the ACCA's decision is contrary to or an unreasonable application of clearly established Federal law as determined by the Supreme Court or based upon an unreasonable determination of the facts, 28 U.S.C. § 2254(d).

Shanklin fails in this endeavor. Shanklin submits Mr. Whisenhunt's new declaration, in which he states that the failure to object to the accomplice liability instruction was an "oversight." (Doc. 24-2 at ¶ 14.) Even if the Court were to consider this declaration, which it will not for the reasons stated in section III.F., *supra*, it does not necessarily demonstrate deficient performance by trial counsel. *See Strickland*, 466 U.S. at 687 (explaining that a showing of "deficient performance" means that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"). And even if it did,

Shanklin still cannot show prejudice flowing from his counsel's failure to object. While Shanklin claims that the State's case against him was weak, multiple witnesses testified that Shanklin told them that he was the triggerman. Thus, as the state courts reasonably found, accomplice liability was not needed to convict Shanklin of capital murder. Shanklin thus failed to plead facts showing how an objection would have likely resulted in a different outcome at trial. Moreover, the jury was correctly instructed as to what specific intent in the capital murder context means. Vol. 9, Tab #R-18, at C. 1645–46 (robbery–murder); *id.* at C. 1650–51 (burglary–murder). Given the strength of the State's case and the evidence pointing to Shanklin as the killer, the state courts' decision was neither contrary to nor an unreasonable application of clearly established Federal law, nor was it an unreasonable determination of the facts.

### 3.   Shanklin's subclaim that his trial counsel were ineffective for failing to object to numerous instances of prosecutorial misconduct

Shanklin's third subclaim is that his trial counsel were ineffective for failing to object to various instances of prosecutorial misconduct during his trial. Shanklin identifies these alleged instances of misconduct in "Claim VIII" of his Amended Petition, arguing that the Alabama courts violated his rights to due process, a fair trial, and a reliable sentencing determination under the Sixth, Eighth, and

Fourteenth Amendments, by allowing the prosecutor to make improper arguments and references to facts not in evidence.

As the ineffective assistance of trial counsel and underlying prosecutorial misconduct claims are related, the Court will address them together in this section. The court will first address each of Shanklin's eight underlying claims of prosecutorial misconduct and then turn to Shanklin's claim that his trial counsel were ineffective in failing to object to these instances. For the reasons explained below, all but two of these claims are unexhausted and procedurally defaulted from this Court's review.

### i.    the court's statement regarding Lori Crumpton

Many of Shanklin's claims of prosecutorial misconduct center around the same themes: that the prosecutor improperly identified himself as the victims' representative and regularly described the victims and their family as parties entitled to a fair trial. Shanklin's first allegation of misconduct follows this theme: he alleges that the trial court erred by stating during the beginning of jury selection that "Ms. Lori Crumpton [Michael's mother] will also be sitting at the table here as the representative for the State." *See* Vol. 2 at R. 134. Shanklin alleges that the prosecutor improperly designated Ms. Crumpton as a representative of the State. Shanklin argues that prosecutors may not imply that they represent the victim's

family, citing *Berger v. United States*, 295 U.S. 78, 88 (1935) ("The [prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all . . . .").

While Shanklin's direct appeal brief argued that prosecutorial misconduct occurred, *see* Vol. 12 at 58-66, it did not include any facts about this particular instance. So Shanklin did not raise this particular claim before any state court, as he was required to do before presenting it here. Shanklin thus did not give the "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate process." *O'Sullivan*, 526 U.S. at 842-45. Thus, he did not exhaust the claim. Further, this Court finds that this claim is procedurally defaulted because no state remedy still exists through which he could pursue relief on this claim. Shanklin would be barred from attempting to raise the claim now in state court under Rule 32.2(c), Ala. R. Crim. P. (statute of limitations bar) and under Rule 32.2(b), Ala. R. Crim. P. (successive petition bar). Thus, because any state remedy with respect to this claim is procedurally barred by Alabama's procedural rules, the claim is procedurally defaulted from this Court's review. *See, e.g., Bailey*, 172 F.3d at 1305 ("if it is clear from state law that any future attempts at exhaustion [in state court] would be futile" under the state's own

procedural rules, a court can simply find that the claim is "procedurally defaulted, even absent a state court determination to that effect"); *Henderson v. Campbell*, 353 F.3d 880, 899 (11th Cir. 2003) (finding if petitioner asserted his undue influence claim in a "new Rule 32 petition" the Alabama courts would reject it based upon the "firmly established and consistently applied procedural grounds" of Rule 32.2(b) (barring successive petitions) or Rule 32.2(c) (statute of limitations) of the Alabama Rules of Criminal Procedure).

With regard to this and every other unexhausted claim in his petition, Shanklin asks this Court *not* to rule that the claim is procedurally defaulted from this Court's review but instead permit him to return to state court to exhaust the claim by filing a petition for a writ of habeas corpus directly in the Alabama Supreme Court. (*See* docs. 41 at 9 & n.3; 28 at 3). Shanklin takes the position that any claim is capable of exhaustion by way of an original writ of habeas corpus in Alabama's highest court. In support, he cites the Alabama Constitution, which he notes grants the Alabama Supreme Court "original jurisdiction . . . to issue such remedial writs or orders as may be necessary to give it general supervision and control of courts of inferior jurisdiction." Ala. Const., Art. VI, § 140(b). In the alternative, Shanklin asks this Court to certify to the Alabama Supreme Court, pursuant to Ala. R. App. P. 18, the question of whether he should be allowed to file an original petition for a writ of

habeas corpus in the Alabama Supreme Court. He argues that the Alabama Supreme Court is in the best position to decide whether he can still obtain state court review of the claims that he never exhausted.

For several reasons, the Court will not acquiesce to Shanklin's proposed plan for handling his unexhausted claims. As an initial matter, both times Shanklin has raised this argument about his perceived ability to return to state court to exhaust his claims by pursuing an original writ of habeas corpus in the Alabama Supreme Court, it has been in a reply brief to which Respondent has not been entitled to respond without seeking leave of the Court. (*See* docs. 41 at 9 & n.3; 28 at 3). The Court has thus not heard from Respondent on the matter. Arguments raised for the first time in reply are generally deem abandoned. *Timson v. Sampson*, 518 F.3d 870, 874 (11th Cir. 2008). Regardless of that fact, however, the more important point is that Shanklin does not direct the Court to any precedent or any other authority that instructs this Court that allowing a petitioner to seek an original writ of habeas corpus directly in the Alabama Supreme Court is an appropriate method of handling unexhausted and procedurally defaulted habeas claims. Further, the Court declines to certify the question of whether this is appropriate to the Alabama Supreme Court. The Eleventh Circuit has instructed courts in this district as to the procedure for handling claims that a petitioner never exhausted in state court, including that courts

may deem them procedurally defaulted if a state's procedural rules would bar further relitigation in the state courts. *See, e.g., Bailey*, 172 F.3d at 1305. Allowing Shanklin to start afresh in the Alabama Supreme Court would contravene this guidance. Additionally, the Supreme Court of Alabama has already been apprised of Shanklin's habeas claims once during Rule 32 proceedings, denying his petition for certiorari. It is not likely to allow him to pursue a new writ with additional claims.

Finally, Shanklin also argues with regard to this and every other unexhausted claim in his petition, that this Court should employ 28 U.S.C. § 2254(b)(1)(B)(i)-(ii) to find that the claim is not procedurally defaulted. Section (b)(1) provides:

> (b)(1) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that—
>
> (A) the applicant has exhausted the remedies available in the courts of the State; or
>
> (B)(i) there is an absence of available State corrective process; or
>
> (ii) circumstances exist that render such process ineffective to protect the rights of the applicant.

28 U.S.C.A. § 2254(b)(1). Thus, even if a federal habeas petitioner has not exhausted a claim in state court, habeas relief may still be granted if "there is an absence of available State corrective process; or [] circumstances exist that render such process ineffective to protect the rights of the applicant." 28 U.S.C. § 2254(b)(1)(B).

According to Shanklin, Alabama does not provide death row prisoners adequate corrective processes. In support, he argues that since he was "limited to unqualified, underpaid out-of-state counsel," he "never stood a chance in Rule 32 proceedings against his well-funded opponent." (Doc. 41 at 10.)

The Court declines to rule that Alabama's Rule 32 procedures are ineffective to protect habeas petitioners' rights. Shanklin was represented by three attorneys, as well as the Equal Justice Initiative, in his Rule 32 proceedings, who aided him in pursuing many other claims to the state's highest court.

Accordingly, because none of Shanklin's arguments as to why this Court should excuse the procedural default of his claims succeeds, this claim of prosecutorial misconduct based upon the prosecutor's statement about Ms. Crumpton will not be considered by this Court.

### ii.    the prosecutor's statements regarding a fair trial for the victim's family

Next, Shanklin alleges that the prosecutor erred by making six statements to the venire asking if they could give the victim's family a fair trial. *See* Vol. 1 at R. 215 ("Could you still set that aside and if you were chosen to be on this jury give this man here a fair trial, listen to the evidence and base your verdict on the evidence *and then giving Michael and his family a fair trial as well*?") (emphasis added); R. 224 ("Is there anyone in here because of a situation where the State of Alabama, who I represent,

or the prior DA before me, made a deal with one of these co-defendants to offer testimony as to what all transpired *that would hold that against the State of Alabama or Ms. Crumpton or Ashley Crumpton*?") (emphasis added); R. 243 ("One of the things, of course, in any kind of case like this for both sides, both for the defense *and for Ms. Crumpton and the State* is to make sure that" any verdict is "based on what you hear" in court) (emphasis added); R. 269 (asking a prospective juror whether, "if by chance my office is somehow involved in the prosecution of that, *would that make it difficult for you to be fair to Ms. Crumpton and the State of Alabama*?") (emphasis added); R. 476 (asking whether, in light of the fact that "Ms. Crumpton['s] . . . son is dead," a prospective juror *could "give us a fair trial, as well*?"); R. 491 (asking about whether a prospective juror could give Shanklin a fair trial before asking, "And what about this lady back here that, the mother of Michael Crumpton, and the State of Alabama?"). Shanklin alleges that it was improper for the prosecutor to have told the venire that the victim was entitled to a fair trial.

While Shanklin argued on direct appeal that prosecutorial misconduct occurred, Shanklin did not raise this particular claim in his state court proceedings. Thus, for all of the reasons explained in the preceding section, *see* section IV.A.3.*i.*, *supra*, it is not exhausted, it is procedurally defaulted from this Court's review, and Shanklin's arguments as to why procedural default should not bar relief are denied.

### iii.     the prosecutor's statements about holding Ashley Crumpton's actions against her

Shanklin alleges that the prosecutor erred by asking the venire if they would hold Ashley Crumpton's actions in self-defense against her. Specifically, the prosecutor asked:

> Would any of you hold it against Ashley Crumpton, the wife of Michael, if she fought in her home against assailants, tried to hit them and get them off of her husband and get them out of her house where her two children were sleeping, would any of y'all hold it against her if she fought for her life and her children's life [sic]?

Vol. 2 at R. 221-22. According to Shanklin, the prosecutor's statements were designed to inflame passions and prejudices in favor of the victims at the cost of the constitutional rights to fundamental fairness and due process to which Shanklin was entitled.

Again, while Shanklin argued on direct appeal that prosecutorial misconduct occurred, Shanklin did not raise this particular claim in his state court proceedings. Thus, for all of the reasons explained in section IV.A.3.*i.*, *supra*, it is not exhausted, it is procedurally defaulted from this Court's review, and Shanklin's arguments as to why procedural default should not bar relief are denied.

### iv.     the prosecutor's statements showing appreciation for the jury

Shanklin alleges that the prosecutor erred by thanking the jury on the Crumptons' behalf during voir dire and during his rebuttal closing argument. Vol. 2 at R. 244; Vol. 9, Tab #R-17, at R. 1632. Specifically, the prosecutor expressed his appreciation for the jury's "being very attentive on Ms. Crumpton's behalf and Ashley's behalf[.]" Vol. 2 at R. 244. At closing, he said, "And on behalf of their family, I really appreciate you going through this because I know some of you didn't want to be here. Thank you." Vol. 9 at R. 1632.

Read liberally, Shanklin's brief to the ACCA on direct appeal could be said to have included this claim. Shanklin argued on direct appeal that the prosecutor "thanked the jury on behalf of the family thereby implying again that he represented the victims. (R. 1632.)." Vol. 12, Tab #R-33, at 62. The ACCA on direct appeal found that these comments, when viewed in context, were not improper, and even if they were, they did not amount to plain error. *Shanklin*, 187 So. 3d at 792-93.

However, Shanklin did not mention this claim in his petition to the Alabama Supreme Court for certiorari review.[2] Thus, it is not exhausted because he did not

---

[2]     Shanklin addressed only two specific instances of alleged prosecutorial misconduct in his certiorari petition, which were different from this allegation. Nonetheless, Shanklin argues that the following general statement in his petition served to exhaust this allegation as well: "Thus, Mr. Shanklin's substantial rights were violated by repeated prosecutorial misconduct, and the reviewing court below failed to recognize the extent and gravity of the prejudice suffered by Mr. Shanklin as a result of the prosecutor's improper comments." (Doc. 41 at 61, quoting Vol. 14, Tab #R-39, at 26 (footnote omitted).) This Court does not agree that he gave the Alabama Supreme Court the opportunity to review this particular claim.

give the "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate process." *O'Sullivan*, 526 U.S. at 842-45. And, for all of the reasons explained in section IV.A.3.i., *supra*, it is procedurally defaulted from this Court's review, and Shanklin's arguments as to why procedural default should not bar relief are denied.

> ### v.    *the prosecutor's statements about the importance of the trial to the victim's family*

Shanklin alleges that the prosecutor erred by telling the jury at the beginning of his opening statement that the trial was "very important to the defendant and it's very important to Michael Crumpton's family." Vol. 4, Tab #R-11, at R. 539.

Similar to the previous claim, Shanklin's appellate brief could be read to have included this claim. *See* Vol. 12, Tab #R-33, at 62 ("The prosecutor within the first minute of his opening arguments stressed the status of this case saying it was 'important' three times within the first five sentences of addressing the jury. (R. 539, 194, 244.)"). However, as with the previous claim, Shanklin did not mention this claim in his certiorari petition before the Alabama Supreme Court. Thus, it is not exhausted because he did not give the "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate process" *O'Sullivan*, 526 U.S. at 842-45. And, for all of the reasons explained in section IV.A.3.i., *supra*, it is procedurally defaulted from this Court's

review, and Shanklin's arguments as to why procedural default should not bar relief
are denied.

### vi.    the prosecutor's statements about Tracy Ward's race

Shanklin alleges that the prosecutor erred by highlighting the interracial
nature of Shanklin's relationship with Tracy Ward in his opening statement.
Specifically, the prosecutor stated: "They [Kevin and Mr. Shanklin] had this
girlfriend, Tracy Ward, and you'll see her. She's a white girl. She's not real bright, I
think that will be obvious to you. They didn't pick out real smart people to go do
this." Vol. 4, Tab #R-11, at R. 549. Shanklin argues that Ms. Ward's race was not
relevant to anything other than appealing to prejudice.

While Shanklin argued on direct appeal that prosecutorial misconduct
occurred, he never raised this particular allegation. Thus, for all of the reasons
explained in section IV.A.3.*i.*, *supra*, it is not exhausted, it is procedurally defaulted
from this Court's review, and Shanklin's arguments as to why procedural default
should not bar relief are denied.

### vii.   the prosecutor's statement: "These women are his people."

Shanklin alleges that the prosecutor erred by stating in his rebuttal closing
argument, "These women are his people." Vol. 9, Tab #R-17, at R. 1616. In context,
the prosecutor said: "But sometimes when you're trying the devil, you've got to go

to hell for some witnesses, because that's the kind of people Antwain Shanklin hangs out with. That's the kind of folks, these are people that we went to find that are his people. These women are his people. It's not Frank Cole and John Softley, these are the folks he's dating, having sex with and getting to go get dope with and trying to go hit a lick with." *Id.* Shanklin argues that this comment also improperly appealed to the jurors' prejudices.

While Shanklin argued on direct appeal that prosecutorial misconduct occurred, he never raised this particular allegation. Thus, for all of the reasons explained in section IV.A.3.*i.*, *supra*, it is not exhausted, it is procedurally defaulted from this Court's review, and Shanklin's arguments as to why procedural default should not bar relief are denied.

### viii.   the prosecutor's alleged vouching for the State's witnesses

Shanklin alleges that the prosecutor improperly vouched for the credibility of the State's witnesses by doing two things: 1) telling the jury that the State's witnesses (some of them Shanklin's cousins) faced retaliation for testifying against Shanklin and 2) stating that he would show the jury why he believed that the State's witnesses were telling the truth. In context, the prosecutor's full statements were as follows:

> I submit to you that you need to take into consideration as jurors the kind of risks some people have in coming into this courtroom and testifying against somebody like this. What kind of risk does it take for

this man's cousin to come into this courtroom and have to say that he hit them up to go hit a lick?

You saw it, you judge the credibility, you judge how it took me having to get up here and force the man to look at his statement to say, yeah, he asked me to go hit a lick. Yeah, I, yeah, robbery, yeah. Finally. They didn't want to say that. What do you think those two guys are going to live through? What do you think Isaiah Howze and Tyrone Dickerson are going to live through for saying what they said in here? What do you think Mr. Traywick is going to live with down at Bloody Bibb [County Correctional Facility]? How much do you think Ms. Piper, [who's] got a child, has got to worry about looking over her shoulder?

I submit to you there's a lot of price that has been paid to bring these witnesses in here and it's not money. It's not the DA trying to get or the investigators trying to get professionals over in Birmingham to lie about something. It's not anything like that. The price to pay is risk, with risk, to come into this courtroom and tell you stuff.

I'm going to ask you to listen to what they said. That's what I'm going to ask you to do, to listen to what they said. And I'm going to show you in a minute why I think they're telling the truth about every dang bit of this. But the other thing that I'm going to ask you to do is I'm going to ask you to consider the risk that each one of these people are putting up with.

Vol. 9, Tab #R-17, at R. 1616–17.

This is the first of the two allegations of prosecutorial misconduct in this section that Shanklin fully exhausted through the state direct appeal process. Vol. 12, Tab #R-33, at 61; Vol. 14, Tab #R-38, at 23. The ACCA reviewed the claim for plain error because Shanklin did not object at trial, but it found no plain error, stating the following:

Shanklin contends that the prosecutor engaged in misconduct because, he says, the prosecutor in his rebuttal closing argument

> "stated that he would show the jury why he believes his witnesses 'are telling the truth.' (R. 1617.) He went on at great length to talk about the dangers the witnesses faced in testifying against Mr. Shanklin, even going so far as to imply that Amber Piper's child may face retaliation for her testimony against Mr. Shanklin. (1616–17.)"

(Shanklin's brief, p. 61.) Although Shanklin correctly argues that it is improper for a prosecutor to vouch for the credibility of a witness, *see Johnson v. State*, 120 So. 3d 1130, 1170 (Ala. Crim. App. 2009), the prosecutor's comments, when viewed in context, do not amount to vouching for the credibility of a witness. . . .

Here, the prosecutor's [ ] argument did not rise to the level of giving personal assurance that the State's witnesses were, in fact, telling the truth, *see, e.g., Ex parte Parker*, 610 So. 2d 1181, 1182 (Ala. 1992) (holding that a prosecutor's comment in closing argument that, "I can assure you he told you the truth," was improper); instead, the prosecutor correctly told the jury that it had to judge the credibility of the witnesses and, thereafter, argued why, based on the evidence at trial, those witnesses told the truth. Additionally, although the prosecutor stated that he was "going to show [the jury] in a minute why I think they're telling the truth about every dang bit of this," this Court has held that "qualifying statements, such as 'I think' as used in the present case, may result in a comment falling outside the prohibition against personally vouching for the witness." *Johnson v. State*, 120 So. 3d 1130, 1170 (Ala. Crim. App. 2009). Moreover, even if the prosecutor's arguments were improper, they would not rise to the level of plain error. *See Ex parte Parker*, 610 So. 2d at 1184.

*Shanklin*, 187 So. 3d at 790–91.

Since the Alabama state courts addressed this claim on the merits, this Court's review is deferential, and to obtain relief Shanklin must demonstrate that the

ACCA's decision, which is the last reasoned state court opinion, *see Wilson*, 138 S. Ct. at 1192, is contrary to or an unreasonable application of clearly established Federal law as determined by the Supreme Court or based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

Without further explanation, Shanklin argues that the decision was an unreasonable determination of the facts because "it ignored crucial facts." (Doc. 41 at 62.) Shanklin also appears to argue that it violates *Berger v. United States*. In *Berger*, the Supreme Court stated that vouching for the credibility of witnesses "can convey the impression that evidence not presented to the jury, but known to the prosecutor, supports the charges against the defendant and can thus jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury." 295 U.S. at 88-89. The Court further noted that a prosecutor's "opinion carries with it the imprimatur of the Government and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id*. However, the ACCA's decision was not an unreasonable application of *Berger* because the prosecutor merely correctly told the jury that it had to judge the credibility of the witnesses and, thereafter, argued why, based on the evidence at trial, those witnesses told the truth. Habeas relief is not warranted on this claim.

### viii. the prosecutor allegedly changing Ashley Crumpton's testimony

Shanklin alleges that the prosecutor attempted to change Ashley Crumpton's testimony in his closing statement to better fit with the State's theory of the case, which was that Shanklin, not his brother, was the triggerman who shot and killed Michael. Ashley Crumpton testified at trial that [Clayton Antwain] Shanklin was the assailant who she had hit in the head with the rock, and that he then ran down the hallway before Michael Crumpton was shot by the other assailant. Vol. 2 at R. 609–12. According to Shanklin, this testimony revealed that he had left the scene before Michael was shot and therefore could not have been the triggerman. Because this testimony did not fit with the State's theory of the case that [Clayton Antwain] Shanklin, not Kevin Shanklin, was the shooter, Shanklin asserts that the prosecutor attempted to change Ashley's testimony in his closing statement by stating:

> Also, you can look at the photographs of Mr. Kevin Shanklin. I submit to you he's got within two days of this offense you'll see the scar right there on his nose. The only thing Ms. Crumpton got wrong, Ashley Crumpton got wrong was which one of them she popped with a rock. You remember, she said, I popped him with a rock and hit him right in here. Remember that? The only thing she got wrong is which one she popped with the rock. She got Kevin with the rock.

Vol. 9 at R. 1629-30.

As with the previous claim, Shanklin exhausted this claim through the direct appeal process. Vol. 12, Tab #R-33, at 64; Vol. 14, Tab #R-38, at 24. On direct appeal,

the ACCA reviewed the claim for plain error because Shanklin did not make an

objection at trial, but found no plain error, as follows:

> Shanklin contends that the "prosecutor improperly attempted to
> change evidence in closing." (Shanklin's brief, p. 63.) Specifically,
> Shanklin argues that the evidence presented at trial through Ashley's
> testimony established that Shanklin did not shoot either Ashley or
> Michael. Shanklin further contends that "[d]uring his rebuttal close,
> [the prosecutor] apparently did not like the facts the way they came out
> at trial" and he argued as follows:

>> "'The only thing Ms. Crumpton got wrong, Ashley Crumpton
>> got wrong as which one of them she popped with a rock. You
>> remember, she said, I popped him with a rock and hit him right
>> in here. Remember that? The only thing she got wrong is which
>> one she popped with the rock. She got Kevin with the rock.'"

> (Shanklin's brief, p. 64 (quoting R. 1329–30 (emphasis in original)).)
> Contrary to Shanklin's argument on appeal, the prosecutor's argument
> did not "change evidence"; rather, the prosecutor's argument was a
> reasonable inference based on the evidence presented at trial.

> This Court has explained:

>> "'""During closing argument, the prosecutor, as well as
>> defense counsel, has a right to present his impressions from the
>> evidence, if reasonable, and may argue every legitimate
>> inference."' *Reeves v. State*, 807 So. 2d 18, 45 (Ala. Crim. App.
>> 2000), quoting *Rutledge v. State*, 523 So. 2d 1087, 1100 (Ala.
>> Crim. App. 1987) (citation omitted), rev'd on other grounds, 523
>> So. 2d 1118 (Ala. 1988).

>> "'""The test of a prosecutor's legitimate argument is that
>> whatever is based on facts and evidence is within the scope of
>> proper comment and argument. *Kirkland v. State*, 340 So. 2d
>> 1139 (Ala. Crim. App.), cert. denied, 340 So. 2d 1140 (Ala. 1976
>> [1977]). Statements based on facts admissible in evidence are

proper. *Henley v. State*, 361 So. 2d 1148 (Ala. Crim. App.), cert. denied, 361 So. 2d 1152 (Ala. 1978). A prosecutor as well as defense counsel has a right to present his impressions from the evidence. He may argue every legitimate inference from the evidence and may examine, collate, sift, and treat the evidence in his own way. *Williams v. State*, 377 So. 2d 634 (Ala. Crim. App. 1979); *McQueen v. State*, 355 So. 2d 407 (Ala. Crim. App. 1978)."' . . .

*Johnson*, 120 So. 3d at 1164.

Here, the prosecutor's argument was based on an inference from the evidence. Although the prosecutor argued that Ashley "got wrong which one she popped with the rock," the prosecutor explained that Ashley was wrong because "you can look at the photographs of Mr. Kevin Shanklin. I submit to you he's got within two days of this offense you'll see the scar right there on his nose." (R. 1629.) The prosecutor's argument is grounded in Ashley's testimony that she struck the individual who put the gun to her head in the face with a rock. Thus, there is no plain error.

*Shanklin*, 187 So. 3d at 793–94 (some citations omitted).

Since the Alabama state courts addressed this claim on the merits, this Court's review is deferential, and to obtain relief Shanklin must demonstrate that the ACCA's decision, which is the last reasoned state court opinion, *see Wilson*, 138 S. Ct. at 1192, is contrary to or an unreasonable application of clearly established Federal law as determined by the Supreme Court or based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

Without further explanation, Shanklin argues that the decision was an unreasonable determination of the facts because "it ignored crucial facts." (Doc. 41

at 62.) Shanklin has not met his burden under § 2254(d), and the Court finds the ACCA's decision reasonable in any event. The jurors were entitled to judge Ashley's memory of the night of Michael's death as they saw fit. The prosecutor offered the jury his interpretation of Ashley's testimony, which was that Ashley misidentified the person who she hit with a rock and who did not kill Michael as [Antwain Clayton] Shanklin because photos of Kevin Shanklin taken shortly after the incident showed a new scar on his face. *See* Vol. 4, at R. 661-63; Vol. 7 at R. 1150-51, 1155-58; Vol. 9 at R. 1629-30. The prosecutor merely interpreted what he thought the evidenced showed and did not change the testimony. Regardless, the trial court instructed the jury that the arguments of counsel were not evidence. Vol. 9 at R. 1666. And the prosecutor himself told the jury, "[Y]a'll get to determine what ya'll saw from the witness stand." *Id.* at R. 1614. The ACCA was reasonable in determining that even if the prosecutor's statement was improper, it did not rise to the level of plain error.

> ### ix.  *trial counsel failed to object to any of the aforementioned instances of prosecutorial misconduct*

As noted, Shanklin also claims that his trial counsel were ineffective for failing to object to the instances of alleged prosecutorial misconduct enumerated in sections *i.* through *viii.*, *supra.*

Shanklin never raised this claim in the state courts. Thus, for all of the reasons explained in the section IV.A.3.i., *supra*, it is not exhausted, it is procedurally

defaulted from this Court's review, and Shanklin's arguments as to why procedural

default should not bar relief are denied.

> **4.  Shanklin's subclaim that his trial counsel were ineffective in
> their defense preparation and presentation**

Shanklin's fourth subclaim within his ineffective assistance of trial counsel

claim is that his trial counsel failed in several areas including witness preparation,

cross-examination, and case presentation. Each area is addressed below.

> ### *i.  Engaging in an offensive trial strategy,
> including unreasonably attacking the Crumptons in
> opening statements without proof*

 Shanklin first alleges that his trial counsel improperly engaged in an offensive

trial strategy in which they argued to the jury that the victim Michael Crumpton was

a "gangster type," thus opening up the door to attack from the prosecution. (Doc.

25-1 at 58.) He also alleges that his counsel "unreasonably attacked the Crumptons,

including Ashley Crumpton, arguing that she 'laughed' after being shot in the leg,

that she was contemplating a divorce from her husband, and that she knew that

Michael had a life insurance policy," but that his counsel had no proof for these

statements. (*Id.*)

Shanklin exhausted this claim in his state postconviction proceedings. Vol. 17,

Tab #R-44, at C. 240–43; Vol. 21, Tab #R-47, at 20–22; Vol. 24, Tab #R-52, at 24–

26. The circuit court denied relief based upon Rules 32.3 and 32.6(b) of the Alabama

Rules of Criminal Procedure. That court noted that there was a strong case against Shanklin, that his counsel did the best they could by poking holes in the State's case to try to convince the jury that the State had not carried its burden, and that Shanklin failed to plead what arguments his counsel should have made that would have resulted in a different outcome. Vol. 19, Tab #R-46, at C. 763–64. In particular, the court explained that the prosecution "painted a sympathetic picture of the Crumptons and their two young children, attacked in the middle of the night by assailants after money and drugs," while the defense "tried to show that not everything was perfect in the Crumpton home" so as "to stop the jury from feeling sympathetic toward Michael and to cast doubt upon Ashley's credibility." *Id*. at C. 764. The ACCA affirmed, quoting the circuit court's opinion, and also denying relief pursuant to Rule 32.7(d) of the Alabama Rules of Criminal Procedure. Vol. 23, Tab #R-50, at 51–54.

Since the Alabama state courts addressed this claim on the merits, this Court's review is deferential, and to obtain relief Shanklin must demonstrate that the ACCA's decision, which is the last reasoned state court opinion, *see Wilson*, 138 S. Ct. at 1192, is contrary to or an unreasonable application of clearly established Federal law as determined by the Supreme Court or based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Shanklin has not made any effort

to do so, and the ACCA's opinion is not unreasonable in any event. The Court sees nothing in the ACCA's opinion that is violative of *Strickland*. Thus, habeas relief is not warranted on this claim.

> ### ii.     Failure to adequately interview Shanklin's family, friends, and acquaintances, who would have presumably told counsel that Kevin Shanklin was the triggerman

Without identifying any witnesses by name, Shanklin alleges generally that his trial counsel failed to interview his family, friends, and acquaintances, who presumably would have indicated that Kevin Shanklin was the triggerman, not him.

Shanklin exhausted this claim in state postconviction proceedings. Vol. 17, Tab #R-44, at C. 235–37; Vol. 21, Tab #R-47, at 19–20; Vol. 24, Tab #R-52, at 22–23. In the circuit court in his Rule 32 proceedings, Shanklin identified as potential witnesses Shanklin's cousins, Isaiah Howze and Tyrone Dickerson, and several of Kevin Shanklin's cellmates (Geno Shanklin, Daniel Tucker, and Jason Clay). Shanklin did not identify any witnesses by name in his brief to the ACCA or petition for certiorari. The circuit court dismissed this claim pursuant to Rule 32.3, 32.6(b), and 32.7(d) of the Alabama Rules of Criminal Procedure because of Shanklin's deficient pleading. Vol. 19, Tab #R-46, at C. 760–61. The ACCA affirmed, writing as follows:

Shanklin argues that trial counsel were ineffective because they failed to adequately interview and to investigate his friends and family. Shanklin's entire argument in his brief follows:

> "Because counsel was unaware of this potential testimony, their decision not to investigate key sources of information like the primary actors in the crime could not be the result of reasonable strategy. And because this evidence would have solidified that Mr. Shanklin killed no one and defeated the main corroborating witnesses, counsel's failures prejudiced him. There is a reasonable probability that the jury's culpability verdict and sentence would have been different. U.S. Const. Amend. V, VI, VIII, XIV."

(Shanklin's brief, at 20.)

In his petition, Shanklin named the friends and family members that counsel should have investigated. Shanklin stated that Kevin Shanklin, his cousin and codefendant, told his cellmates Geno Shanklin, Daniel Tucker, and Jason Clay that he was the person who pulled the trigger during the murder and not Shanklin. Shanklin stated that if counsel had investigated Kevin's cellmates, they would have obtained proof of Kevin's confession. Shanklin also stated that counsel failed to investigate his cousins Isaiah Howze and Tyrone Dickerson. Shanklin claimed that had counsel investigated Howze and Dickerson they would have learned that Howze had a robbery charge dismissed in exchange for his testimony. Shanklin stated that Howze testified that Shanklin had been told by a man with tattoos to avoid committing a robbery in Cordova until the weekend. Shanklin argued that had counsel investigated Dickerson they would have learned that Dickerson had been threatened that he would be charged with a crime if he did not testify for the State. Shanklin claimed that had counsel investigated Howze and Dickerson themselves, they would have learned that Howze and Dickerson were coerced by the State to testify.

In dismissing this claim, the circuit court found:

> "This claim is insufficiently pleaded and meritless.

"Turning first to Kevin Shanklin, whether Clayton Shanklin was the triggerman is immaterial—a non-triggerman is just as guilty of capital murder as the triggerman if he was a knowing accomplice to an intentional killing. *E.g., Doster v. State*, 72 So. 3d 50, 95-96 (Ala. Crim. App. 2010); *Sneed v. State*, 1 So. 3d 104, 123-26 (Ala. Crim. App. 2007). Moreover, as the Court of Criminal Appeals noted, Shanklin repeatedly admitted to being the triggerman, telling at least four people that he shot Michael Crumpton. *Shanklin*, 187 So. 3d at 794. Thus, he failed to plead specific facts that counsel should have learned from investigating his family and friends or from interviewing him and how these facts would have helped his case, and he failed to establish a reasonable probability that the result of his trial would have been different had counsel learned these facts. Thus, this claim is dismissed pursuant to Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure.

"Second, concerning Howze and Dickerson, Shanklin failed to plead facts showing that they testified falsely. He also failed to plead how he was prejudiced or how, had counsel conducted further investigation into these witnesses, the result of his trial would have been different.

"Moreover, the claim concerning these two witnesses is meritless. Howze admitted that he had been charged with robbery after a bar fight, that the case was dismissed, and that he was on work release due to a child support issue. He also stated that he had not been promised anything or threatened to make him testify. (R. 831-82.) Dickerson testified that he was picked up and brought to the police station to give a statement, that the police threatened to charge him with a crime if he did not give a statement, and that the police turned the recorder off at one point and reminded him that he would be prosecuted if he did not tell them what he knew. (R. 843-44.) Shanklin pleaded nothing showing that these statements were untruthful or that counsel would have discovered anything through further investigation that would have changed the outcome of his case. Therefore, this

claim is dismissed pursuant to Rules 32.3, 32.6(b), and 32.7(d) of the Alabama Rules of Criminal Procedure."

(C. 760-61.)

This Court agrees that Shanklin's claim was insufficiently pleaded and that no material issue of fact or law entitled Shanklin to relief. Shanklin did not plead how trial counsel should have known about Kevin's statement to his cellmates or that counsel would have learned anything differently through an investigation into Dickerson and Howze than what was testified to at trial. Because Shanklin did not plead facts showing that he is entitled to relief, this claim was correctly summarily dismissed. See Rules 32.6(b) and 32.7(d), Ala. R. Crim. P.

Vol. 23, Tab #R-50, at 47–50.

Since the Alabama state courts addressed this claim on the merits, this Court's review is deferential, and to obtain relief Shanklin must demonstrate that the ACCA's decision, which is the last reasoned state court opinion, *see Wilson*, 138 S. Ct. at 1192, is contrary to or an unreasonable application of clearly established Federal law as determined by the Supreme Court or based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Shanklin has not made any effort to do so, and the ACCA's opinion is not unreasonable in any event. The Court sees nothing in the ACCA's opinion that is violative of *Strickland*. Thus, habeas relief is not warranted on this claim.

> iii.    ***Failure to interview people who knew the Crumptons, people who knew the co-defendants, and people who were at the apartment on the evening of the crime***

84

Shanklin does not identify these individuals, plead the substance of their testimony, or plead how this testimony have changed the outcome of the trial.

Respondent argues that since Shanklin never raised this specific claim in the state courts, and it is not properly before this Court. Indeed, the Court can find no claim described in this specific way in Shanklin's Rule 32 amended petition. Shanklin urges that "the substance" of this claim was sufficiently presented to the state courts. (Doc. 41 at 24 (quoting *Picard*, 404 U.S. at 278)). But the Eleventh Circuit has held that "an issue is exhausted if 'the reasonable reader would understand [the] claim's *particular legal basis and specific factual foundation*' to be the same as it was presented in state court." *Pope*, 680 F.3d at 1286 (quoting *Kelley*, 377 F.3d at 1344–45) (emphasis added). Thus, for all of the reasons explained in section IV.A.3.*i.*, *supra*, it is not exhausted, it is procedurally defaulted from this Court's review, and Shanklin's arguments as to why procedural default should not bar relief are denied.

### iv.    *Unable to challenge the testimony of Tracy Ward*

Shanklin next alleges that because of their failure to prepare and investigate, counsel were unable to challenge the testimony of Tracy Ward.

This claim was exhausted in state postconviction. Vol. 17, Tab #R-44, at C. 243, 246–47; Vol. 21, Tab #R-47, at 24–25; Vol. 24, Tab #R-52, at 26, 29–30. In his amended Rule 32 petition, Shanklin claimed that counsel erred by conducting a joint

interview of Tracy Ward with Sam Bentley, Kevin Shanklin's attorney. Vol. 17, Tab

#R-44, at C. 246–47. The Rule 32 court deemed this claim insufficiently pleaded.

Vol. 19, Tab #R-46, at C. 766. The ACCA agreed on appeal, writing as follows:

> Shanklin's next claim relates to another claim he raised regarding trial counsel's conducting an interview with Ward. Shanklin argues that his trial counsel should not have interviewed Ward alongside Kevin Shanklin's counsel because "Ward might have assigned different culpability to the actions of Clayton and Kevin Shanklin." (Shanklin's brief, at 25.)
>
> The circuit court found the claim insufficiently pleaded, stating:
>
> > "Shanklin failed to plead facts showing that Ward would have offered different testimony had she only been interviewed by his counsel, that the testimony she gave was untruthful, or that he was prejudiced by the joint interview. He also failed to cite any authority stating that a joint interview with a codefendant's counsel is presumptively prejudicial."
>
> (C. 766.)
>
> We agree with the circuit court's conclusions here. Shanklin failed to plead facts that, if true, would establish that counsel was ineffective for meeting with Ward while codefendant's counsel was present. Because Shanklin did not plead facts showing that he is entitled to relief, this claim was correctly summarily dismissed. *See* Rule 32.7(d), Ala. R. Crim. P.

Vol. 23, Tab #R-50, at 57.

Since the Alabama state courts addressed this claim on the merits, this Court's

review is deferential, and to obtain relief Shanklin must demonstrate that the

ACCA's decision, which is the last reasoned state court opinion, *see Wilson*, 138 S.

Ct. at 1192, is contrary to or an unreasonable application of clearly established Federal law as determined by the Supreme Court or based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Shanklin has not made any effort to do so, and the ACCA's opinion is not unreasonable in any event. The Court sees nothing in the ACCA's opinion that is violative of *Strickland*. Thus, habeas relief is not warranted on this claim.

### v.       *Unable to challenge the testimony of Ashley Crumpton*

Shanklin next alleges that because of their failure to prepare and investigate, counsel were unable to challenge the testimony of Ashley Crumpton.

This claim was exhausted in state postconviction. Vol. 17, Tab #R-44, at C. 243–46; Vol. 21, Tab #R-47, at 22–24; Vol. 24, Tab #R-52, at 26–29. In his amended Rule 32 petition, Shanklin identified several complaints with counsel's performance: counsel failed to clarify the identities of the two men and who did what; counsel asked Ashley about Michael's life insurance, and she denied receiving any; Ashley recalled the Chicago Bears playing on the night of the murder, but that was a bye week. Vol. 17, Tab #R-44, at C. 244–46. The circuit court held that this claim was insufficiently pleaded and meritless. The ACCA affirmed, writing as follows:

> Shanklin argues that trial counsel were ineffective because counsel failed to investigate basic facts of the crime and, thus, counsel was unable to adequately cross-examine important State witnesses. This Court will address the witnesses in turn. . . .

Shanklin contends that trial counsel failed to challenge Ashley's inconsistent statements and point out that she remembered the wrong team playing football on the night of the murder.

The circuit court stated the following when summarily dismissing this claim:

". . . Shanklin alleges that counsel failed to sufficiently prepare to cross-examine Ashley Crumpton. He cites three supposed missteps: (1) counsel failed to pursue Ashley when she supposedly identified Shanklin as the man who both shot her and put the gun in her face, (2) counsel failed to learn prior to trial that Ashley had not received a life insurance payout from her husband's death, and (3) counsel failed to impeach Ashley based on naming the wrong football team that had played on the evening of her husband's murder.

"This claim is dismissed because Shanklin failed to specifically plead how he was prejudiced by this cross-examination or how, had counsel examined Ashley differently, the result of his trial would have been different.

"Moreover, these allegations are meritless. On direct examination, Ashley testified to the events of the crime. The State questioned her about a series of photographs of Shanklin, noting that he had changed his appearance since the murder by getting a tattoo on his face. (R. 642-45.) They then had the following exchange after showing Ashley a picture of him:

"Q. Ashley, is there any doubt in your mind that this man was one of those people inside your home that night when your husband ended up dead?

"A. No doubt whatsoever.

"Q. Is there any doubt in your mind that this man right here was one of the men in there that shot you in the leg?

"A. No, no doubt.

"Q. And who put the gun to your face and pulled the hammer back three times and tried to kill you?

"A. That is the man that was in my apartment.

"Q. Do you know why he has changed his appearance today, do you have any idea?

"(R. 644-45.) Ashley did not say that the man who shot her and the man who then attempted to do so were identical, but rather that Shanklin had been one of the men in her bedroom. Given this record, any objection would have been meritless, and thus, Shanklin failed to plead a sufficient factual basis showing that competent counsel would have objected.

"As for the life insurance policy, Shanklin is correct that counsel stated in opening that he believed the evidence would show that Ashley knew there was a life insurance policy on her husband. (R. 567.) On cross-examination, Ashley only stated that she had not received any life insurance money—she was not asked whether such a policy existed. She did, however, admit that she and Michael were having marital problems and that she had threatened to throw him out of their house. (R. 650.)

"Finally, turning to the football game, Ashley testified that the Crumptons and Michael's uncle had watched the game on Sunday, October 11, 2009, and that she spent at least part of her time cooking, cleaning, and tending to the children. (582-83.) While Shanklin is correct that Ashley was mistaken if the family had been watching a live game, which was never established in the record, he pleaded nothing showing that the result of his case would have been any different if Ashley had been questioned more thoroughly about the NFL teams playing hours before her husband was murdered. Therefore, this claim is dismissed."

(C. 765-66.)

> Because Shanklin did not plead facts showing that he is entitled
> to relief and because Shanklin failed to state a material issue of fact or
> law that would entitle him to relief, this claim was correctly summarily
> dismissed. *See* Rules 32.6(b) and 32.7(d), Ala. R. Crim. P.

Vol. 23, Tab #R-50, at 54–56.

Since the Alabama state courts addressed this claim on the merits, this Court's

review is deferential, and to obtain relief Shanklin must demonstrate that the

ACCA's decision, which is the last reasoned state court opinion, *see Wilson*, 138 S.

Ct. at 1192, is contrary to or an unreasonable application of clearly established

Federal law as determined by the Supreme Court or based upon an unreasonable

determination of the facts. *See* 28 U.S.C. § 2254(d). Shanklin has not made any effort

to do so, and the ACCA's opinion is not unreasonable in any event. The Court sees

nothing in the ACCA's opinion that is violative of *Strickland*. Thus, habeas relief is

not warranted on this claim.

### vi.   *Unable to challenge the testimony of jailhouse informants*

Shanklin next alleges that because of their failure to prepare and investigate,

counsel were unable to challenge the testimony of "the State's jailhouse

informants." (Doc. 24 at 59.) In particular, he alleges that this failure led to damaging

testimony from Kenneth Traywick. (*Id*. at 60–62.)

This claim was exhausted in state postconviction. Vol. 17, Tab #R-44, at C. 243–44, 246–49; Vol. 21, Tab #R-47, at 25–27; Vol. 24, Tab #R-52, at 30–34. In his amended Rule 32 petition, Shanklin claimed that counsel were unprepared to challenge the testimony of Isaiah Howze, Tyrone Dickerson, Josh Moreland, Laronda Brown, and Kenneth Traywick. Vol. 17, Tab #R-44, at C. 247–49. The circuit court found that this claim was insufficiently pleaded:

> As Shanklin failed to plead facts showing what supposed benefits these witnesses received that they testified falsely, or that the result of his trial would have been different had counsel conducted further investigation, this claim is dismissed pursuant to Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure.

> Moreover, as discussed above, the trial transcript shows that this claim is meritless. Howze admitted that he had been charged with robbery after a bar fight, that case was dismissed, and he was on work release due to a child support issue. He also stated that he had not been promised anything or threatened to make him testify. (R. 831–32.) Shanklin pleaded nothing to show that Howze testified falsely.

> Dickerson testified that he was picked up and brought to the police station to give a statement, that the police threatened to charge him with a crime if he did not give a statement, and that the police turned the recorder off at one point and reminded him that he would be prosecuted if he did not tell them what he knew. (R. 843–44.) Shanklin pleaded nothing to show that this statement was untruthful or that counsel would have discovered anything else through further investigation.

> Moreland, who was incarcerated for theft of property, was a trustee at the Walker County Jail when Shanklin was brought in. (R. 846–47.) He testified that after hearing Shanklin's story, he told the administrator, then gave a recorded statement to police. (R. 853–54.)

Moreland stated that he was not threatened, promised anything, or coerced into giving his statement. (R. 854–55.) After that, he was shipped to another facility in Marion County for a week, and at the time of the trial, he was on work release. (R. 865.) When asked whether his statement secured him a spot in work release, Moreland denied it; he had completed a six-month drug addiction program, and completion meant automatic work release. (R. 865–66.) He explained that every qualifying prisoner was offered an opportunity to do the program and that no one in the prison system knew he had given the statement. (R. 67.) Shanklin pleaded nothing to show that Moreland's testimony was untrue or that his counsel would have learned anything different had they conducted additional investigation.

Brown testified that she was convicted of third-degree robbery prior to the murders, that she pleaded guilty in March 2010, that she was sentenced to ten years split time served, that she violated her probation, and that she had since been in rehab through Community Corrections and was about to graduate. (R. 919–20.) She stated that no one made any promises or threats to her for her testimony and that she did not worry that her probation would be revoked if she refused to give a statement. (R. 920–21, 924.) Again, Shanklin failed to plead anything showing that this testimony was untruthful or that his counsel would have learned anything different if they had further investigated her case. [. . .]

Shanklin also claims that counsel were ineffective in their -examination of Kenneth Traywick, an inmate who testified to conversations he had with Shanklin and stated that he feared retaliation when he returned to the penitentiary. (R. 876.) Attempting to discredit Traywick, counsel asked if Shanklin had impregnated Traywick's sister, which Traywick denied. (R. 877.) Traywick also admitted that prior to telling investigators about Shanklin's statements, he had accused Shanklin, "all five-foot-seven of him," of raping him. (R. 878.) Counsel's apparent motivation in asking these questions was to bring to light any grudge Traywick held against their client, particularly through the accusation that Shanklin, a relatively small man, had raped him. This claim is dismissed pursuant to Rules 32.3 and 32.6(b) of the Alabama Rules of Criminal Procedure because Shanklin failed to plead

facts showing that he was prejudiced by counsel's questioning concerning Traywick's sister or by counsel's attempt to discredit Traywick by making his accusation seem ridiculous, and because he failed to plead facts showing that if counsel had not asked these questions, the result of his trial would have been different.

Vol. 19, Tab #R-46, at C. 766–69.

The ACCA affirmed, agreeing that the claims were insufficiently pleaded.

Vol. 23, Tab #R-50, at 57–59. The ACCA explained:

Shanklin claims that trial counsel failed to challenge the bias of four witnesses—Isiah Isaiah Howze, Tyrone Dickerson, Joshua Moreland, and Laronda Brown—who, Shanklin alleges, were coerced into testifying on behalf of the State. Shanklin contends that trial counsel failed to adequately investigate whether the witnesses' testimonies were the result of agreements or threats from law enforcement and that counsel struggled with impeaching witnesses with prior convictions.

The circuit court, again, found Shanklin's claim to be insufficiently pleaded. . . .

The circuit court further found the claim without merit, stating that both Howze and Dickerson testified that they had been charged or threatened with a charge but that they had not been promised anything in exchange for their testimony. Moreland and Brown also testified that they had been incarcerated and that no one had made promises or threats for their testimony. The circuit court stated that Shanklin failed to show that the witnesses' testimonies were untruthful or that counsel would have learned anything differently if they had conducted further investigation.

With respect to Shanklin's claim that trial counsel struggled with impeaching witnesses with prior convictions, the circuit court found this claim insufficiently pleaded. In dismissing this claim, the circuit court stated that "the witnesses were frank about their current and past

crimes" and that "Shanklin pleaded nothing to show how else his counsel should have impeached them or how he was prejudiced by his counsel's cross-examination." (C. 768.)

Shanklin failed to show that trial counsel's performance was deficient or how he was prejudiced by counsel's performance. Shanklin failed to show what questions trial counsel should have asked or that more cross-examination would have changed the outcome of the proceedings. Because Shanklin did not plead facts showing that he is entitled to relief, this claim was correctly summarily dismissed. *See* Rule 32.7(d), Ala. R. Crim. P.

[ . . . ]

Shanklin claims that trial counsel failed to challenge the bias of Kenneth Traywick who testified that Shanklin confessed to running away once the shooting started during a robbery. During trial, in an attempt to discredit Traywick, counsel asked Traywick whether Shanklin had gotten Traywick's sister pregnant. Traywick replied that Shanklin had not, and, according to Shanklin, trial counsel had no follow-up or proof to the contrary. Counsel asked Traywick if he had ever accused Shanklin of raping him while incarcerated, and Traywick admitted that he had. Shanklin argues that evidence of a defendant's aggression and prior violence are prejudicial and by trial counsel's eliciting the accusation without presenting evidence absolving him of it, trial counsel's performance was deficient resulting in significant prejudice to him.

The circuit court dismissed this claim, finding the claim insufficiently pleaded.

[ . . . ]

We agree with the circuit court's findings on this claim. This claim is insufficiently pleaded. *See* Rules 32.3 and 32.6(b), Ala. R. Crim. P. Because Shanklin did not plead facts showing that he is entitled to relief, this claim was correctly summarily dismissed. *See* Rule 32.7(d), Ala. R. Crim. P.

Vol. 23, Tab #R-50, at 57–59.

Since the Alabama state courts addressed this claim on the merits, this Court's review is deferential, and to obtain relief Shanklin must demonstrate that the ACCA's decision, which is the last reasoned state court opinion, *see Wilson*, 138 S. Ct. at 1192, is contrary to or an unreasonable application of clearly established Federal law as determined by the Supreme Court or based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Shanklin has not made any effort to do so, and the ACCA's opinion is not unreasonable in any event. The Court sees nothing in the ACCA's opinion that is violative of *Strickland*. Thus, habeas relief is not warranted on this claim.

> ### vii.    *Failure to object to victim impact testimony from Ashley and Lori Crumpton (Michael's mother)*

Shanklin next alleges that counsel were ineffective for failing to object to guilt phase victim impact testimony from Ashley and Lori Crumpton.

This claim was exhausted in state postconviction. Vol. 17, Tab #R-44, at C. 254–56, 246–49; Vol. 21, Tab #R-47, at 31–32; Vol. 24, Tab #R-52, at 40–41. In  his amended Rule 32 petition, Shanklin took issue with the following: Ashley testified about her relationship with Michael, their children, and their life together; Ashley testified about Michael's funeral, and the State introduced pictures from the funeral;

Lori testified about meeting Ashley for the first time and about the wedding; Lori testified about the children, and the State introduced pictures from Halloween and Christmas. Vol. 17, Tab #R-44, at C. 255. The circuit court held that this claim was insufficiently pleaded, noting that the ACCA on direct appeal had held that the minimal victim impact evidence did not prejudice Shanklin, and Shanklin failed to plead facts to the contrary. Vol. 19, Tab #R-46, at C. 771–72. The ACCA affirmed, writing as follows:

> Shanklin contends that trial counsel failed to adequately object to the introduction of victim-impact testimony from Ashley Crumpton and from Lori Crumpton, Michael's mother, during the guilt-phase proceeding. In finding this claim insufficiently pleaded, the circuit court stated:
>
>> "The witnesses were allowed to briefly testify about how Michael and Ashley met, their residence, and their children, and the State introduced photographs of Michael with his family and at his funeral. (R. 572-80, 668-69, 671-75.) The defense objected to the introduction of certain photographs, renewing the objection raised in their pretrial suppression motion, but the objection was overruled. (R. 576.) Counsel did not, however, object to the testimony.
>>
>> "While the Court of Criminal Appeals found that some of this testimony was irrelevant to any guilt phase issue, it held, '[T]he record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.' *Shanklin*, 187 So. 3d at 782 (citation and quotation omitted). As the evidence 'was brief background information that did not specifically focus on the effect that Michael's death had on' Ashley and Lori, and in light of 'the

overwhelming evidence of Shanklin's participation in this offense,' id., the testimony did not prejudice Shanklin's substantial rights.

"Here, Shanklin failed to plead facts showing that he was prejudiced by the introduction of this testimony or that the testimony had any effect on the jury's guilt-phase deliberations."

(C. 772.)

Shanklin has not pleaded sufficient facts to indicate that there would have likely been a different outcome but for trial counsel's performance. Even if trial counsel's performance were deficient, as this Court has previously held, there was no prejudice affecting a substantial right of Shanklin. Because Shanklin did not plead facts showing that he is entitled to relief, this claim was correctly summarily dismissed. *See* Rule 32.7(d), Ala. R. Crim. P.

Vol. 23, Tab #R-50, at 6465.

Since the Alabama state courts addressed this claim on the merits, this Court's review is deferential, and to obtain relief Shanklin must demonstrate that the ACCA's decision, which is the last reasoned state court opinion, *see Wilson*, 138 S. Ct. at 1192, is contrary to or an unreasonable application of clearly established Federal law as determined by the Supreme Court or based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d). Shanklin has not made any effort to do so, and the ACCA's opinion is not unreasonable in any event. The Court sees nothing in the ACCA's opinion that is violative of *Strickland*. Thus, habeas relief is not warranted on this claim.

### *viii.    Failure to ensure a full recordation*

Shanklin's last allegation in this section is that trial counsel were ineffective for failing to ensure full recordation of his trial, particularly the jury striking and the charge conference.

This claim was exhausted in state postconviction. Vol. 17, Tab #R-44, at C. 252–53; Vol. 21, Tab #R-47, at 30; Vol. 24, Tab #R-52, at 37–38. The circuit court deemed this claim insufficiently pleaded: "Shanklin failed to plead facts showing how he was prejudiced, such as facts showing that there was any reversible error committed during these off-record portions of the trial." Vol. 19, Tab #R-46, at C. 770. The ACCA agreed, finding: "Shanklin has pleaded no facts showing that he was prejudiced because counsel failed to file a motion for full recordation of the proceedings. Shanklin did not plead facts showing that any error occurred during these off-record portions of the trial that would entitle him to relief." Vol. 23, Tab #R-50, at 63.

Since the Alabama state courts addressed this claim on the merits, this Court's review is deferential, and to obtain relief Shanklin must demonstrate that the ACCA's decision, which is the last reasoned state court opinion, *see Wilson*, 138 S. Ct. at 1192, is contrary to or an unreasonable application of clearly established Federal law as determined by the Supreme Court or based upon an unreasonable

determination of the facts. *See* 28 U.S.C. § 2254(d). Shanklin has not made any effort to do so, and the ACCA's opinion is not unreasonable in any event. The Court sees nothing in the ACCA's opinion that is violative of *Strickland*. Thus, habeas relief is not warranted on this claim.

### B.   Shanklin's claim that the trial court violated his due process and Eighth Amendment rights when it declined to instruct the jury on lesser included offenses

Shanklin claims that because he was facing capital murder charges, *Beck v. Alabama* established that he had a constitutional right, under the due process clause and the Eighth Amendment, to a jury instruction on lesser included offenses, including felony murder, even in the absence of evidence supporting such an instruction. *See* 447 U.S. at 638 ("if the unavailability of a lesser included offense instruction enhances the risk of an unwarranted conviction, Alabama is constitutionally prohibited from withdrawing that option from the jury in a capital case"). Shanklin specifies that this is a freestanding argument, in addition to his ineffective assistance of trial counsel claim that is premised on counsel's failure to request a lesser included offenses jury instruction, which was discussed by this Court in section IV.A.1., *supra*.

Shanklin never raised this particular claim in the state courts. However, Shanklin argues that this Court should not find it unexhausted and procedurally

defaulted because the ACCA *sua sponte* reviewed the jury instructions for plain error on direct appeal. In support, Shanklin cites the Supreme Court's statement in *Castille v. Peoples* that "[i]t is reasonable to infer an exception [to exhaustion] where the State has actually passed upon the claim" because "it is fair to assume that further state proceedings would be useless." 489 U.S. 346, 351 (1989) (citation omitted). The ACCA indeed reviewed the jury instructions for plain error on direct appeal. *Shanklin*, 187 So. 3d at 795 ("Although Shanklin did not object to the circuit court's jury instructions during the guilt phase of his trial and does not argue on appeal that the circuit court's jury instructions during the guilt phase of trial were erroneous, we have reviewed the guilt-phase instructions for plain error."). The ACCA engaged in a detailed discussion of one of the other instructions—the instruction on accomplice liability—ultimately finding that while the instruction was erroneous there was no plain error. *See id.* at 795–96. Then, the ACCA concluded by stating, "Accordingly, there is no plain error in the circuit court's instructions." *Id.* at 796. However, the ACCA never specifically mentioned the lesser included offenses jury instruction in its discussion. It is therefore unclear whether it can be said that the ACCA "actually passed upon" this claim, 489 U.S. at 351.

Regardless, on the merits, Shanklin's claim fails. Although *Beck* is clearly established Federal law, it does not require what Shanklin says it does. *Beck* holds

that a death sentence may not be imposed in a capital case "when the jury was not permitted to consider a verdict of guilt of a lesser included non-capital offense, *and when the evidence would have supported such a verdict*." 447 U.S. at 627 (emphasis added). Here, Shanklin asked that instructions on lesser included offenses not be given, and the trial court stated that it did not believe that the evidence supported an instruction on felony murder in any event. *See* Vol. 19, Tab #R-46, at C. 773.

Shanklin has pleaded no facts that, when considered in light of the record, establish that he was entitled to a felony murder instruction. Both Shanklin cousins shot at Ashley Crumpton, Vol. 4 at R. 602, 604, 606, 608, one hitting her in the leg, the other attempting three times to shoot her in the face. Both cousins fought Ashley and Michael with rocks and the gun. After the murder, Shanklin told multiple witnesses of his crime. *E.g.*, Vol. 5 at R. 766, 768, 772 (Amber Piper); R. 851 (Joshua Moreland); R. 847 (Kenneth Traywick). Moreover, the Supreme Court has held that a defendant may waive instructions on lesser included offenses, *Spaziano v. Florida*, 468 U.S. 447, 456–57 (1984), which is what Shanklin did through his affidavit. Thus, Shanklin was not entitled to an instruction on felony murder, and even if he were, he waived it. Shanklin failed to plead facts showing error.

**C.      Shanklin's claim that he was denied effective assistance of trial counsel during the penalty and sentencing phases of his trial**

Shanklin argues that he was denied his Sixth Amendment right to effective assistance during the penalty and judge-sentencing phases of his trial in numerous ways, all related to trial counsel's alleged failure to investigate and present a compelling mitigation case.

During the penalty phase of his trial, Shanklin presented four witnesses to the jury. Willodean Shanklin, Shanklin's aunt, stated that she loved him. She said he was "a loving child . . . a normal child," who "liked to play" and had "a good heart." While she admitted that he had "had some trouble," she insisted that he was "still a good child" who would "help you if he can." She stated that if Shanklin were sentenced to life without parole, she would visit him. Willodean agreed that she took the verdict "especially hard" and said that Shanklin has "a loving family." She asked that his life be spared. On cross-examination, she testified that Shanklin had both parents growing up, that he went to school, and that his parents supported his education. Vol. 10, Tab #R-23, at R. 1693–97.

Jackie Shanklin, Shanklin's uncle, testified that he worked for Liberty National Insurance. He affirmed what Willodean had said about Shanklin, adding that they had a big family and that he was around while Shanklin was growing up. Jackie said Shanklin's family would support him and visit him if he were given life without parole, and he asked for Shanklin's life to be spared. On cross-examination,

he agreed that Shanklin grew up with two parents who had supported him all his life. He also testified that Shanklin's family was able to provide him with "some stuff and spending money and things like that" when he was a child. *Id.* at R. 1698–1700.

Clayton Shanklin, Sr., Shanklin's father, testified that he was 45 years old, and Shanklin was his eldest son, with middle son Maurice and daughter Tina. He said that Shanklin had "a good childhood" and that he and his wife loved Shanklin very much. Shanklin, Sr.'s wife could not bring herself to testify at that point because she had "collapsed on the sidewalk," but he insisted that she loved Shanklin. He said they would visit Shanklin if he were given life without parole, no matter where he was sent. He also begged for Shanklin's life to be spared. On cross-examination, he said that the family had supported Shanklin after his previous conviction in Jefferson County. He stated that he was a coal miner, while his wife was an R.N. He said that Shanklin "had both parents . . . [t]hat loved him and took care of him" when he was a child, but he admitted that the Crumpton girls would not have two parents. *Id.* at R. 1701–04.

Crystal Marie Coleman, Shanklin's wife, testified that she married him in September 2007 and that they had two children together, Xavier and Xandria. She said that Shanklin knew his children and had a relationship with them prior to his incarceration, explaining, "He used to pick the kids up every other weekend and then

he would also stop by and give me money and clothes and different things to help out." If Shanklin received life without parole, she said she would take the children to visit him and try to explain why he was in there. She said she sympathized with Ashley but asked for the court not to make matters worse by sentencing Shanklin to death. On cross-examination, she testified that she did not know Laronda Brown, Tracy Ward, or Amber Piper, Shanklin's girlfriends, and did not know that he was dating any of them at the time of the murder. She said that she went to Birmingham to support him when he was convicted of assault in Birmingham. *Id.* at R. 1706–10.

After this presentation, the jury unanimously recommended life without parole. Vol. 10, Tab #R-28, at R. 1739. The sentencing hearing before the trial judge was held about six months later, with the defense offering two witnesses. Clayton Shanklin, Sr. again testified. He stated that he had been there throughout the trial and once again "begg[ed] the Court to spare [Shanklin's] life." He said, "I love [Shanklin] with all my heart. If I could trade places with him, I would." Vol. 10, Tab #R-29, at R. 1754–56. Renae Shanklin, Shanklin's mother, also testified. She apologized for missing parts of the trial, explaining that she was in "panic mode" and asking for his life to be spared. She added, "I am sorry as a mother. I sympathize with Ms. Crumpton. I am very sorry for what happened to your son, but that's my son and his family loves him too." She said that she would still visit Shanklin in

prison and begged the court to "save him, save his life. His family needs him." *Id*. at R. 1757–58.

The trial court ultimately overrode the jury's sentencing recommendation and sentenced Shanklin to death. At the hearing, the trial court stated to Shanklin: "Mr. Shanklin this was the most difficult decision I've ever had to make in my life. You have cut down a young man in his prime, you've maimed a young woman, you've deprived two young children of their father. This community is very fortunate that four people weren't killed on that [fateful] night. I pray, sir, that you make amends with our maker." *Id*., Tab #R-30, at R. 1763.

The trial court's sentencing order gave the following reasons for the judicial override. The trial court stated that although "[t]he aggravating circumstances clearly weigh in favor of the death penalty," some jurors' emotions "may have hindered their ability to follow the law and impose the death penalty." Some of the jurors looked "visibly upset" when they returned to the courtroom to deliver their guilt-phase verdict, and there was an outburst following it. Some jurors then asked the bailiff if the penalty-phase verdict would be made public, and the trial judge was brought in to explain to the jury that it would be public, causing several jurors to look "concern[ed] and consternate[ed]." Vol. 1 at C. 82, 88–89. The trial court also noted that "the overwhelming evidence in this case pointed to Shanklin as the major

perpetrator," including Ashley's and Ward's testimony; the victim's family did not ask for life without parole; the court had knowledge of Shanklin's criminal history that was kept from the jury, including the fact that his Jefferson County assault conviction was pled down from attempted murder and that he had numerous arrests on drug possession and trafficking, burglary, robbery, and theft charges; and the court was convinced that "the aggravating circumstances vastly outweigh the mitigating circumstances" to the point of necessitating an override. *Id*. at 82–90.

During state postconviction proceedings, Shanklin raised and exhausted multiple claims of penalty phase and sentencing phase ineffective assistance of counsel, offering new evidence in support of mitigation that he claimed counsel should have uncovered. Vol. 17, Tab #R-44, at C. 266–92; Vol. 21, Tab #R-47, at 41–60; Vol. 24, Tab #R-52, at 52–76. With regard to the penalty phase specifically, Shanklin alleged that his trial counsel failed to adequately interview him and his family about potential mitigation evidence; failed to acquire certain records pertaining to his background; failed to present evidence about his traumatic childhood; failed to present testimony from an investigator, mitigation specialist, social worker, mental health expert, and an expert on drug and alcohol abuse; failed to present a coherent mitigation theory at the penalty phase or explain the relevance of the evidence; failed to adequately prepare his aunt, uncle, father, and wife to

testify at the penalty phase; and that he was prejudiced by these failings because the trial court overrode the jury's recommendation of life imprisonment without parole. With regard to the judge-sentencing phase specifically, Shanklin alleged that his trial counsel failed to act as his advocate during that phase; that Mr. Camp's decision to withdraw prior to that phase constituted abandonment; that his trial counsel failed to adequately investigate and present mitigating evidence; and that these cumulative failures prejudiced him.

The circuit court considering Shanklin's Rule 32 petition found that Shanklin had failed to show prejudice on this claim. Vol. 19, C. 775–83. The judge who considered Shanklin's Rule 32 petition was also his trial judge. For prejudice determinations then, the question was whether *that judge* would have changed his mind about sentencing Shanklin to death in light of the new evidence.

The ACCA affirmed the Rule 32 court's dismissal of these claims in a lengthy discussion, first writing as follows:

> Here, trial counsel presented evidence in mitigation. In fact, the evidence convinced the jury, by a vote of 12 to 0, to recommend a sentence of life imprisonment without the possibility of parole. "[T]he jury's recommendation of life imprisonment without parole negates [the appellant's] showing that he was prejudiced by counsel's performance." *Boyd v. State*, 746 So. 2d 364, 389 (Ala. Crim. App. 1999).
>
> Counsel presented testimony from Shanklin's aunt, uncle, father, and wife. These witnesses testified that Shanklin had been a

good father who loved his family and children. They asked that his life be spared and promised to visit and support him.

The circuit court, in its sentencing order, found the existence of five aggravating factors: 1) that Shanklin was under the sentence of imprisonment at the time of the murder; 2) that Shanklin had previously been convicted of two felonies involving the use or threat of violence to the person; 3) that Shanklin knowingly created a great risk to many persons; 4) that Shanklin committed the capital offense while he was engaged or was an accomplice in the commission of a robbery or burglary; and 5) that the capital offense was especially heinous, atrocious, or cruel compared to other capital offenses. The circuit court considered the statutory mitigating circumstances and found none to exist. The circuit court considered the non statutory mitigating evidence Shanklin presented via family members, but found this testimony to be "extremely weak and . . . assign[ed] very little weight to these factors." The circuit court considered the jury's unanimous recommendation of a sentence of life without the possibility of parole and assigned the jury's advisory verdict great weight. After weighing the aggravating and mitigating circumstances, the circuit court found that the aggravating circumstances vastly outweighed the mitigating circumstances and sentenced Shanklin to death.

Vol. 19, Tab #R-50, at 73–74 (citation omitted). The ACCA later added, "Although a jury's recommendation of life imprisonment without the possibility of parole does not preclude a finding of prejudice under *Strickland*, it does weigh against such a finding." *Id*. at 79 (collecting cases).

Quoting the Rule 32 court, the ACCA then found that none of Shanklin's claims was sufficiently pleaded. For example, while he claimed that counsel should have better interviewed him, "[h]e failed to plead facts showing what evidence he should have given counsel and how that evidence would have resulted in a different

outcome," or that he was unable to communicate this information to counsel. *Id.* at 75. He failed to plead what other individuals would have testified to and how it would have overcome his strongly aggravated case. *Id.* at 76–77. He failed to show how he was prejudiced by counsel's failure to acquire his school, medical, or jail records, as the jury recommended life without parole. *Id.* at 78–79. Shanklin failed to plead the identities of witnesses who should have testified to the new mitigation evidence he offered and their willingness and availability to do so. *Id.* at 80. He failed to plead the names of experts who allegedly should have been called, much less the substance of the experts' testimony and their availability. *Id.* Further, the ACCA noted that some of Shanklin's new mitigation evidence contradicted the defense's mitigation case, and evidence of his drug use and troubled childhood might have served as a double-edged sword to some jurors. *Id.* at 80–81. The ACCA also found that although Shanklin pled that counsel failed to adequately prepare his witnesses to testify, he failed to plead what other information counsel should have drawn from them on the stand, and he failed to show prejudice. *Id.* at 81. Finally, the ACCA rejected his claim of cumulative ineffective assistance, especially as the circuit court judge—who, again, had been the trial judge—found no prejudice. *Id.* at 82–85.

The ACCA then addressed Shanklin's claims of sentencing-phase ineffective assistance. The ACCA first found that Mr. Camp had not "abandoned" Shanklin by

withdrawing prior to the sentencing phase; the Alabama State Bar recommended that he withdraw because of his conflict, and the trial court appointed Mr. Adams, whom the family had already retained, and Mr. McKeown to assist Mr. Whisenhunt. *Id*. at 85–87. Second, the ACCA found that Shanklin failed to plead what other facts his counsel should have uncovered and presented, and what witnesses they should have used to present this information, to convince the trial court not to override the jury's recommendation. *Id*. at 87. The ACCA the Rule 32 court's finding that Shanklin suffered no prejudice "is entitled to considerable weight" because the Rule 32 judge was also the sentencing judge. *Id.* at 88. Finally, the ACCA again rejected Shanklin's claim of cumulative ineffective assistance. *Id.*

In Claim III of his federal habeas petition, Shanklin now presents a 50-page penalty phase ineffective assistance of trial counsel claim (*see* doc. 25-1 at 64–116), most of which consists of a narrative "mitigation story" (*id.* at 84–109), which Shanklin states was "developed through the assistance of a mitigation investigator with a background in mental health" (*id.* at 84 n.60). He further states that this investigator "spent hundreds of hours researching the backgrounds of [Shanklin] and his family; gathering and reviewing relevant records; conducting witness interviews of family, friends, educators, and others in the community; assisting the experts; and developing a relationship of trust with" him to prepare the mitigation

story. (*Id.*) Broadly speaking, the mitigation story speaks of Shanklin's parents, their marriage, and their separations; alleged violence and abuse in the home; unstable family members; Shanklin's educational career; Shanklin's personality; Shanklin's brother and sister; the town of Parrish, Alabama; "Mad Dog" Madison, a local drug dealer whom Shanklin worked for; Shanklin's two marriages; the deaths of Shanklin's great-grandmother and his first wife; incidents of mental illness, addiction, and incarceration in Shanklin's extended family; and Shanklin's mental health and substance abuse.

Some of this new evidence was never presented to the state courts.[3] With regard to the parts of this mitigation story that are unexhausted, the Court finds that they are procedurally barred from this Court's review for all of the reasons explained in section IV.A.3.i., *supra*.

With regard to the portions of this claim that Shanklin *did* exhaust during his Rule 32 proceedings, Shanklin has not made an effort to establish that the ACCA's decision regarding his ineffective assistance of counsel claim was contrary to or an unreasonable application of clearly established Federal law or based upon an

---

[3]    Respondent has compared the mitigation information Shanklin now offers with the information he presented in the state courts, detailing which portions of the current federal claim are new and which were offered to the state courts and thus exhausted below. (Doc. 33 at 72-73.) Because the Court finds that the new information is procedurally barred from this Court's review and none of the repeated information gives rise to relief under § 2254(d), the Court will not restate the comparison in detail here.

unreasonable determination of the facts before it. Rather, Shanklin contends in his reply brief that "[b]ecause this claim cannot be adequately considered until it has been fully exhausted, [] Shanklin will not address the merits of any portion . . . ." (Doc. 41 at 21.)[4] In any event, the ACCA's decision was not unreasonable. For many of these claims, Shanklin failed to plead who should have been called to testify and what the substance of their testimony would have been, especially as some of the evidence, such as that concerning Shanklin's drug abuse, could be considered a double-edged sword. In sum, the penalty and sentencing phase ineffective assistance of counsel claim is due to be denied.

> **D.    Shanklin's claim that his constitutional rights were violated because the trial court overrode the jury's recommendation of life without parole and sentenced him to death, and the ACCA upheld that decision**

In this claim, Shanklin challenges the trial court's decision to override the jury's unanimous penalty phase recommendation that Shanklin be sentenced to life in prison without parole and sentence Shanklin to death.

At the time of Shanklin's sentencing, what has come to be known as "judicial override" was authorized by section 13A-5-47(e) of the Code of Alabama. In 2017, the statute was amended to remove the override provision, but only prospectively.

---

[4]    As noted in the procedural history section, Shanklin filed a motion to stay these federal habeas proceedings so that he could exhaust this claim in state court (Doc. 26), which this Court denied because any further attempt at exhaustion would be futile. (Doc. 42.)

*See* Ala. Laws Act 2017-131 (S.B. 16). The amended statute provides that the trial court must impose the sentence decided by the jury. *See* Ala. Code § 13A-5-47(a). But the 2017 amendment "shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to April 11, 2017." *Id*. § 13A-5-47.1.

Shanklin emphasizes that he is one of only five Alabama prisoners facing execution despite a jury unanimously recommending a life sentence. (Doc. 25-1 at 6).  He adds that the practice of allowing a judge to override a jury's vote for a life sentence in a capital case has now been abolished in every state. Aside  from  that, Shanklin argues that his sentence was imposed in violation of his rights to a fair trial, reliable sentencing, and due process. The crux of his argument is that one of the trial court's reasons for overriding the jury's verdict was improperly based upon an *ex parte* and unrecorded interaction that the trial court claimed to have had with the jury which led the trial court to conclude that it was "very likely these jurors . . . were unable to carry out their sworn legal obligation during sentencing." Vol. 1 at C. 89. Shanklin argues that no evidence in the record supports the trial court's conclusion in that regard.

The full context of the portion of the trial court's sentencing order of which Shanklin complains reads as follows:

*Taylor v. State*, 808 So. 2d 1215 (Ala. 2001), is very instructive. In justifying the judicial override, the trial court made two key findings. First, the court found, as in this case, that the aggravating circumstances substantially outweighed the mitigating circumstances. *Id.* at 1219. The trial court's second finding was that "some jurors" outbursts of emotion after they found the defendant guilty of capital murder indicated that they were overwhelmed by their impending duty to consider the death penalty as required by law. *Id.* Based on these two factors the Alabama Supreme Court held that the trial court "permissibly assessed the jury's recommendation very little weight." A similar situation occurred in this case.

In this case, several jurors were visibly upset upon entering the courtroom to render their verdict at the conclusion of the guilt phase. In addition, at the conclusion of the rendering of the verdict at the guilt phase, there was an outburst among persons in the audience in the courtroom, requiring order to be restored. The courtroom was ordered vacated and the jury was quickly sequestered in the jury room. A recess was taken before the commencement of the penalty phase of the trial. During this break, several members of the jury asked the bailiff if the results of the penalty phase portion of the trial would be made public. This judge presiding over the case was summoned and explained to the jury that the penalty phase portion of the trial would indeed be public. There was a look of concern and consternation on the faces of several of the jurors. As in [*Ex parte Taylor*, 808 So. 2d 1215 (Ala. 2001)], it is very likely these jurors, although very cooperative, diligent, and attentive throughout the trial, were unable to carry out their sworn legal obligation during sentencing. This Court holds that this was likely a key factor in the jury's vote recommending a sentence of life without parole in the face of the overwhelming weight of the aggravating circumstances.

IN CONCLUSION … The Court finds that there is only one logical conclusion as to the defendant's punishment. That conclusion being that he should suffer the punishment of death by legal [sic] injection according to Alabama law.

*Id.* at C. 86, 88–89.

Shanklin's counsel filed a motion for new trial, arguing that:

> there was no evidence that the[ jurors'] emotions prohibited them from following the law, to this attorney's knowledge. The record is devoid of any evidence indicating that the jurors in this case displayed emotional outbursts that prevented them from following the law. … If there was any "evidence" of jurors being unable to follow the law, neither this Honorable Court nor the State made any mention of this on the record, nor was it ever proven otherwise at the time of the supposed trouble.

*Id.* at C. 95. The trial court conducted a hearing on the motion for new trial and denied the motion. *Id.* at C. 99.

Shanklin exhausted this claim on direct appeal, arguing that the trial court's sentencing order incorporated facts not in evidence and that the trial court made incorrect assumptions about the jurors, including about their emotions as to the penalty phase verdict. Vol. 12, Tab #R-33, at 39–42 (brief to ACCA); Vol. 14, Tab #R-38, at 14–19 (cert petition to Alabama Supreme Court). Specifically, in his brief to the ACCA, Shanklin contended that the record was "entirely devoid" of evidence supporting the trial court's finding of juror incapacity, and argued that a death sentence imposed on the basis of such "misstatements" and "speculation" "does not reflect the rational, reviewable, and guided discretion required of any death sentence," citing *Gregg v. Georgia*, 428 U.S. 153, 189 (1976), and *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982), and he specifically asserted that "the trial court deprived Mr. Shanklin's constitutional rights under the Sixth, Eighth and

Fourteenth Amendments to the United States Constitution." Vol. 12, Tab #R-33, at

39, 41–42.

The ACCA rejected the claim on direct appeal, heavily quoting the trial

court's sentencing order, as follows:

> Shanklin contends that the circuit court failed to provide a sufficient basis for overriding the jury's recommendation under *Ex parte Carroll*, 852 So. 2d 833 (Ala. 2002), and *Ex parte Taylor*, 808 So. 2d 1215 (Ala. 2001).

> This Court has explained:

> "In *Taylor*, the Alabama Supreme Court held that, based on the requirements of § 13A-5-47(d) and (e), Ala. Code 1975, 'the trial judge must state specific reasons for giving the jury's recommendation the consideration he gave it.' 808 So. 2d at 1219. . . .

> "In *Carroll*, the Alabama Supreme Court stated:

>> "'We take this opportunity to further explain the effect of a jury's recommendation of life imprisonment without the possibility of parole. Such a recommendation is to be treated as a mitigating circumstance. The weight to be given that mitigating circumstance should depend upon the number of jurors recommending a sentence of life imprisonment without parole, and also upon the strength of the factual basis for such a recommendation in the form of information known to the jury, such as conflicting evidence concerning the identity of the "triggerman" or a recommendation of leniency by the victim's family; the jury's recommendation may be overridden based upon information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.'

"*Carroll*, 852 So. 2d at 836 (emphasis added). In [*Ex parte*] *Tomlin*, the Alabama Supreme Court held that a 12–0 jury recommendation of life imprisonment without the possibility of parole was entitled to 'great weight.' 909 So. 2d [283,] at 286 [(Ala. 2003)]."

*Stanley v. State*, 143 So. 3d 230, 325–26 (Ala. Crim. App. 2011) (opinion on remand from the Alabama Supreme Court).

Here, the circuit court complied with *Taylor, Carroll,* and *Ex parte Tomlin*, 909 So. 2d 283 (Ala. 2003). Specifically, the circuit court, as required by *Taylor* and *Carroll*, provided its "specific reasons for giving the jury's recommendation the consideration [the circuit court] gave it." *Taylor*, 808 So. 2d at 1219. Specifically, the circuit court explained:

"*Carroll* and [*Ex parte*] *Martin*[, 931 So. 2d 759, 771 (Ala. 2004),] require that this Court address its reasons for overriding the jury's advisory recommendation. Using the factors outlined in *Carroll*, this Court distinguishes *Carroll* from the facts of this case.

"(a) Number of Jurors Recommending Life: In *Carroll*, ten jurors recommended life without parole. In this case, all twelve jurors made such a recommendation. While no court is able to read the minds of a jury, the mandates of *Carroll* and *Martin* seemingly require this Court to do just that.

"Based on the overwhelming evidence in this case and the unanimous verdicts on both counts of capital murder (and the attempted murder count as well), it is not easy to understand why all twelve members of the jury voted against the death penalty in this case. There is evidence that several jurors emotions may have hindered their ability to follow the law and impose the death penalty. The aggravating circumstances clearly weigh in favor of the death penalty. [Shanklin] presented no evidence of any statutory mitigating factors. The non-statutory mitigating factors

concerning family factors and character, etc., were extremely weak and this Court assigns very little weight to these factors. The only real mitigating circumstance is the jury's recommendation of life without parole which, was unanimous, and given great weight by this Court.

"(b) Conflicting Evidence of the 'Triggerman': While the facts in *Carroll* may have left some doubt as to the identity of the 'triggerman,' the overwhelming evidence in this case pointed to Shanklin as the major perpetrator. The State presented an eyewitness who was present at the scene and was herself a victim of the crime. The State also presented testimony from a codefendant, Tracy Ward, who clearly pointed out Shanklin's role in the crime and his admission to the shooting of Michael Crumpton. The jury unanimously found that Shanklin intentionally killed Michael Crumpton. There is no doubt whatsoever as to [Shanklin's] involvement in this horrific crime, as there apparently was in *Carroll*. Accordingly, in comparison to *Carroll*, judicial override is proper in this case.

"(c) Recommendation of the Victim's Family: In *Carroll*, the victim's family recommended Carroll not receive the death penalty. No one from Michael Crumpton's family made such a recommendation in this case. While there was no testimony elicited (and this Court would not have allowed such testimony) from Michael Crumpton's family as to their recommendations for Shanklin's sentence, this Court has little doubt that it would have been the death penalty. Accordingly, in comparison to *Carroll*, judicial override is proper in this case.

"(d) Facts of the Crime/Not Killing the Witnesses: It is accurate that Shanklin did not kill Ashley Crumpton (although there was an attempt on her life) and the two infant children in the apartment. Shanklin did, however, threaten to kill Amber Piper and her small child if she 'told anyone' about his admission to the crime. It seems unbearably cruel to force anyone to watch or live through the slaughter of another person, especially when the witness is related to that person. Yet, that is what also happened

in *Carroll*, and the Alabama Supreme Court found that this factor tipped in favor of a life without parole sentence. Although with grave reservation, this Court gives the absolute minimum consideration of this factor as tipping the scales in favor of the jury's recommendation in light of Carroll.

"(e) Additional Facts Unknown to the Jury: Finally, *Carroll* also allows this Court to consider 'information known only to the trial court and not to the jury, when such information can properly be used to undermine a mitigating circumstance.' *Carroll*, 852 So. 2d at 836. The Court does have knowledge of Shanklin's criminal history which was unknown to the jury. The defendant was originally charged with Attempted Murder in CC–2006–4973 and 4974 (Jefferson County, Alabama) which resulted in his pleading to Assault in the First Degree in both cases. In addition, Shanklin has had numerous arrests including Possession of a Controlled Substance, Use/Possession of Drug Paraphernalia, Burglary in the First Degree, Robbery in the First Degree, Theft of Property in the First Degree, Burglary in the [Third] Degree, Theft of Property in the [Second] Degree, and Trafficking Illegal Drugs. This information conceivably could have weighed against the 'non-statutory mitigating circumstances' if known by the jury, particularly the testimony from Shanklin's family members regarding his character. Accordingly, this court places minimal weight of this 'information known only to the trial court and not to the jury' as a justification for an override.

"As clearly shown above, this case is clearly distinguishable from *Carroll*. Because only one of the factors listed by the Alabama Supreme Court in *Carroll* as 'tipping the scales in favor of following the jury's recommendation' applies in this case, and that one just minimally, this court sees no legal impediment to overriding the jury's recommendation."

(C. 81–85.)

The circuit court further justified its override of the jury's recommendation:

> "In this case, several jurors were visibly upset upon entering the courtroom to render their verdict at the conclusion of the guilt phase. In addition, at the conclusion of the rendering of the verdict at the guilt phase, there was an outburst among persons in the audience in the courtroom, requiring order to be restored. The courtroom was ordered vacated and the jury was quickly sequestered in the jury room. A recess was taken before the commencement of the penalty phase of the trial. During this break, several members of the jury asked the bailiff if the results of the penalty phase portion of the trial would be made public. This judge presiding over the case was summoned and explained to the jury that the penalty phase portion of the trial would indeed be public. There was a look of concern and consternation on the faces of several of the jurors. . . . [I]t is very likely these jurors, although very cooperative, diligent, and attentive throughout the trial, were unable to carry out their sworn legal obligation during sentencing. This Court holds that this was likely a key factor in the jury's vote recommending a sentence of life without parole in the face of the overwhelming weight of the aggravating circumstances." [FN 39]

> > FN 39. Although Shanklin argues that "the record is entirely devoid of any such indication" that several jurors' emotions may have hindered their ability to follow the law and to impose the death penalty, nothing in the record demonstrates that the circuit court's observations were inaccurate or incorrect.

(C. 88–89.) Under *Taylor*, the circuit court's justification for overriding the jury's recommendation is not impermissible. Additionally, the circuit court's sentencing order complied with *Tomlin* by assigning the jury's recommendation "great weight" based on its 12–0 recommendation for life imprisonment without the possibility of parole. Consequently, Shanklin's argument that the circuit court's sentencing order was insufficient under *Carroll* and *Taylor* is without merit.

*Shanklin*, 187 So. 3d at 800–03.

At first blush, it would appear that since the Alabama state courts addressed this claim on the merits, this Court's review is deferential, and to obtain relief Shanklin must demonstrate that the ACCA's decision, which is the last reasoned state court opinion, *see Wilson*, 138 S. Ct. at 1192, is contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court or based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

However, despite Shanklin framing this claim as a constitutional violation, the ACCA did not explicitly address the constitutional violation components of Shanklin's claim on their merits. Instead, the ACCA framed the issue as one of compliance with the state law requirement that a sentencing order identify specific reasons justifying an override decision. Shanklin thus argues that there is no decision to which this Court owes deference, and this Court should review the constitutional claim *de novo*.

In *Johnson v. Williams*, the Supreme Court addressed this issue, which:

arises when a defendant convicted in state court attempts to raise a federal claim, either on direct appeal or in a collateral state proceeding, and a state court rules against the defendant and issues an opinion that addresses some issues but does not expressly address the federal claim in question.

568 U.S. 289, 292-93 (2013). The Court asked:

If this defendant then raises the same claim in a federal habeas proceeding, should the federal court regard the claim as having been

adjudicated on the merits by the state court and apply deference under
§ 2254(d)? Or may the federal court assume that the state court simply
overlooked the federal claim and proceed to adjudicate the claim de
novo, the course taken by the Court of Appeals in the case at hand?

*Id.* at 93. The Court held that when such clarity is lacking—e.g., where a state court

"issues an opinion that addresses some issues but does not expressly address the

federal claim in question," *id.*, "a federal habeas court must presume that the federal

claim was adjudicated on the merits—but that presumption can in some limited

circumstances be rebutted," *id.* at 301. When determining whether this presumption

should hold regarding a particular claim, a federal court must remain mindful that

"[a] judgment is normally said to have been rendered 'on the merits' only if it was

'delivered after the court . . . heard and evaluated the evidence and the parties'

substantive arguments.'" *Id.* at 302 (citations omitted). Thus, if the circumstances

indicate that a federal claim was "rejected" by the state court "as a result of sheer

inadvertence, it has not been evaluated based on the intrinsic right and wrong of the

matter." *Id.* at 303. Likewise, if the state court responds to a claim of federal

constitutional error using only state law, and that state law is "different from" or

"less protective" than the applicable federal rule, "the presumption that the federal

claim was adjudicated on the merits may be rebutted." *Id.* at 301. In such cases, "§

2254(d) entitles the prisoner to an unencumbered opportunity to make his case before a federal judge." *Id.* at 303.

Shanklin contends that the question the ACCA recharacterized and decided was simply not the one that his appellate counsel asserted. He argues that the claim was not that the trial court failed to give "specific reasons" for overriding the jury's life recommendation; it was that the specific reasons the trial court gave had no basis in fact, such that the death sentence made possible by those reasons was arbitrary and unreliable. He contends that the "intrinsic rights and wrongs" of those two questions are different, *see Johnson*, 568 U.S. at 303.

Shanklin also argues that while *Johnson* recognizes the possibility that a state court decision expressed only in state law terms might nevertheless amount to a merits adjudication of a federal question "if the state-law rule subsumes the federal standard," *Johnson*, 568 U.S. at 301, that did not happen in his case. He points out that the ACCA cited five cases while discussing Shanklin's claim: *Ex parte Carroll*, 852 So. 2d 833 (Ala. 2002); *Ex parte Taylor*, 808 So. 2d 1215 (Ala. 2001); *Ex parte Tomlin*, 909 So. 2d 283 (Ala. 2003); *Stanley v. State*, 143 So. 3d 230 (Ala. Crim. App. 2011); and *Ex parte Martin*, 931 So. 2d 759 (Ala. 2004). *See Shanklin*, 187 So. 3d at 801. Shanklin contends that while each case helped shape how Alabama's capital sentencing scheme functions within the federal constitutional framework with which

it must comply, none stated a rule that "subsumes" a capital defendant's right not to be sentenced based on materially false information.

Ultimately, whether this Court views this claim *de novo* or whether it views the ACCA's decision for reasonableness through the deferential lens of § 2254(d), the result is the same that Shanklin's claim lacks merit. Shanklin argues that the trial court violated his rights to be sentenced on materially accurate information, to be present and assisted by counsel at all critical stages of his criminal proceedings, and to due process of law.

Shanklin theorizes that the trial judge's encounter with the jury never occurred, and thus Shanklin has been deprived of his Eighth and Fourteenth Amendment rights not to be sentenced to death based on materially false information. In support, he cites *Johnson v. Mississippi*, 486 U.S. 578, 584 (1988) ("The fundamental respect for humanity underlying the Eighth Amendment's prohibition against cruel and unusual punishment gives rise to a special need for reliability in the determination that death is the appropriate punishment in any capital case."), and *Townsend v. Burke*, 334 U.S. 736, 741 (1948) (sentence imposed "on the basis of . . . materially untrue" information, "whether caused by carelessness or design, is inconsistent with due process of law, and . . . cannot stand"). In support of his theory that the trial court fabricated this encounter, Shanklin points out that

at the time, neither the parties nor the judge said anything on the record to suggest that jurors looked "visibly upset" as they entered the courtroom to announce their guilt phase verdict. Vol. 9, Tab #R-19, R. 1674-76. Shanklin further argues that despite the sentencing order claiming that there was an outburst "among persons in the audience" as the jury announced its verdict, "requiring order to be restored" by vacating the courtroom, the court reporter captured no outburst and the court admonished no "persons in the audience." Ultimately, however, Shanklin offers only speculation in support of his accusation that the trial judge simply fabricated this incident. Since nothing in the record supports this theory, this Court will not entertain it.

Alternatively, Shanklin argues that if the encounter between the trial judge and the jury did occur, the trial judge should not have engaged with the jury in that manner without affording Shanklin any notice or opportunity to participate. He cites *Illinois v. Allen*, 397 U.S. 337, 338 (1970) ("One of the most basic of the rights guaranteed by the Confrontation Clause is the accused's right to be present in the courtroom at every stage of his trial."). Yet Shanklin has not explained how his constitutional rights were violated by the trial court explaining to the jury the mere fact that the penalty phase portion of the jury trial would indeed be a public proceeding.

Ultimately, this Court cannot say that Shanklin's death sentence was unconstitutionally imposed. The trial court's lengthy sentencing order was legal, logical, and appropriate. As it was required to do, it gave the jury's life recommendation great weight. However, it was not required to adopt that recommendation. The trial court also did what was required under section 13A-5-47 of the Code of Alabama: it considered the aggravating and mitigating circumstances, weighed them with the jury's recommendation, and independently concluded that death was appropriate in Shanklin's case. As is clear from the order, the trial court did not think it was a close question as to whether the death sentence should be imposed. The ACCA's opinion also did what it was required to do under sections 13A-5-53(b)(2) and (3) and reweighed the aggravating and mitigating circumstances. The ACCA found that Shanklin's death sentence was appropriate and in line with the death sentences imposed in other robbery–murder and burglary–murder cases. Vol. 13, Tab #R-37, at 811–12 (collecting cases). Habeas relief is not warranted on this claim.

**E.** **Shanklin's claim that the "heinous, atrocious, or cruel compared to other capital offenses" aggravator is unconstitutionally broad and that it was applied to him in an arbitrary and capricious manner**

Shanklin contends that the "heinous, atrocious, or cruel compared to other capital offenses" aggravator (hereinafter, the "HAC" aggravator) found in Ala.

Code § 13A-5-49(8) (1975) is not only unconstitutionally overly broad on its face but that it was also applied in an arbitrary and capricious manner to him, and that he is actually innocent of this aggravator.

On direct appeal, Shanklin argued that the HAC aggravator is unconstitutionally vague and that it did not apply in his case. Vol. 12, Tab #R-33, at 75 ("The application of this aggravator violated Mr. Shanklin's right to due process, a fair trial, and reliable sentencing proceedings as protected by the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, the Alabama Constitution, and Alabama law."). The ACCA disagreed, writing as follows:

> Shanklin contends that he "was sentenced to death under an unconstitutionally vague aggravating circumstance; that the alleged murders were especially 'heinous, atrocious, or cruel' . . . when compared to other capital offenses." (Shanklin's brief, p. 74 (quoting § 13A–5–49(8), Ala. Code 1975).) Specifically, Shanklin, in his brief on appeal, appears to raise two arguments: first, that § 13A–5–49(8), Ala. Code 1975, is unconstitutionally vague; second, "[e]ven if not unconstitutionally vague, the facts from this case certainly do not fit the description of 'conscienceless or pitiless homicides which are unnecessarily torturous to the victim.'" (Shanklin's brief, p. 75.)

> As to Shanklin's first argument—that § 13A–5–49(8), Ala. Code 1975, is unconstitutionally vague—this Court, in *Minor v. State*, 914 So. 2d 372, 437 (Ala. Crim. App. 2004), rejected the precise argument Shanklin now raises on appeal, explaining:

>> "With respect to Minor's constitutional challenge to the heinous, atrocious, or cruel aggravating circumstance in § 13A–

5–49(8), Ala. Code 1975, this Court has repeatedly upheld that circumstance against similar challenges. *See Duke v. State*, 889 So. 2d 1 (Ala. Crim. App. 2002) . . . ."

Thus, Shanklin is not entitled to relief as to that claim.

As to Shanklin's second argument—that "the facts from this case certainly do not fit the description of 'conscienceless or pitiless homicides which are unnecessarily torturous to the victim'"—that claim is without merit. Shanklin, in his brief on appeal, argues that

"[e]ven accepting the State's facts as true, there is nothing to suggest that this crime was the worst of the worst. It was a robbery gone bad, where a man was shot in the back. He was not tortured in any way. If this crime fits into the framework of heinous, atrocious, or cruel then so too does every single homicide ever committed."

(Shanklin's brief, p. 75.)

Thus, it appears that Shanklin's argument on appeal is that Shanklin's actions, as a matter of law, do not rise to the level of "heinous, atrocious, and cruel." Shanklin, however, does not cite any authority to support his claim. Consequently, Shanklin's argument does not satisfy Rule 28(a)(10), Ala. R. App. P. Regardless, Shanklin's claim is without merit.

"This Court has stated the following concerning the application of this aggravating circumstance:

"'The especially heinous, atrocious, or cruel aggravating circumstance "appl[ies] to only those conscienceless or pitiless homicides which are unnecessarily torturous to the victim." *Ex parte Kyzer*, 399 So. 2d 330, 334 (Ala. 1981), citing *State v. Dixon*, 283 So. 2d 1 (Fla. 1973).

"'''There are three factors generally recognized as indicating that a capital offense is especially

> heinous, atrocious, or cruel: (1) the infliction on the victim of physical violence beyond that necessary or sufficient to cause death; (2) appreciable suffering by the victim after the assault that ultimately resulted in death; and (3) the infliction of psychological torture on the victim.'"

> "'*Saunders* [*v. State*], 10 So. 3d [53] at 108 [ (Ala. Crim. App. 2007)] . . . .'

> "*Stanley v. State*, 143 So. 3d 230, 312 (Ala. Crim. App. 2011)."

*Boyle v. State*, 154 So. 3d 171, 242–43 (Ala. Crim. App. 2013). Additionally,

> "'[o]ne factor this Court has considered particularly indicative that a murder is "especially heinous, atrocious or cruel" is the infliction of psychological torture. Psychological torture can be inflicted where the victim is in intense fear and is aware of, but helpless to prevent, impending death. Such torture "must have been present for an appreciable lapse of time, sufficient enough to cause prolonged or appreciable suffering." *Norris v. State*, 793 So. 2d 847, 861 (Ala. Crim. App. 1999).'

> "*Ex parte Key*, 891 So. 2d 384, 390 (Ala. 2004). *See also White v. State*, 587 So. 2d 1218, 1234 (Ala. Crim. App. 1990) (noting that '[e]vidence as to the fear experienced by the victim before death is a significant factor in determining the existence of the aggravating circumstance that the murder was heinous, atrocious, and cruel. *Ex parte Whisenhant*, 555 So. 2d 235, 243–44 (Ala. 1989), cert. denied, [496] U.S. [943], 110 S. Ct. 3230, 110 L. Ed. 2d 676 (1990).')."

*Baker v. State*, 87 So. 3d 587, 604 (Ala. Crim. App. 2009) (emphasis added).

Here, the evidence presented at trial established the existence of all three heinous, atrocious, and cruel factors. As to the first factor, the State's evidence at trial established that Michael was subject to "physical violence beyond that necessary or sufficient to cause death." Specifically, Ashley testified that Michael was struck on the head with a large rock and was shot in the back four times. According to Dr. Ward, Michael had an injury on the back of his head consistent with being struck with a gun or a rock and had other facial injuries that were the result of a "tremendous amount of force." Additionally, Dr. Ward testified that Michael received four gunshot wounds but was killed by only one of those shots. Dr. Ward testified that two of the other bullets broke Michael's ribs and would have caused "severe pain."

As to the second factor, the State's evidence demonstrated that Michael experienced "appreciable suffering" before he died. Specifically, the evidence established that Michael was awakened when two individuals entered his bedroom and were fighting Ashley. At that time, Michael began fighting one of the individuals, was struck several times by a large rock, and was shot four times in the back. Michael, however, did not die quickly; rather, the testimony at trial indicated that Michael lived for "several minutes." According to Ashley, Michael was pale and had difficulty breathing. Dr. Ward testified that Michael suffered "a slow, relatively agonizing death," explaining:

> "Once the bullet went through the heart and the vena cava, those areas started to bleed. Because the bullet is coming from the back of the heart to the front, the blood left the sac of the heart first of all and went into the right side of his chest. So, we found about a liter of blood in the right side of his chest and the chest wall is fixed relatively. So if you put a liter of blood, and you can just visualize a two liter bottle of soda and half of that amount of volume is in the right side of his chest so his lung is not going to be able to expand well because the blood is going to keep it from expanding. And that means he can't take a deep breath of air and he is going to get the sensation of smothering or of not being able to breathe. In addition to that, the blood does collect eventually inside that sac around the heart and that is going to mean that his heart can't expand and contract when it beats, so he is going to

have a sensation that he is not getting enough blood to his brain and to the rest of his body and at the same time he is suffering from not being able to get a good breath of air, so it would be the equivalent of smothering."

(R. 1461–62.)

As to the third factor, the State's evidence demonstrated that Michael was "in intense fear and [was] aware of, but helpless to prevent, [his] impending death." Specifically, as noted above, Michael lived for several minutes after being shot four times in the back and walking with Ashley down the hallway into their living room. According to Ashley, they

"both walked to the sofa, the loveseat, and he has his gun in his hand and I asked him just to put it down and he drops the gun on the couch. And I asked him if he was okay, and he looked at me and asked me if I were okay and he said no. And I told him I was fine, I had just been shot in the leg. I went to try to open the front door and my hands were shaking so bad I couldn't open it so he opened it for me. And I told him I was going to call an ambulance so I ran back down the hallway to get our phone that usually sits on the computer stand.

". . . .

"[Michael] looked pale. He couldn't breathe and he was just hurting."

(R. 617–18.)

Thus, contrary to Shanklin's argument on appeal, the evidence presented at trial indicated that this capital offense was especially heinous, atrocious, or cruel. Accordingly, Shanklin is not entitled to relief on this claim.

*Shanklin*, 187 So. 3d at 806–09 (footnote and some citations omitted).

After rejection by the ACCA, Shanklin did not repeat this specific claim in his petition for certiorari in the Alabama Supreme Court. *See* Vol. 14, C. 1–31 (cert. petition). Although Shanklin contends in his reply brief that he presented "the substance of . . . [the] claim" to the Alabama Supreme Court (*see* doc. 41 at 48), he also acknowledges that his certiorari petition was a "broad-based attack" on the judicial sentencing and that this claim was not "presented artfully" (*id.* at 48–49). Indeed, the portions of his certiorari petition that Shanklin quotes to support his contention that he sufficiently presented "the substance of" of the claim merely speak in general terms of errors and constitutional violations and never specifically raise any issue about the HAC aggravator. *See* Vol. 14, C. 14; 18; 29. But the Eleventh Circuit has held that "an issue is exhausted if 'the reasonable reader would understand [the] claim's *particular legal basis and specific factual foundation*' to be the same as it was presented in state court." *Pope*, 680 F.3d at 1286 (quoting *Kelley*, 377 F.3d at 1344–45) (emphasis added). Thus, for all of the reasons explained in section IV.A.3.*i.*, *supra*, Shanklin did not exhaust this claim, it is procedurally defaulted from this Court's review, and Shanklin's arguments as to why procedural default should not bar relief are denied.

Shanklin also claims "actual innocence" to excuse the procedural default of this particular claim, *see Smith*, 477 U.S. at 537, because he claims to be actually

innocent of the HAC aggravator, citing *Sawyer v. Whitley*, 505 U.S. 333, 345 (1992) ("Sensible meaning is given to the term 'innocent of the death penalty' by allowing a showing in addition to innocence of the capital crime itself a showing that there was no aggravating circumstance or that some other condition of eligibility had not been met.") (footnote omitted)). The Court is not persuaded.

Assuming that Shanklin had pursued this claim through to the Alabama Supreme Court to fully exhaust it, Shanklin would still not be due relief under § 2254(d).[5] Shanklin argues that the state courts' decisions were based on an

---

[5]     The Court notes that it does not agree with Respondent that the ACCA denied this claim based on an adequate and independent state procedural ground.

As can be seen from the above-quoted portion of the ACCA's opinion addressing this claim, the ACCA made two alternative findings with specific regard to Shanklin's claim that the HAC aggravator did not apply to him: 1) that Shanklin failed to cite authority to support the claim so he did not satisfy Alabama Rule of Appellate Procedure 28(a)(10); and 2) that the claim failed on the merits. *Shanklin*, 187 So. 3d at 807 ("Thus, it appears that Shanklin's argument on appeal is that Shanklin's actions, as a matter of law, do not rise to the level of "heinous, atrocious, and cruel." Shanklin, however, does not cite any authority to support his claim. Consequently, Shanklin's argument does not satisfy Rule 28(a)(10), Ala. R. App. P. Regardless, Shanklin's claim is without merit.").

Alabama Rule of Appellate Procedure 28(a)(10) requires an appellant's brief to set forth "[a]n argument containing the contentions of the appellant/petitioner with respect to the issues presented, and the reasons therefor, with citations to the cases, statutes, other authorities, and parts of the record relied on." Ala. R. App. P. 28(a)(10). "The purpose of Rule 28 [ ], outlining the requirements for appellate briefs, is to conserve the time and energy of the appellate court and to advise the opposing party of the points he or she is obligated to make." *Ex parte Borden*, 60 So. 3d 940, 943 (Ala. 2007).

Respondent argues that the ACCA's finding that Shanklin failed to satisfy this appellate procedure rule constitutes an "adequate and independent state procedural ground for denying habeas relief," which means that the claim is procedurally defaulted. (Doc. 33 at 81–82). Respondent cites *Taylor v. Dunn*, 1:14-cv-00439, 2018 WL 575670, at *15 (S.D. Ala. Jan. 25, 2018)

unreasonable determination of the facts in light of the record before them, *see* §
2254(d)(2). Specifically, he takes issue with one of the trial court's findings that the
HAC aggravator applied because Ashley Crumpton "had to endure the killing of her
spouse in front of her eyes and escaped death herself by the fact of the gun not firing
. . . ." Vol. 1 at C. 74–75. Shanklin argues that in focusing on Ashley's suffering, the
trial court applied the wrong legal standard because Alabama law provides that the
HAC aggravator applies only to the murder *victim*. Regardless, assuming that this
one finding by the trial court was inappropriate, the ACCA on direct appeal found
on its own the existence of all three HAC factors, as required by Alabama law, and
did not rely upon Ashley's suffering. *See Shanklin*, 187 So. 3d at 808. Shanklin's
other arguments are essentially that Michael was never in intense fear of his own
impending death and that he did not experience appreciable suffering before he
ultimately died. However, the trial court and the ACCA found the opposite,

---

("federal habeas courts have routinely deemed claims to be procedurally defaulted where the state
courts dismissed them pursuant to a Rule 28(a)(10) waiver").

Shanklin responds that the fact that the ACCA also spent three pages of its opinion
considering and rejecting this claim on the merits means that it did not deny this claim on an
adequate and independent state procedural ground. *See Shanklin*, 187 S. 3d at 807–09.

The Court agrees with Shanklin on this point. *See Harris v. Reed*, 489 U.S. 255, 262 (1989)
("[A] federal claimant's procedural default precludes federal habeas review, like direct review,
only if the last state court rendering a judgment in the case rests its judgment on the procedural
default.").

conclusions that Shanklin has not rebutted by clear and convincing evidence. Accordingly, habeas relief is not warranted on this claim.

### F.   Shanklin's claim that State's evidence was insufficient to support a capital murder conviction

Shanklin claims that the State's evidence was insufficient to support his capital murder conviction because the State failed to prove that he had a specific intent to kill.

The ACCA rejected this claim on direct appeal, writing:

> Shanklin contends that the circuit court erred when it denied his motion for a judgment of acquittal and when it denied his motion for a new trial because, he says, the State "presented insufficient evidence to prove capital murder as charged in the indictment" in that, he argues, the State failed to establish that Shanklin "intentionally killed" Michael. Specifically, Shanklin, in his brief on appeal, contends that the State's evidence was insufficient and against the great weight of the evidence because, he says, the evidence presented at trial established that he "was not the triggerman." (Shanklin's brief, p. 73.) Additionally, Shanklin argues that, although "a non-triggerman can be convicted of capital murder if he was a knowing accomplice to the intentional killing itself" (Shanklin's brief, p. 73 (citation and quotation marks omitted)), "the State did not operate under an accomplice liability theory[;] instead it argued that [Shanklin] was the triggerman." (Shanklin's brief, p. 74.)

> > "'"In a challenge of the sufficiency of the evidence, an appellate court must consider the evidence in the light most favorable to the prosecution, and the appellate court will not substitute its judgment for that of the trier of fact." *Maddox v. State*, 620 So. 2d 132, 133 (Ala. Cr. App. 1993). Conflicting evidence presents a jury question not subject to review on appeal, provided that the state's evidence established a prima facie case. *Gunn v. State*, 387

So. 2d 280 (Ala. Cr. App.), cert. denied, 387 So. 2d 283 (Ala. 1980). A trial court's denial of a motion for a judgment of acquittal must be reviewed by determining whether there existed legal evidence before the jury, at the time the motion was made, from which the jury by fair inference could have found the defendant guilty beyond a reasonable doubt. *Willis v. State*, 447 So. 2d 199 (Ala. Cr. App. 1983). Furthermore:

> "''''"A verdict of conviction will not be set aside on the ground of insufficiency of the evidence, unless, allowing all reasonable presumptions for its correctness, the preponderance of the evidence against the verdict is so decided as to clearly convince this Court that it was wrong and unjust."'''"

> "'*McCollum v. State*, 678 So. 2d 1210, 1215 (Ala. Cr. App. 1995), quoting *Cox v. State*, 500 So. 2d 1296 (Ala. Cr. App. 1986), quoting in turn other cases.'

> "*Presley v. State*, 770 So. 2d 104, 111 (Ala. Cr. App. 1999)."

*Broadnax v. State*, 825 So. 2d 134, 191 (Ala. Crim. App. 2000).

On appeal, Shanklin argues only that the State's evidence demonstrated that he was not the "triggerman" who killed Michael and shot Ashley. When viewed in a light most favorable to the State, however, the evidence presented at trial established that Shanklin told Tracy Ward, Amber Piper, Isaiah Howze, and Tyrone Dickerson that he shot Michael. Additionally, Joshua Moreland testified that Shanklin told him that Shanklin shot Ashley in the leg. Thus, the evidence was sufficient to establish the intent necessary to sustain the convictions for the capital murder of Michael and for the attempted murder of Ashley. Moreover, although Shanklin correctly argues that evidence was presented at trial that established that he was not the "triggerman," that evidence merely created a conflict in the State's evidence for the jury to resolve.

Accordingly, Shanklin is not entitled to relief on this claim.

136

*Shanklin*, 187 So. 3d at 794–95.

After rejection by the ACCA, Shanklin did not repeat this specific claim in his petition for certiorari in the Alabama Supreme Court. *See* Vol. 14, C. 1–31 (cert. petition). Thus, it is not exhausted because he did not give the "state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate process." *O'Sullivan*, 526 U.S. at 842-45. And, for all of the reasons explained in section IV.A.3.i., *supra*, it is procedurally defaulted from this Court's review, and Shanklin's arguments as to why procedural default should not bar relief are denied.

### G.     Shanklin's claim that prosecutor improperly elicited testimony implying that he had a prior criminal history

Shanklin claims that the prosecution improperly questioned two of its law enforcement witnesses and an informant so as to elicit testimony suggestive that Shanklin had a criminal history.

The prosecution presented Cordova Police Chief Kenneth Bobo to testify about the investigation. Vol. 6 at R. 1022. At one point, he was asked about compiling the photo array shown to Ashley Crumpton. The following exchange occurred:

> A. We have a system, a statewide system that is called LETS. And basically what that is, is it's driver's license photos, Department of Correction photos, any background information whatsoever. It is a real detailed search. I put in the height, description, which you can vary it,

you can put in a weight description and you can vary that. You can put in an age description and vary it. You can put in the race and the sex and you can put in even a location if you want a specific town or specific county or specific state. I put those descriptions into the system and pulled off a minimum of twenty to forty photographs off of the system.

Q. That LETS system that you're talking about, years ago, and I know you haven't been a police officer as long as say Frank Cole or John Softley.

A. That's correct.

Q. They used to have mug books that they kept reams in rings like notebooks with mug shots of different types of people in them, people who had been arrested, their picture and their height and weight and information. Now, it's modern, we don't do that anymore, do we?

A. No.

Q. It's done computerized?

A. That is correct.

[. . .]

Q. Is it your testimony, Chief Bobo, that at the direction of Mr. Cole that he requested that you put together like a mug book to show witnesses; is that correct?

A. That is correct.

Q. And when you did your search to just get some photographs, did you have some parameters for your search?

A. Yes.

Q. And did that include a general height and weight that y'all had earlier gotten from Ms. Ashley Crumpton?

A. Yes.

Q. Did it also include a racial makeup that you got from Ashley Crumpton?

A. Yes.

Q. Did you also include areas of the county within the parameters of your search of Parrish–Cordova area?

A. Yes.

Q. Also did you include in that, people that had a background maybe in doing some situations like this that had been involved in some activities similar to a violent home invasion situation?

A. Yes.

Q. All right. When you put all of those together, there are approximately thirty photographs in there?

A. Yes.

[. . .]

Q. Were those mug shots that you have in State's Exhibit Number 1, were they given to Ashley Crumpton at some sort of office where there was a desk where she could sit down and look through them?

A. Yes, sir.

Vol. 7 at R. 1161–63, 65.

When the prosecutor then offered the photos into evidence, he stated, "Your Honor, at this time the State is going to offer State's Exhibit Number 1, which is the

entire mug shot lineup and then each of the individual photographs that she picked

out, which will be State's 1-D and 1-C, and then the collage, which is 1-A." *Id.* at R.

1167.

Near the end of its case in chief, the prosecution offered Walker County

District Attorney's Investigator John Softley as a witness. Vol. 9 at R. 1507. The

following exchange occurred:

Q. And what community do you live in?

A. Parrish Community.

Q. And how long have you lived down there?

A. Most of my life, forty years, fifty years, basically.

Q. Okay. Do you know Antwain Shanklin?

A. I do.

Q. And do you know him from your community?

A. I do.

Q. Okay. How long have you known Antwain?

A. Probably most of his life. I've known him a long time, fifteen years
maybe, something like that.

*Id.* at R. 1507–08.

The defense lodged no objections to these portions of Chief Bobo's and

Investigator Softley's testimonies.

The prosecution also offered testimony from Joshua Moreland, a trustee at the Walker County Jail who was incarcerated at the same time as Shanklin. Vol. 5 at R. 847. After testifying about the conversations Shanklin had with him, Moreland was asked whether he believed what Shanklin had told him about the crime, as follows:

> Q. Okay. You had been with Antwain enough to get an idea how he acted and what he was like when he was down there in jail. Did you believe him when he told you this?
>
> A. Yeah.
>
> Q. Did he sound pretty serious?
>
> A. Yeah, you hear a lot about him in jail from some of the other people that know him on the street. He's kind of curious, but he's a smaller guy, you know, he's got a pretty good rap around the jail about him on the street being violent.
>
> MR. CAMP: I would object and move to strike. He's testifying to hearsay now.
>
> THE COURT: I'm going to sustain that objection. Motion to strike is granted.

*Id*. at R. 854.

Shanklin exhausted this claim on direct appeal in the state courts. Vol. 12, Tab #R-33, at 55–58; Vol. 14, Tab #R-38, at 20–22. To the ACCA, Shanklin claimed that the trial court had erred by allowing the prosecution to imply that he had a criminal record through the testimony of Chief Bobo, Investigator Softley, and Moreland set

forth above. Vol. 12, Tab #R-33, at 55–58. Specifically, Shanklin found fault with the prosecutor's question to Chief Bobo about including people who had been involved in activities like a violent home invasion in the photo array; references to the array as "mug shots;" Investigator Softley's testimony that he knew Shanklin from the community; and Moreland's testimony that Shanklin had a reputation for violence. *Id*. at 55–56.

The ACCA rejected the claim. The ACCA began by noting that some of these claims were reviewed only for plain error because they had not been objected to at trial, Vol. 13, Tab #R-37, at 784, and then found that any error was harmless. First, as to Chief Bobo, the ACCA wrote:

> Although Shanklin correctly notes that the State asked Chief Bobo if, when preparing the photo lineup, he included "people that had a background maybe in doing some situations like this that had been involved in some activities similar to a violent home invasion situation" (R. 1163), that question did not demonstrate that Shanklin was, in fact, one of the 29 people who were included in the photo lineup that had previously committed a "violent home invasion."

> Additionally, Shanklin correctly asserts that the State referred to the photographs used in the photo lineup as "mug shots." (R. 1161, 1162, 1165, 1167.) Although this Court has not held that it is improper to refer to photographs used in a photo lineup as "mug shots," this Court "has recognized the danger inherent in the use at trial of 'mug shot' . . . photographs." *Carlisle v. State*, 371 So. 2d 975, 978 (Ala. Crim. App. 1979) (citing *Holsclaw v. State*, 364 So. 2d 378 (Ala. Crim. App. 1978)); *see also McNabb v. State*, 887 So. 2d 929, 972–73 (Ala. Crim. App. 2001). The danger of admitting such photographs is in the inference created by their use—that the defendant has a prior criminal

history. *Carlisle v. State*, 371 So. 2d at 978. "Mug shot"–type photographs, however, are admissible "[i]f numbers, dates, and the names of police departments are excised or blocked out . . . so long as they do not imply that the defendant has a prior criminal record." *Carlisle v. State*, 371 So. 2d at 978.

Here, even if the State's reference to the photographs used in the photo lineup as "mug shots" was improper, it does not rise to the level of plain error. At trial, although the State, when questioning Chief Bobo, generally referred to the photographs used in the lineup as "mug shots," Chief Bobo testified that the lineup was generated by using the LETS system, which, he said, included "driver's license photos, Department of Correction photos, any background information whatsoever." (R. 1161.) Additionally, there was no specific reference to Shanklin's photograph as, in fact, being a "mug shot"—as opposed to simply a driver's license photo.[FN32] Furthermore, when published to the jury, the photographs used in the photo lineup had been excised of all criminal history, driving history, "numbers, dates, and the names of police departments"; thus, we find no plain error.

FN 32. Notably, nothing in Shanklin's photograph makes it immediately apparent that it is a "mug shot." In fact, only two photographs used in the lineup—neither of which are Shanklin's—depict an individual wearing an orange prison jumpsuit. Shanklin's photograph is a front-facing picture of Shanklin, which depicts his head and the top of his shoulders and a white collar, on a blue background.

*Shanklin*, 187 So. 3d at 785.

Then, turning to Investigator Softley's testimony, the ACCA again found no

plain error: "Although Shanklin argues that Investigator Softley's testimony implied

that he knew Shanklin 'in his law enforcement capacity,' Investigator Softley's

testimony clearly established that he knew Shanklin from living in the Parrish community—not in his law-enforcement capacity." *Id*. at 786.

Finally, the ACCA considered Moreland's testimony about Shanklin's jailhouse reputation for violence:

> Initially, we recognize that Shanklin objected to Moreland's statement, and Shanklin's objection was sustained and the testimony was stricken from the record. Thus, "there is no adverse ruling from which [Shanklin] can appeal, [and] we . . . review this claim pursuant to the plain error rule." *Melson v. State*, 775 So. 2d 857, 873 (Ala. Crim. App. 1999).

> Even assuming Moreland's statement was improper, we cannot conclude that the statement resulted in error that adversely affected the substantial rights of Shanklin. Although Moreland testified that Shanklin had "a pretty good rap around the jail about him on the street being violent," throughout Shanklin's trial the State presented lawfully admitted evidence demonstrating Shanklin's violent behavior. Specifically, at the time he made the complained-of statement, Moreland had already testified that Shanklin had confessed to him that Shanklin "shot the guy," that "he shot [Ashley]," and that he had said that "he wished he would have killed Kevin" to eliminate a witness. Additionally, the jury heard testimony from Amber Piper that Shanklin threatened to kill her and her child if she told anyone about Shanklin's involvement in the crime. Because there was other lawfully admitted evidence of Shanklin's violent behavior outside jail, we cannot conclude that Moreland's testimony that Shanklin had a reputation for violent behavior was plain error.

*Id*. at 786.

Since the Alabama state courts addressed this claim on the merits, this Court's review is deferential, and to obtain relief Shanklin must demonstrate that the

ACCA's decision, which is the last reasoned state court opinion, *see Wilson*, 138 S. Ct. at 1192, is contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court or based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

Shanklin argues that the ACCA's decision denying relief on this claim both ignored and unreasonably applied Supreme Court law holding that an accused has the right to the presumption of innocence. He cites *Taylor v. Kentucky*, in which the Supreme Court held that "one accused of a crime is entitled to have his guilt or innocence determined solely on the basis of the evidence introduced at trial, and not on grounds of official suspicion, indictment, continued custody, or other circumstances not adduced as proof at trial." 436 U.S. 478, 485 (1978). Shanklin states that courts should not allow evidence of prior crimes or wrongs to show one has a character to act in similar manner, citing *Old Chief v. United States*, 519 U.S. 172, 180-81 (1997).

However, Shanklin has not established that "the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington*, 562 U.S. at 103. Habeas relief is not warranted on this ground.

**H. Shanklin's claim that he was denied his rights to due process, a fair trial, and a reliable sentencing determination under the Sixth, Eighth, and Fourteenth Amendments when the trial court allowed the prosecutor to make improper arguments and references to facts not in evidence**

The Court addressed this claim as part of Shanklin's ineffective assistance of trial counsel claim in section IV.A.3., *supra*.

**I. Shanklin's claim that improper victim-impact testimony was admitted during the guilt phase**

Shanklin argues that his rights were violated because the trial court allowed the prosecution to offer victim-impact testimony during the guilt phase from Ashley Crumpton and Lori Crumpton. Specifically, he objects to: Ashley's testimony about how she and Michael met (Vol. 4 at R. 572); Ashley's testimony about how long she and Michael dated (*Id.* at R. 572–73); Ashley's testimony about her life with Michael (*Id.* at R. 574); Ashley's testimony about their children (*Id.* at R. 573–74); Ashley's testimony that she did not see Michael take his last breath (Vol. 5 at R. 621); Lori's testimony about how long she had known Ashley (*Id.* at R. 668); Lori's testimony about how Ashley and Michael's relationship began (*Id.* at R. 668–69); Lori's testimony about how Ashley and Michael lived with her for a time (*Id.* at R. 669); Lori's testimony about the frequency of her visits (*Id.* at R. 669); and Lori's testimony about the last time she saw Michael alive (*Id.* at R. 673–74). Shanklin also

objects to the admission of five photographs during these witnesses' testimony, which he contends were not necessary to establish any fact.

The context in which these statements were made is helpful in resolving this claim. The prosecution's first witness was Ashley Crumpton, whose testimony began as follows:

Q. Ashley, if you would, tell everybody who you are?

A. My name is Ashley Crumpton. I am Michael Crumpton's wife.

Q. And Ashley, do you still live in the Jasper/Cordova area?

A. No, sir.

Q. And you have moved away; is that right?

A. Yes.

Q. And tell me a little bit about when did you and Michael meet?

A. High school.

Q. How old are you today?

A. Twenty-two (22).

Q. And back in October the 12th of 2009 how old were you then?

A. Twenty (20).

Q. What year did y'all meet in high school?

A. '05.

Q. What high school did y'all go to?

A. Cordova High School.

Q. How long did you know Michael before—did you know Michael before y'all started dating?

A. Uh-huh.

Q. All right. About how old were you when y'all started dating?

A. Fourteen (14).

Q. Eventually—how long was it before you got married?

A. I got married when I was seventeen.

Q. About three years later?

A. Uh-huh.

[. . .]

Q. Now, do you have any kids?

A. I do. Two.

Q. You have two. What are their names?

A. Abby Crumpton and Emma Crumpton.

Q. How old are your children?

A. Now, they are four and two.

Q. Now, back in October 12th, 2009, how old were they then?

A. Abby was about to turn two, and Emma was only eight months

old.

Q. Abby, is she redheaded?

A. Yes, sir.

Q. Little curly headed, redheaded little girl?

A. (Nods in the affirmative)

Q. Okay. Now, when y'all got married, did y'all get your own place to live or did y'all stay with parents or what?

A. When we did get married, we had a trailer. And then shortly after, we lived with Ms. Crumpton, Michael's mother.

Q. You're talking about Michael's mom sitting right here?

A. Yes, sir.

Q. And how long did y'all live with them?

A. I think pretty much after Abby's first birthday and then we got an apartment over there at Cordova.

Vol. 4 at R. 572–74.

Later, when discussing Michael's death, the prosecutor asked Ashley, "And did you get to see Michael take his last breath?" She answered no. *Id.* at R. 621.

Next to testify was Lori Crumpton, Michael's mother. Her testimony also began with information establishing her connection to the victims:

Q. Okay. How long have you known Ashley?

A. Probably since 2005.

Q. How did you meet Ashley?

A. The first time I met Ashley she went to church with us, and her grandfather had—she was living with her grandfather at the time. He had brought her over there to let her go to church with us that morning, and that was the first time I met her.

Q. And did she know Michael?

A. They were just starting to like each other when I first met her.

Q. So, he did invite her to go to church with y'all?

A. Yes, sir.

Q. Did they eventually get married from that?

A Yes, sir.

Q. How long was it from that first time that you met her until they got married, if you remember?

A. They got married October 5th of 2006.

Q. Did they live with you for a while?

A. They did.

Q. When was that?

A. Right after Abby was born. They lived there for about ten months to a year.

Q. And Abby is the oldest child; is that correct?

A. Yes, sir.

Q. I'm sorry, I believe you said they lived with you for about ten months; is that right?

A. Ten months to a year.

Q. And when they moved out, where did they move to?

A. To the apartment.

Q. And how long did they live in the apartments?

A. Right at a year.

Q. Did you go over there frequently and visit?

A. Pretty frequently. I work overnight so, I'm off on Friday and Saturday so, usually on Fridays especially I would go spend some time during the day.

*Id.* at R. 668–69. There was no objection made to the testimony above.

During Ashley's and Lori's testimony, the prosecution offered five photographs into evidence. The defense made a pretrial motion to suppress four photos "of a little girl sleeping in a bed," and the prosecution agreed to show only one of that set. *Id.* at R. 530, 534, 576. The five photographs ultimately admitted included: a picture of Michael and Abby, Vol. 4 at R. 576, 672; another picture of Michael and Abby with Michael's grandparents ("Meemaw" and "Nanna"), taken during Abby's first Halloween in 2008, *id.* at R. 577, 672–73; a picture of Michael and Abby at Michael's last Christmas, *id.* at R. 577, 673; a picture of Abby asleep in her bedroom in the apartment in February 2009 (one of the objected-to

photographs), *id.* at R. 578, 671; and a picture of Michael in his casket, *id.* at R. 579, 674–75.

As Lori identified the subjects and circumstances of the photos, she also spoke about the last time she saw her son:

> Q. Do you remember if you went over to the apartment any the week that this [the murder] occurred, that happened on late Sunday night or early Monday morning, do you remember if you went over to the apartment visiting that week?
>
> A. Yes, sir.
>
> Q. When was that?
>
> A. On Saturday. Well, the last time I don't remember if I had went any before that, but I know on Saturday before this happened on Sunday night, Monday morning.
>
> Q. And was Michael there when you went?
>
> A. Yes, sir.
>
> Q. What did y'all do that day?
>
> A. Earlier that day we had all been at my house. We had had a birthday dinner for him because we were unable to the weekend right after his birthday.
>
> Q. So, y'all were celebrating his birthday?
>
> A. Right. When I was at his apartment, me and my fiancé had went after we got through with dinner, we went to his apartment to watch the Alabama football game with him.

Q. Okay. And how long did you stay over there that day, if you remember?

A. The ballgame was already started when we got there, and we stayed until it was over. I'm not sure how long we were there, but probably at least one to two hours.

Q. Did you watch the rest of the game?

A. Yes, sir.

Q. Who won?

A. Alabama.

Q. Okay. And you didn't go back over Sunday, did you?

A. No, sir.

Q. And when was the next time you saw Michael?

A. In the funeral home.

*Id.* at R. 673–74. There was no objection made to Lori's testimony.

Shanklin exhausted some portions of this claim through the direct appeal process. Vol. 12, Tab #R-33, at 50–52; Vol. 14, Tab #R-38, at 19–20. On direct appeal to the ACCA, Shanklin argued that the trial court erred by admitting the photographs containing Abby, which allegedly served no purpose but to inflame the jury. Vol. 12, Tab #R-33, at 26–29. Shanklin did not raise a claim about the photograph of Michael in his casket. Shanklin also argued that the trial court erred by allowing victim-impact testimony during the guilt phase, citing the testimony of

Ashley and Lori set forth above (except Ashley's testimony that she did not see

Michael take his last breath and Lori's testimony about the last time she saw Michael

alive, which are raised for the first time here). *Id.* at 50–52.

The ACCA first addressed Shanklin's claims about the photographs of Abby,

finding no error in the admission of the photos, writing:

> Shanklin contends that the circuit court erred when it admitted
> allegedly "irrelevant and prejudicial photos" (Shanklin's brief, p. 26);
> specifically, "prejudicial photos of the victim's children" (Shanklin's
> brief, p. 26) [. . .]
>
> The following is well settled:
>
>> "'Generally, photographs are admissible into evidence in a
>> criminal prosecution "if they tend to prove or disprove some
>> disputed or material issue, to illustrate or elucidate some other
>> relevant fact or evidence, or to corroborate or disprove some
>> other evidence offered or to be offered, and their admission is
>> within the sound discretion of the trial judge." *Magwood v. State*,
>> 494 So.2d 124, 141 (Ala. Cr. App. 1985), aff'd, 494 So. 2d 154
>> (Ala. 1986), cert. denied, 479 U.S. 995, 107 S. Ct. 599, 93 L.Ed.2d
>> 599 (1986). [. . . ]
>
> *Sneed v. State*, 1 So. 3d 104, 131–32 (Ala. Crim. App. 2007) (quoting
> *Bankhead v. State*, 585 So. 2d 97, 109 (Ala. Crim. App. 1989)).
>
> 1.    *Photographs of Michael's Children*
>
> Shanklin contends that the circuit court erred when it admitted
> State's Exhibit 8, which includes a total of five photographs: (1) two
> photographs of Michael while he was alive with his daughter; (2) one
> photograph of Michael while he was alive with his "Mee-maw," his
> "Nanna," and his daughter; (3) a photograph of Michael's daughter

asleep in her bedroom in the apartment; and (4) a photograph of Michael in his casket at the funeral home.

Before trial, Shanklin moved to suppress "four photographs," which, he described, as "pictures of a little girl sleeping in a bed." (R. 530.) Shanklin argued that "they are not probative at all," that they "are definitely prejudicial," that they "don't have anything to do with the case," that they "weren't taken . . . at the time of the incident," and that they "are meant to inflame the jury or impassion the jury to prejudice [Shanklin]." (R. 530.)

The State, on the other hand, argued that the pictures were relevant to show where the two children were in the apartment at the time Michael was killed and that they would aid Ashley's testimony "showing where her kids were and why they had been moved." (R. 531.) Additionally, the State argued that the photographs of the children in the bedroom were probative to "show[ ] the bloodthirstiness of these two men and what they did and plus to show the factual basis of where these children were in relation to the shootings." (R. 532.) After explaining how the photographs of the children in the bedroom would aid the testimony at trial, the State agreed to show only one photograph of the children in the bedroom, and it "withdr[e]w the rest." (R. 534.)

At trial, the State introduced only one picture of Michael's daughter sleeping in her bedroom as part of State's Exhibit 8—which, as noted above, included four other photographs, and Shanklin renewed his pretrial objection.

With regard to the photograph of Michael's daughter sleeping in her bed, Ashley testified as follows:

"[Prosecutor]: Now, the last one. Do you recognize that?

"[Ashley]: Yes, I do.

"[Prosecutor]: What is that?

"[Ashley]: [My daughter] asleep in her bedroom in the apartment.

"[Prosecutor]: So, we have seen the diagram earlier during opening statement that had the floor plan, and I asked you about the floor plan a few minutes ago. Is this a picture inside the children's bedroom?

"[Ashley]: Yes, sir.

"[Prosecutor]: And it has a date of February 20, 2009. Do you know as you sit here today whether or not that—

"[Ashley]: That is accurate.

". . . .

"[Prosecutor]: All right. That door there in the background, which door would that be?

"[Ashley]: That would be their closet door.

"[Prosecutor]: Now, in relation to your bedroom, if you're looking at the crib as it was in the apartment, which direction to your left or right would be your bedroom?

"[Ashley]: It would be to the right if you were standing sideways of her bed.

"[Prosecutor]: So, it would be to the right of that photograph as we're looking at the photograph?

"[Ashley]: Uh-huh."

(R. 578–79.) Ashley also testified that the shooting occurred in her bedroom and that when the shooters left the apartment she noticed that her eldest child had been moved from her bed into the crib with her youngest daughter.

Based on the testimony presented at trial, this complained-of photograph was relevant to establish the children's proximity to the shooting as well as to demonstrate where the children were located after the shooting occurred. Moreover, although Shanklin contends that this photograph was used only to inflame the jury, "photographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." *Ex parte Siebert*, 555 So. 2d 780, 784 (Ala. 1989) (citing *Hutto v. State*, 465 So. 2d 1211, 1212 (Ala. Crim. App. 1984)). Accordingly, the circuit court did not err when it admitted this photograph.

With regard to the photographs of Michael while he was alive, both with his daughter and with his "Mee-maw" and "Nanna," Shanklin did not first object to these three specific photographs in the circuit court. As noted above, Shanklin, before trial, moved to suppress four photographs of Michael's children sleeping in their bedroom. Shanklin did not, however, move to suppress any photographs of Michael with his daughter or of Michael with his "Mee-maw" and "Nanna." Additionally, although Shanklin did object to the introduction of State's Exhibit 8, he did so only on the basis of renewing his pretrial objection to the photographs of the children in the bedroom. Thus, we examine this claim for plain error.

"'In *Jolly* [*v. State*, 395 So. 2d 1135 (Ala. Crim. App. 1981)], citing McElroy's Alabama Evidence, this court held:

"""It generally is agreed that the photograph of the victim of the homicide, taken before the alleged murder, is admissible for the purpose of identification. This is usually admitted in connection with the testimony of a witness who saw the alleged deceased at the time of the killing and who is called upon to identify the deceased as the person in the photograph. The foregoing decisions which admit the victim's photograph into evidence for the purpose of identification are applicable even though there exists no dispute over the identity of the deceased. (citing *Luschen*

> *v. State*, 51 Ala. App. 255, 284 So. 2d 282 (1973) (not error
> to introduce "angelic" looking picture of deceased).
>
> . . .
>
> *See Taylor v. State*, 666 So. 2d 36, 66 (Ala. Crim. App.
> 1994) (finding no plain error in the admission during the
> guilt phase of a photograph of the victims in front of a
> Christmas tree). *See also Ferguson v. State*, 814 So. 2d 925
> (Ala. Crim. App. 2000) (finding no plain error in
> admission during the guilt phase of the victims in front of
> their boat because it was relevant to show, among other
> things, that they were alive before the offense)."

*McMillan v. State*, 139 So. 3d 184, 226–27 (Ala. Crim. App. 2010).

> These three photographs, although depicting Michael with his
> daughter and other relatives, were used at trial for Ashley and Lori
> Crumpton to identify Michael. Thus, we cannot conclude that there
> was error, much less plain error, when the circuit court admitted these
> photographs.

*Shanklin*, 187 So. 3d at 770–73 (footnote and some citations omitted).

The ACCA then turned to Shanklin's claim about Ashley and Lori's guilt

phase testimony, finding that while the testimony was not entirely proper, a new trial

was not warranted, writing:

> Shanklin contends that the circuit court erred "by allowing the
> State to introduce prejudicial victim-impact evidence during" the guilt
> phase of his trial. (Shanklin's brief, p. 50.) Specifically, Shanklin asserts
> that, during the guilt-phase proceedings, the circuit court "permitted
> the State to introduce testimony about the effect of Michael
> Crumpton's deaths [sic] on the surviving members of the family"—
> namely, Ashley and Lori. (Shanklin's brief, p. 51.) According to
> Shanklin,

"Ashley Crumpton testified about her and [Michael's] relationship, how they met and how long they dated. (R. 572–73.) She talked at length about their lives together and about her children with the victim. (R. 572–78.) The State also elicited testimony about the victim's funeral. (R. 579–81.) The victim's mother, Lori [Crumpton], also testified about irrelevant matters meant to elicit sympathy from the jury. (R. 667–70.) She also testified about and the State published photos of the victim's children during Christmas and in their Halloween costumes. (R. 672–73.)"

(Shanklin's brief, pp. 51–52.)

Initially, we note that Shanklin did not object to the complained-of testimony of Ashley and Lori; therefore, we review this claim under the plain-error rule.

"'It is well settled that victim-impact statements "are admissible during the guilt phase of a criminal trial only if the statements are relevant to a material issue of the guilt phase. Testimony that has no probative value on any material question of fact or inquiry is inadmissible." *Ex parte Crymes*, 630 So. 2d 125, 126 (Ala. 1993), citing Charles W. Gamble, McElroy's Alabama Evidence, § 21.01 (4th ed. 1991). However, "when, after considering the record as a whole, the reviewing court is convinced that the jury's verdict was based on the overwhelming evidence of guilt and was not based on any prejudice that might have been engendered by the improper victim-impact testimony, the admission of such testimony is harmless error." *Crymes*, 630 So. 2d at 126.'

"*Jackson v. State*, 791 So. 2d 979, 1011 (Ala. Crim. App. 2000)."

*Gissendanner v. State*, 949 So. 2d 956, 965 (Ala. Crim. App. 2006). "[T]he introduction of victim impact evidence during the guilt phase of a capital murder trial can result in reversible error if the record

indicates that it probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law." *Ex parte Rieber*, 663 So. 2d 999, 1006 (Ala. 1995). However, "a judgment of conviction can be upheld if the record conclusively shows that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant." *Id*. at 1005.

Shanklin's claim that Ashley's and Lori's testimony about Michael's funeral was improper victim-impact testimony is without merit. As explained above, Shanklin was indicted for two counts of capital murder and one count of attempted murder. To prove capital murder the State was required to prove that Michael was, in fact, deceased—that element is met by Ashley's and Lori's testimony that they attended Michael's funeral. [FN 29] Consequently, Lori's and Ashley's testimony about attending Michael's funeral was admissible during the guilt phase of Shanklin's trial because it was "relevant to a material issue of the guilt phase."

> FN 29. The State, in its closing argument, mentioned Ashley's and Lori's testimony about attending Michael's funeral as evidence of Michael's being deceased.

Shanklin, however, correctly argues that Ashley's testimony about her and Michael's relationship, how they met, how long they dated, and their children was not "relevant to a material issue of the guilt phase." Likewise, Lori's testimony about how long she had known Ashley, how Ashley and Michael met, when Ashley and Michael got married, and the fact that Ashley and Michael lived with her until their first daughter was born was not "relevant to a material issue of the guilt phase." Consequently, that testimony was inadmissible.

Regardless, after examining the record as a whole, we cannot conclude that their testimony "probably distracted the jury and kept it from performing its duty of determining the guilt or innocence of the defendant based on the admissible evidence and the applicable law," *Ex parte Rieber*, 663 So. 2d at 1006; rather, the record "conclusively shows

that the admission of the victim impact evidence during the guilt phase of the trial did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant." *Id.* at 1005.

Here, Lori's and Ashley's testimony, although inadmissible, was brief background information that did not specifically focus on the effect that Michael's death had on them. When comparing that brief testimony to the overwhelming evidence of Shanklin's participation in this offense we cannot conclude that the admission of that testimony "prejudiced a substantial right of [Shanklin]." *Ex parte Rieber*, 663 So. 2d at 1005.

"It is presumed that jurors do not leave their common sense at the courthouse door. It would elevate form over substance for us to hold, based on the record before us, that [Shanklin] did not receive a fair trial simply because the jurors were told what they probably had already suspected—that [Michael] was not a 'human island,' but a unique individual whose murder had inevitably had a profound impact on her children, spouse, parents, friends, or dependents (paraphrasing a portion of Justice Souter's opinion concurring in the judgment in *Payne v. Tennessee*, 501 U.S. 808, 838, 111 S.Ct. 2597, 2615, 115 L.Ed.2d 720 (1991))."

*Ex parte Rieber*, 663 So. 2d at 1006. Accordingly, Shanklin is not entitled to relief on this claim.

*Shanklin*, 187 So. 3d at 780–82.

When Shanklin petitioned for certiorari in the Alabama Supreme Court, he reiterated his claim that the trial court admitted improper guilt-phase victim impact testimony, Vol. 14, Tab #R-38, at 19–20, but he did not specifically mention the introduction of the photographs. Consequently, Respondent argues that Shanklin's claim about the victim-impact testimony of Ashley and Lori Crumpton has been

exhausted (except Ashley's testimony that she did not see Michael take his last breath and Lori's testimony about the last time she saw Michael alive), while his claim about the admission of the photographs during their testimony has not been exhausted.

On the other hand, Shanklin responds that he sufficiently exhausted the claim about the photographs by sufficiently presenting the claim to the Alabama Supreme Court because the ACCA had considered the photographs in conjunction with the victim impact testimony, which is how he had briefed the issue. But the Eleventh Circuit has held that "an issue is exhausted if 'the reasonable reader would understand [the] claim's *particular legal basis and specific factual foundation*' to be the same as it was presented in state court." *Pope*, 680 F.3d at 1286 (quoting *Kelley*, 377 F.3d at 1344–45) (emphasis added). Thus, the following portions of Shanklin's current claim are not exhausted: Ashley's testimony that she did not see Michael take his last breath; Lori's testimony about the last time she saw Michael alive; and the admission of the five photographs.  For all of the reasons explained in section IV.A.3.i., *supra*, these portions of this claim are procedurally defaulted from this Court's review, and Shanklin's arguments as to why procedural default should not bar relief are denied.

With regard to the portions of this claim that were exhausted (the victim impact evidence), since the Alabama state courts addressed them on the merits, this Court's review is deferential, and to obtain relief Shanklin must demonstrate that the ACCA's decision, which is the last reasoned state court opinion, *see Wilson*, 138 S. Ct. at 1192, is contrary to or an unreasonable application of clearly established federal law as determined by the Supreme Court or based upon an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

Shanklin argues that the ACCA's decision was unreasonable because the victim impact evidence admitted during the first moments of the State's presentation of its case against him was "so unduly prejudicial that it render[ed] the trial fundamentally unfair." *Payne v. Tennessee*, 501 U.S. 808, 825 (1991). The Court is not persuaded. The ACCA correctly held that even though this testimony was irrelevant, it was harmless in the scope of the trial. Here, the witnesses offered minimal information about their relationships with Michael and each other, centering Michael as part of a family. Testimony that Michael once invited Ashley to go to church with him or that Abby had curly red hair may have been irrelevant, but the court correctly found that it "did not specifically focus on the effect that Michael's death had on them." Vol. 13, Tab #R-37, at 782. This is not the "unduly prejudicial" evidence against which the Supreme Court cautioned in *Payne*, 501 U.S.

at 821, but merely background information explaining these witnesses' connection to the deceased. The ACCA correctly found that this testimony was not prejudicial when compared the overwhelming evidence of Shanklin's crimes. An eyewitness and victim, Ashley, testified about his actions that night, and four other individuals similarly testified about incriminating statements he made about his involvement after the fact. The forensic evidence showed that Michael suffocated on his own blood from one of the four shots that hit his back. Any prejudice to Shanklin from these initial statements was de minimis when compared to the strong evidence against him.

Further, assuming that Shanklin had pursued the specific claim about introduction of the photographs through to the Alabama Supreme Court to fully exhaust it, Shanklin would still not be due relief under § 2254(d). The ACCA was not unreasonable in concluding that their admission did not rise to the level of undue prejudice and fundamental unfairness described in *Payne*, *supra*. The state courts' decision was neither contrary to nor an unreasonable application of clearly established federal law, nor was it an unreasonable determination of the facts.

## J.   Shanklin's claim that his death sentence violates the Eighth and Fourteenth Amendments because the system is rooted in racism

Shanklin advances the theory that his death sentence is unconstitutional because "[t]he death penalty in Alabama . . . is rooted in racism," and his sentence

is thus "a product of systemic racism (whether conscious or not) rather than justice." (Doc. 24 at 159.) Shanklin discusses racism in Alabama's history, recounting events dating back to America's colonial period through George Wallace's run for Governor of Alabama in 1962 on a promise of segregation. (*Id.* at 163–70.) Shanklin offers statistics about how historically, Black individuals have made up a much larger percentage of Alabama's executions than white individuals. (*Id.* at 163.) He also cites a study finding that the proportion of death sentences imposed by judicial override is often elevated in election years, and he notes that the Walker County judge that sentenced Shanklin to death in 2012 was up for re-election that year. (*Id.* at 169.)

Shanklin admits that he never presented this claim to the Alabama state courts, neither on direct appeal nor during Rule 32 postconviction proceedings. Thus, for all of the reasons explained in section IV.A.3.*i.*, *supra*, this claim is not exhausted, it is procedurally defaulted from this Court's review, and Shanklin's arguments as to why procedural default should not bar relief are denied. Indeed, Shanklin raised other claims in state court similar to this: on direct appeal he argued that Alabama's method of execution is unconstitutional, Vol. 12, Tab #R-33, at 44–45; and in postconviction proceedings he argued that judicial override violates *Ring v. Arizona*, 536 U.S. 584 (2002), and *Hurst v. Florida*, 577 U.S. 92 (2016) (despite the

Alabama Supreme Court having by then held that *Hurst* has no effect on Alabama's capital sentencing scheme, *Ex parte Bohannon*, 222 So. 3d 525 (Ala. 2016)). Vol. 17, Tab #R-44, at C. 329–36. Shanklin's arguments as to why he was unable to raise this claim in the Alabama state courts are not persuasive.

### K.    Shanklin's claim that his death sentence violates the Eighth Amendment because he is severely mentally ill

Shanklin contends that his execution would be unconstitutional because he was severely mentally ill at the time of his crime.[6] Citing *Atkins v. Virginia*, 536 U.S. 304, 321 (2002), Shanklin states that the Eighth Amendment prohibits the execution of severely mentally ill individuals. In *Atkins*, the Supreme Court held that the Eighth Amendment's ban on excessive and cruel and unusual punishment prohibits the execution of intellectually disabled persons. *Atkins* did not address the severely mentally ill, but Shanklin argues that the Court's reasoning in *Atkins* dictates that sentencing people with severe mental illness to death is nothing more than the purposeless and needless imposition of pain and suffering.

Shanklin raised a claim like this in his Rule 32 petition, arguing that he should not be executed because he is severely mentally ill, intellectually disabled, and young. Vol. 17, Tab #R-44, at C. 295-327. The circuit court dismissed the claim as

---

[6]    Shanklin's amended petition describes him as a "severely mentally ill state prisoner." (Doc. 25-1 at 5.) However, in his reply brief he clarifies that "the crux of this claim is that [he] was severely mentally ill at the time of his crime . . . ." (Doc. 41 at 72.)

insufficiently pleaded and meritless pursuant to Rules 32.3, 32.6(b), and 32.7(d) of the Alabama Rules of Criminal Procedure. Vol. 19, at C. 784–86. The circuit court found that Shanklin did not plead that a mental health professional had ever indicated that he was severely mentally ill. *Id.* at 785. In his Rule 32 petition, Shanklin had cited to the report of Dr. McKeown, who had conducted a pretrial competency evaluation prior to trial. *See* Vol. 1 at C. 40. The circuit court noted, however, that while Dr. McKeown had reported that Shanklin had a history of substance abuse and its side effects, he opined that "there is no indication of a major affective disorder or any characteristics that would be consistent with a thought disturbance." Vol. 19, at C. 785 (quoting Vol. 1 at C. 40-41).

Shanklin did not appeal the circuit court's denial of this claim to the ACCA, so he did not fully exhaust the claim. Thus, for all of the reasons explained in the preceding section, see section IV.A.3.i., *supra*, it is not exhausted, it is procedurally defaulted from this Court's review, and Shanklin's arguments as to why procedural default should not bar relief are denied.

In a further attempt to excuse the procedural default of this claim specifically, Shanklin posits that if the Eighth Amendment categorically bars the execution of the severely mentally ill, procedural default should not bar relief on this claim in his case. He similarly argues that he should be found "actually innocent" of the death penalty,

citing *Sawyer*, 505 U.S. at 336 ("[T]o show 'actual innocence' one must show by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner eligible for the death penalty under the applicable state law.").

However, Shanklin has not met the burden of proving that he is actually innocent of the death penalty because he was severely mentally ill at the time of his crime. Similarly, Shanklin's claim would fail on the merits if this Court were able to consider it *de novo*. The trial court ordered Shanklin to be assessed for his competence to stand trial and his mental state at the time of the offense. Dr. McKeown conducted a forensic evaluation of Mr. Shanklin. Although, as Shanklin emphasizes, Dr. McKeown found that Shanklin functioned in the "low-average" range of intellect, had a history of substance abuse and suicide attempts, reported hearing voices, and had previously taken Elavil, a drug used to treat symptoms of anxiety with depression or schizophrenia with depression, Dr. McKeown ultimately opined, "No information is available that would suggest that the Defendant during the time frame of the index crime lacked the ability to appreciate appropriate and inappropriate behavior." Vol. 1, at C. 36-40. Nor was there any "indication of a severe mental disease or defect and his significant substance abuse use included [sic]

during the time of the alleged event would not provide a basis for a mental state defense." *Id.* at C. 40-41.

Shanklin has failed to show that he is too impaired to be executed or that he cannot understand what he did and why he is on death row. Shanklin's amended petition in this case noted that he apparently had a period of active psychosis in 2021, but by November 8 of that year, he "was no longer psychotic and could rationally communicate with counsel." (Doc. 24 at 27–28.) Shanklin is not due relief on this claim.

L.   **Shanklin's claim that executing him after Alabama's repeal of the judicial override statute violates the Eighth Amendment and contemporary standards of decency**

Shanklin's final claim is that Alabama's repeal of the judicial override statute renders his death sentence unconstitutional. Shanklin's theory is that since Alabama repealed, in 2017, the portion of its capital sentencing scheme that permitted judicial override of jury penalty-phase verdicts, Alabama concluded that judicial overrides are no longer consistent with the standards of decency in Alabama.

Shanklin exhausted this claim during state postconviction review. Vol. 17, Tab #R-44, at C. 365–80; Vol. 21, Tab #R-47, at 62–75; Vol. 24, Tab #R-52, at 79–94. The ACCA, in affirming the circuit court's denial of relief on this claim, wrote the following:

Shanklin argues that his death sentence is unconstitutional because, he says, to execute him following the legislative repeal of judicial overrides would be cruel and unusual punishment and arbitrary.

In rejecting this claim, the circuit court found:

". . . . Shanklin alleges that his death sentence was invalidated by the passage of Senate Bill 16 (2017 Alabama Laws Act 2017-131) on April 11, 2017. Although the law repealed judicial override, by its own terms, it did so only prospectively. Shanklin's sentencing order is dated April 4, 2012, and therefore, as the law does not apply to Shanklin, he has failed to state a claim.

"The plain language of the statute notwithstanding, Shanklin's argument is based upon (if not directly taken from) a brief filed in *State v. Santiago*, 122 A.3d 1 (Conn. 2015). *Santiago* concerned a distinguishable situation. Connecticut abolished the death penalty by legislation with prospective effect, leaving those inmates with preexisting death sentences subject to that punishment. *Id.* at 7-8. The Connecticut Supreme Court held that prospective abolition violated the state's constitutional prohibition against cruel and unusual punishment. *Id.* at 9. But Connecticut's abolition of the death penalty for all offenders was a substantive change in that state's law, quite unlike the procedural change laid out in Senate Bill 16. The death penalty remains constitutional in Alabama—the only difference is that henceforth, the jury's penalty-phase recommendation as to sentence is binding on the trial court.

"Many of Shanklin's arguments are minimally edited from their source brief, and while they are appropriate in the *Santiago* context, they are nonsensical here. For example, Shanklin states:

"It would be both arbitrary and wrong to seek a death sentence based on the date of the crime because the date of the crime provides no fundamental, moral distinction between crimes that can call for death and crimes that

cannot. To allow the State to execute a judicially condemned prisoner after it would be exactly the sort of random or arbitrary imposition of the death penalty that the Eighth Amendment forbids.

"(Am. Pet. 174.) Here, Shanklin deems equal the abolition of all death sentences with the decision to make juries the sentencing authority, which is simply not the case. He pleaded nothing showing how his sentence is unconstitutional, as the crime for which he was sentenced to death remains a death eligible crime.

"Later in this claim, Shanklin argues that an inmate sentenced prior [to] the passage of Senate Bill 16 would violate principles of equal protection and substantive due process (Am. Pet. 175-179.) The first sentence of this sub-claim—'With no legitimate penological purpose, much less a compelling one, the effective-date provision singles out a small group of offenders for the uniquely harsh penalty of death while providing a sentence of life imprisonment without the possibility of release for all other similarly situated offenders.' (Am. Pet. 175)—shows that this is an argument unsuited to the claim before this Court. Shanklin's conclusion that he and all other inmates sentenced to death before Senate Bill 16's passage must now be given life sentences to comport with the requirements of due process is absurd.

"The Court of Criminal Appeals' decisions following the enactment of the Habitual Felony Offender Act, 2000 Ala. Laws 2000-759, are instructive in this matter. That act, like Senate Bill 16, was explicitly prospective in application. In cases such as *Zimmerman v. State*, 838 So. 2d 404, 406 (Ala. Crim. App. 2001), the Court of Criminal Appeals refused to give retroactive effect to the act, explaining, 'Where legislation confers a benefit not previously provided and is effective on a certain date, the apparent inequity results from all such ameliorative legislation and has been held not to deny equal protection.' Moreover, there was no equal protection violation because the act made its provisions only prospectively applicable; in so doing, it created

two classes of persons, and those sentenced before and after its enactment were not, in fact, in like situations. *Id.*

> "Shanklin failed to plead facts stating a claim for relief. Therefore, this claim is meritless and dismissed pursuant to Rule 32.7(d) of the Alabama Rules of Criminal Procedure."

(C. 788-90.)

Here, just as in *Zimmerman*, the circuit court found Shanklin's claim to be without merit. Shanklin's reliance on *Santiago* is inapposite. Senate Bill 16, codified at 2017 Alabama Laws Act 2017-131, was enacted on April 11, 2017, and amended sections 13A-5-45, 13A-5-46, and 13A-5-47, Ala. Code 1975. This act removed the option for judicial sentencing in capital sentencing. There is no question as to the nonretroactivity of the act which, by its terms, stated that it "shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to the effective date of this act." The death penalty remains a legal sentence for those convicted of capital murder in Alabama; the only change is that as of April 11, 2017, the jury's penalty-phase advisory verdicts are now binding. Because Shanklin was charged, tried, and sentenced before the legislation went into effect, it is not a denial of equal protection to sentence Shanklin according to the statute in effect at that time. Shanklin has not demonstrated that the circuit court's findings regarding this claim were erroneous, and he is due no relief.

Vol. 23, Tab #R-50, at 92–95.

Shanklin now argues that the ACCA failed to address the portion of his claim where he argued that by repealing the law allowing judicial overrides in death penalty cases, the Alabama legislature determined that judicial overrides are no longer consistent with the standards of decency in Alabama and serve no valid penological objective. Thus, Shanklin contends that because the ACCA failed to adjudicate the

merits of the precise claim that he presented, 28 U.S.C. § 2254(d) is not applicable and this Court can review the claim *de novo*.

Regardless of whether this Court reviews the claim *de novo* or for reasonableness under § 2254(d), Shanklin's claim fails. Judicial override was removed from Alabama's capital sentencing scheme by Act 2017-131, which was approved on April 11, 2017. Whereas the judge had been the final sentencer after an advisory penalty-phase jury verdict, capital sentencing is now be left totally in the hands of the jury. And of course, the death penalty remains a legal sentence for those convicted of capital murder in Alabama. All along, Alabama juries have been tasked with finding an aggravating circumstance necessary to make defendants death-eligible, and judges have been obligated to consider their advisory penalty-phase verdicts. The only change is that as of April 11, 2017, these advisory verdicts are now binding. Further, the act has only prospective application—it "shall apply to any defendant who is charged with capital murder after the effective date of this act and shall not apply retroactively to any defendant who has previously been convicted of capital murder and sentenced to death prior to the effective date of this act." Ala. Laws Act. 2017-131 § 2. Thus, death-sentenced capital murderers like Shanklin who were sentenced prior to April 2017 are unaffected by the passage of the act. The legislature could have made Act 2017-131 retroactive, but instead, they determined

that the procedural change in the manner in which death sentences will be determined is applicable only prospectively.

In his Rule 32 proceedings, Shanklin relied on *State v. Santiago*, 122 A.3d 1 (Conn. 2015), a Connecticut case. However, the *Santiago* case is inapposite. Connecticut abolished the death penalty on April 25, 2012, by legislation with prospective effect; thus no defendants could be sentenced to death in that state from that point onward, but those inmates who already had death sentences imposed would still be subject to that punishment. *Santiago*, 122 A.3d at 7–8. The Connecticut Supreme Court held that prospective abolition violated Connecticut's constitutional prohibition against cruel and unusual punishment. *See id.* Shanklin tries to stretch *Santiago*'s ruling—that Connecticut's abolition of the death penalty meant that the death sentences imposed on capital murderers sentenced prior to April 2012 served no legitimate penological goal, *Santiago*, 122 A.3d at 56–57—to Alabama's procedural alteration in the manner in which death sentences are imposed. The state courts explicitly rejected the *Santiago* argument and held that Shanklin's death sentence remained constitutional. Vol. 23, Tab #R-50, at 94–95. Indeed, Shanklin has alleged nothing showing how his sentence is unconstitutional. The crime for which he was sentenced to death remains a death-eligible crime after Act 2017-131,

a very different situation from that presented in Connecticut after the prospective abolition of the death penalty. The claim lacks merit.

## V.    CONCLUSION

For all of the reasons set forth herein, Shanklin's petition for writ of habeas corpus is due to be dismissed, or in the alternative denied.

Rule 11(a) of the Rules Governing Section 2254 Cases requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. This Court may issue a certificate of appealability "only if the applicant has a made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). To make such a showing, a "petitioner must demonstrate that reasonable jurist would find the district court's assessment of the constitutional claims debatable and wrong," *Slack v. McDaniel*, 529 U.S. 473, 484 (2000), or that "the issues presented were adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotations omitted). This Court finds Shanklin's claims do not satisfy either standard. Accordingly, a motion for a certificate of appealability is due to be denied.

A separate order in accordance with this opinion will be issued.

**DONE** and **ORDERED** on March 27, 2024.

_____
L. Scott Coogler
United States District Judge

160704